GEORGE A. RILEY (S.B. #118304)
DAVID R. EBERHART (S.B. #195474)
LUANN L. SIMMONS (S.B. #203526)
O'MELVENY & MYERS LLP
Embarcadero Center West
275 Battery Street
San Francisco, California 94111-3305
Telephone: (415) 984-8700
Facsimile: (415) 984-8701

Attorneys for Defendant
Axis Systems, Inc.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| IKOS SYSTEMS, INC., and MASSACHUSETTS INSTITUTE OF TECHNOLOGY,<br><br>Plaintiffs,<br><br>v.<br><br>AXIS SYSTEMS, INC.,<br><br>Defendant. | Case No. C01-21079-JW<br><br>**NOTICE OF MOTION AND MOTION FOR LEAVE TO PRESENT EXPERT TESTIMONY ON CLAIM CONSTRUCTION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing Date: April 22, 2002<br>Time: 9:00 a.m.<br>Place: Courtroom 8<br>Judge: Hon. James Ware |

NOTICE OF MOTION AND MOTION
TO PRESENT EXPERT TESTIMONY
C01-21079-JW

# NOTICE OF MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

NOTICE IS HEREBY GIVEN THAT, on April 22, 2002, at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 8 of the United States District Court for the Northern District of California, San Jose Division, defendant Axis Systems, Inc. ("Axis") will and hereby does move pursuant to Paragraph 9 of the January 15, 2002 Scheduling Order in this action for leave to present the expert testimony of Dr. William H. Mangione-Smith at the Claim Construction Hearing scheduled for May 3, 2002.

This motion is made on the grounds that the testimony and evidence would assist the Court in properly interpreting the claim terms in accordance with the specifications and as they would be understood by one of skill in the relevant art. No prejudice would befall plaintiffs IKOS Systems, Inc. ("IKOS") and Massachusetts Institute of Technology ("MIT"), who have had sufficient notice of Axis's desire to present such testimony and evidence and have deposed Dr. Mangione-Smith concerning his proposed testimony. The motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the concurrently filed Declaration of David R. Eberhart, the other papers on file herein, and such other matters as may be considered at the hearing.

Dated: March 18, 2002

                                        GEORGE A. RILEY
                                        DAVID R. EBERHART
                                        LUANN L. SIMMONS
                                        O'MELVENY & MYERS LLP

                                        By   s/ George A. Riley
                                                      George A. Riley
                                         Attorneys for Defendant
                                         Axis Systems, Inc.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................... 1

II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY ........................... 2

III. LAW AND ARGUMENT ....................................................................................... 5

    A. The Court Would Benefit From Expert Testimony To Ensure that the Claim Terms Are Given The Proper Meanings As Understood By Those Of Skill In The Art. ............................................................................... 5

        1. Construing Claim Terms Consistent With Specific Understandings Of Those Terms In The Art ............................................ 6

        2. Construing Claim Terms Adapted From Prior Art Systems And Other References In A Consistent Manner ............................................. 9

        3. Construing Claim Terms To Avoid Making Claims Invalid ................. 12

    B. Plaintiffs Face No Prejudice From The Granting Of this Motion. .............. 12

IV. CONCLUSION ..................................................................................................... 13

# TABLE OF AUTHORITIES

Page(s)

**CASES**

AFG Industries, Inc. v. Cardinal IG Co.
   239 F.3d 1239 (Fed. Cir. 2001) .................................................................................. 9, 10

Bailey v. Dart Container Corp.,
   157 F. Supp. 2d 110 (D. Mass. 2001) ............................................................................. 5

Charles E. Hill & Assocs. v. Compuserve, Inc.,
   65 F. Supp. 2d 924 (S.D. Ind. 1999) ............................................................................... 5

Data General Corp. v. International Business Machines Corp.,
   93 F. Supp. 2d 89 ............................................................................................................ 5

EMI Group North America, Inc. v. Intel Corp.
   157 F.3d 887 (Fed. Cir. 1988) ..................................................................................... 5, 6

Generation II Orthotics Inc. v. Medical Technology Inc.
   263 F.3d 1356 (Fed. Cir. 2001) ....................................................................................... 6

Hoechst Celanese Corp. v. BP Chem. Ltd.
   78 F.3d 1575 (Fed. Cir. 1996) ......................................................................................... 5

Infigen, Inc. v. Advanced Cell Technology, Inc.
   65 F. Supp. 2d 967 (W.,D. Wis. 1999) .................................................................... 10, 11

Intellicall, Inc. v. Phonometrics, Inc.
   952 F.2d 1389 (Fed. Cir. 1992) ....................................................................................... 5

Pitney Bowes, Inc. v. Hewlett-Packard Co.,
   182 F.3d 1298, 1309 (Fed. Cir. 1999) ............................................................................. 5

Rhine v. Casio,
   183 F.3d 1342 (Fed. Cir. 1999) ..................................................................................... 12

| | |
|---|---|
| 1 | **MEMORANDUM OF POINTS AND AUTHORITIES** |

**I.   INTRODUCTION**

Axis and IKOS manufacture and sell complex products used to test, debug, and verify the design of semiconductor integrated circuits or "chips." Each company's products consist of highly specialized software and hardware modules that control numerous Field Programmable Gate Arrays ("FPGAs"). Customers use the Axis and IKOS products to represent or "model" circuit designs for testing and debugging the designs before manufacturing the chips.

In this action, IKOS and MIT assert that Axis's products infringe three of IKOS's patents – U.S. Patent No. 5,596,742 (the "'742 Patent"), U.S. Patent No. 5,761,484 (the "'484 Patent") and U.S. Patent No. 5,649,176 (the "'176 Patent") (collectively, the "IKOS Patents"). Axis has counterclaimed on grounds of invalidity, unenforceability and non-infringement. Axis has also filed a patent infringement action against IKOS, alleging that IKOS's products infringe one of Axis's patents that relates to the same technology. Axis Systems, Inc. v. IKOS Systems Inc., N.D. Cal. (San Jose Div.), Case No. C01-21079-JW.

A Claim Construction Hearing has been scheduled in this action for May 3, 2002. Paragraph 9 of the Court's January 15, 2002 Scheduling Order requires that a party seeking to present testimony at the Claim Construction Hearing may do so only upon Court order based upon a timely motion. By this motion, Axis seeks leave to present the testimony of Dr. William H. Mangione-Smith at the Claim Construction Hearing. Dr. Mangione-Smith is an expert in the technology covered by these patents, and his testimony would aid the Court in understanding this highly technical subspecialty of computer and electrical engineering. This evidence would also ensure that the Court construes the patent terms consistently with the specifications and as those terms would be understood by one of skill in the art.

No prejudice to plaintiffs would result from the granting of this motion. Axis has provided plaintiffs with sufficient notice of its desire to present expert testimony

at the Claim Construction Hearing, in accordance with the Patent Local Rules. Plaintiffs have also had the opportunity to depose Dr. Mangione-Smith concerning his proposed testimony. That deposition took place on March 11, 2002.

Accordingly, Axis moves the Court for leave to present the expert testimony of Dr. William H. Mangione-Smith at the May 3, 2002 Claim Construction Hearing.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The IKOS Patents concern highly complex computer technology used in the design and debugging of state of the art semiconductor integrated circuits. The technology involves simulating or emulating the behavior of a semiconductor circuit by creating a model of the circuit in an array of FPGAs. The circuit model can then be run and analyzed by the user. The model can also be operated in an environment such as motherboard in which the chip is ultimately destined to function.

Each FPGA in the array has a limited number of pins through which signals may be transmitted into or out of the FPGA. As a result, the FPGA can handle many more signals internally than it can transmit externally to a neighboring FPGA at any one time. The constraint created by the limited number of pins may prevent the user from taking full advantage of the logic available in each of the FPGAs in the array. To overcome this pin limitation constraint, the '742 Patent and the '484 Patent describe the use of "virtual interconnections," involving a highly specific technique for transmitting multiple signals across a single physical pin. Claim 1 of the '742 Patent claims:

> **1.** A reconfigurable electronic system comprising:
> a plurality of reprogrammable logic modules, each logic module having a plurality of pins for communicating signals between logic modules;
> inter-module connections between pins of different logic modules; and
> a configurer to configure each logic module to define a partition of a specified target circuit with interconnections between the partitions of the target circuit being provided through pins and inter-module connections, a partition of the configured target circuit having a number of interconnections to other partitions that exceeds the number of pins on the logic module and the logic module being configured to communicate through virtual interconnections in a time-multiplexed fashion through at least one pin, the inter-module communications including interconnections which extend through intermediate reconfigurable logic modules.

The '484 Patent also relates to "virtual interconnections." The specification for the '484 Patent is almost identical to the specification for the '742 Patent. Claim 17 of the '484 Patent claims:

> **17.** A reconfigurable electronic system comprising:
>
> a plurality of reprogrammable logic modules, each logic module having an array of gates reconfigurable to define a hardware logic circuit and a plurality of pins for communicating signals external to the logic module;
>
> inter-module connections between pins of different logic modules; and
>
> a configurer for automatically configuring the array of gates, each logic module to define a partition of a specified target circuit with communications between the partitions of the target circuit being provided through pins and inter-module connections
>
> a partition of the configured system having a number of inter-module communications to other partitions that exceeds the number of pins on the logic module of the partition and gates of the logic module of the partition being configured as a multiplexer for receiving a plurality of outputs from the configured array of gates and for statically communicating the received outputs through a single pin in a multiplexed, pipelined fashion.

The '176 Patent concerns a different, but related, technique. A modeled circuit often suffers from what are known as "hold time violations," which result when the input to a storage device in the design changes state before the control signal associated with that input arrives at the storage device. The '176 Patent describes a highly specific technique for the "resynthesis" of the modeled circuit to avoid such hold time violations. This technique involves the incorporation of additional timing and control circuitry into the modeled design. Claim 14 of the '176 Patent claims:

> **14.** A method for converting a digital circuit design into a new circuit that is substantially functionally equivalent to the digital circuit design, the digital circuit design and the new circuit being adapted to operate in an environment in response to at least one environmental timing signal and environmental data signals and providing output data signals to the environment, the method comprising:
>
> defining an internal clock signal; and
>
> resynthesizing sequential logic elements in the digital circuit design that are clocked by the environmental timing signal to sequential logic elements in the new circuit that are clocked by the internal clock signal.

There are numerous other claims in these patents using other technical terminology. Given the complexity of the inventions, it would be helpful to have the

testimony of an expert such as Dr. Mangione-Smith to assist in the process of construing the patent terms in accordance with the specifications. Among other things, an expert can explain the meaning of terms that are not well-defined in the specifications. An expert can also explain prior art systems and references in the specifications, which would shed light on the meaning of the terms appearing in the claims. Such evidence can also help ensure that the Court construes the claims in a manner that accords with the specifications and with the understanding of one skilled in the art.

Dr. Mangione-Smith is qualified to testify in this action. Dr. Mangione-Smith holds a doctorate in electrical engineering from the University of Michigan. He has taught electrical engineering at UCLA for the past seven years, and is a tenured member of the UCLA faculty. He has taught, worked and written extensively on the application of programmable logic, primarily in the form of FPGA arrays, to a broad range of computing tasks, and he has also directed student research into such projects. (See William Mangione-Smith Depo. at 8:20 - 28:1 & Ex. I-57 (attached as Exhibit A to the Declaration of David R. Eberhart ("Eberhart Decl.")).)

Plaintiffs have long known of Axis's desire to call Dr. Mangione-Smith as an expert witness at the Claim Construction Hearing. Axis identified Dr. Mangione-Smith as an expert whose testimony would support its claim constructions in its Preliminary Claim Construction Statement And Identification Of Extrinsic Evidence, in accordance with Patent Local Rule 4-2(b). During the negotiations over the claim constructions, Axis's counsel told plaintiffs' counsel that Axis intended to seek leave to call Dr. Mangione-Smith at the Claim Construction Hearing, and the parties agreed to schedule a date for his deposition. When the Joint Claims Construction And Prehearing Statement was subsequently filed, Axis again identified Dr. Mangione-Smith as an expert that Axis proposed to call at the Claim Construction Hearing and provided a summary of his testimony in accordance with Patent Local Rule 4-3. Most recently, on March 11, 2002, plaintiffs' attorneys deposed Dr. Mangione-Smith in this action. The agreed-upon subject matter of the deposition was Dr. Mangione-Smith's proposed testimony at the Claim

Construction Hearing.

## III. LAW AND ARGUMENT

### A. The Court Would Benefit From Expert Testimony To Ensure That The Claim Terms Are Given The Proper Meanings As Understood By Those Of Skill In The Art.

The terms in the patents must be given the meaning a person "experienced in the field of the invention" would understand them to mean. Hoechst Celanese Corp. v. BP Chem. Ltd., 78 F.3d 1575, 1578 (Fed. Cir. 1996); accord Intellicall, Inc. v. Phonometrics, Inc., 952 F.2d 1384, 1387 (Fed. Cir. 1992). Extrinsic evidence, including expert testimony, can aid in ensuring that the interpretation given to technical terms is consistent with the view of one skilled in the art.

As the Federal Circuit has explained, "it is entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309 (Fed. Cir. 1999). This is especially true with respect to the technical terms in patent claims. "Although the patent file may often be sufficient to permit the judge to interpret the technical aspects of the patent properly, consultation of extrinsic evidence is particularly appropriate to ensure that his or her understanding of the technical aspects of the patent is not entirely at variance with the understanding of one skilled in the art." Id.

For this reason, courts frequently rely on expert testimony at claim construction hearings. See, e.g., EMI Group North America, Inc. v. Intel Corp., 157 F.3d 887, 892 (Fed. Cir. 1988) (two day Markman hearing with extensive expert testimony); Bailey v. Dart Container Corp., 157 F. Supp. 2d 110, 113 (D. Mass. 2001) (five day Markman hearing with expert testimony); Data General Corp. v. International Business Machines Corp., 93 F. Supp. 2d 89, 91 (four day Markman hearing with expert testimony); Charles E. Hill & Assocs. v. Compuserve, Inc., 65 F. Supp. 2d 924, 926 (S.D. Ind. 1999) (two-day Markman hearing with expert testimony). Notably, in EMI Group,

the Federal Circuit expressly stated that its determination of the proper construction of the claims terms had "drawn on the record of the Markman hearing and the testimony of the expert witnesses." EMI Group, 157 F.3d at 892.

As demonstrated below, the expert testimony that Axis seeks to offer at the Claim Construction Hearing would ensure that the claim term constructions the Court is tending to from the intrinsic evidence of these highly technical patents were consistent with the meanings given to those terms by those of skill in the art. Such evidence, for example, would provide context and meaning to several broad terms that are not well defined in the patents. Similarly, the evidence would assist the Court in understanding prior art systems and methods that are sources of the techniques described in the claims. The evidence would also help the Court to avoid adopting constructions of the claim terms that would effectively invalidate the claims by making them read on prior art.

### 1. Construing Claim Terms Consistent With Specific Understandings Of Those Terms In The Art.

Several of the patent claims include broad terms that have specific meanings within the context of the art but are not well-defined in the patent specifications. In those instances, the intrinsic evidence alone may be insufficient to determine how the terms should be construed. Having an expert in the art available to provide the necessary context to interpret these claims would properly aid the Court in confirming that its construction of the terms is not at variance with the understanding of one skilled in the art. It is entirely proper for the Court to consider such evidence. See Generation II Orthotics Inc. v. Medical Technology Inc., 263 F.3d 1356, 1367 (Fed. Cir. 2001) (interpreting the term "controlled" as it would be understood by one of skill in the art based on intrinsic evidence and expert testimony of the understanding of the term in the art).

For example, Claim 14 and most of the other claims of the '176 Patent use the terms "environmental timing signal" and "internal clock" to refer to two signals that are used to control the combinational logic in the FPGA arrays. Although these terms may appear simple to understand, they are not. Even the inventors have had difficulty

explaining the precise contours of these terms. For example, Dr. Charles Selvidge, one of the '176 Patent inventors, testified that an "environmental timing signal" and a "virtual clock" or "internal clock" signal could be classified in different ways. (Charles Selvidge Depo. at 71:18-72:13 (Eberhart Decl. Ex. B).)

Dr. Mangione-Smith can provide the needed context to these references to aid in the proper construction of these terms. He will be able to explain that the "environmental timing signal" is a lower frequency signal from the environment in which the modeled circuit will ultimately operate, and that the "internal clock," also called the "virtual clock," is a much higher frequency signal, invisible to the environment, that essentially runs the modeled design. These definitions are entirely consistent with the descriptions of these terms in the specification. See '176 Patent 2:52-65; 3:3-14. Dr. Mangione-Smith's testimony would ensure that the terms are interpreted consistently with the invention as understood by those of skill in the art, and avoid any ambiguity as to the proper understanding of these terms based on the context in which they are used.

Similarly, several claims in the '176 Patent use the term "environment." While this term may seem to have a straightforward meaning to a lay reader, it has a different and much more specific meaning in this highly technical area of electrical and computer engineering. Dr. Mangione-Smith can competently testify that this term is generally understood by those knowledgeable in the art to refer to the system in which a modeled design is intended to operate, which is external to the configurable logic and also external to the host workstation. Dr. Mangione-Smith can also explain how this definition is consistent with the specification. For example, Figure 1 of the '176 Patent, as described in the specification, shows that the host workstation, the configurable logic, and the environment or "target" system are each distinct and non-overlapping. See '176 Patent 4:28-30 & Fig. 1.

Such testimony would also assist the Court in understanding the term "resynthesizing," which is used in Claim 14 of the '176 Patent. This term is not clearly defined in the patent. As Dr. Mangione-Smith can explain, the "resynthesizing" of a

1  modeled circuit would be understood by one of skill in the art to follow from a prior
2  "synthesizing" and analysis of the circuit. That understanding is consistent with the '176
3  Patent specification, which shows that the resynthesis takes place only after the
4  synthesized circuit has first undergone the several analysis steps described as transition
5  analysis, value analysis and sampling analysis. See '176 Patent 11:66-13:25 & Fig. 6. Dr.
6  Mangione-Smith would also be able to explain the meaning of each of these analysis steps
7  preceding the resynthesizing step, which would aid in the Court's understanding of this
8  complex technique.

9  Claim 1 of the '742 Patent and Claim 17 of the '484 Patent use the terms
10 "communications" and "communicating." These terms, which are not defined in the
11 specifications, have specific meaning in this art. Dr. Mangione-Smith would be able to
12 explain that the term "communicate," as understood by one skilled in the art, refers to the
13 meaningful transmission of information. This is consistent with the testimony of one of
14 the inventors, who defined communicate as the transfer of "knowledge." (Anant Agarwal
15 Depo. at 47:5-8 (Eberhart Decl. Ex. C).) Given the lack of any clear definition in the
16 patent specifications, the testimony of an expert such as Dr. Mangione-Smith will be
17 extremely helpful to ensure that such terms are construed as they would be understood by
18 one of skill in the art.

19 Several of the claims in the '742 Patent and the '484 Patent use the term
20 "time-multiplexed." The term "multiplex" has a highly specific definition as that term is
21 used in the specifications for these patents. See '742 Patent at 5:14-25, 5:36-44; '484
22 Patent at 5:40-51, 5:62-6:3. The term "time-multiplexed," however, is not well defined in
23 the specifications. Dr. Anant Agarwal, one of the inventors on the '742 Patent and the
24 '484 Patent, testified that the use of a simple multiplexer "maybe" would constitute "time-
25 multiplexing." (Agarwal Depo. 53:12-21(Eberhart Decl. Ex. C).) Dr. Mangione-Smith
26 would be able to explain how this term is generally understood in this field to refer to the
27 serial transmission of signals over a shared wire wherein each signal is assigned a time
28 slot that repeats over time. That understanding is consistent with the descriptions of the

inventions in the '742 Patent and the '484 Patent.

### 2. Construing Claim Terms Adapted From Prior Art Systems And Other References In A Consistent Manner.

The patent specifications identify techniques adopted from prior art systems that are referred to, but not described in any detail, in the specifications. Expert testimony would be useful to explain these prior art systems and provide meaning and context to the claim terms describing these techniques. The consideration of such expert testimony to explain how a technique is understood by those skilled in the art is entirely appropriate. See AFG Industries, Inc. v. Cardinal IG Co., 239 F.3d 1239 (Fed. Cir. 2001).

In AFG Industries, the Federal Circuit relied on the testimony of one skilled in the relevant art to determine whether the term "layer" in a patent claim for a multilayer glass window coating should be construed to encompass very thin "interlayers" or "barrier layers" applied between the main layers of the glass coating. The testimony centered on the techniques used in the art for the application of coating layers and barrier layers onto glass. Based on that testimony and consistent intrinsic evidence, the Federal Circuit determined that a barrier layer was not a "layer" as used in the patent claim, and vacated the district court's decision. Id. at 1249. Here, Dr. Mangione's testimony concerning the prior art systems referred to in the IKOS Patents would similarly demonstrate, in a manner consistent with the specifications, how one of skill in the art would understand the terms used in the claims of the IKOS Patents.

For example, an understanding of static communications is essential to interpreting every claim of the '742 Patent and the '484 Patent. The above-quoted Claim 1 of the '742 Patent, and many other claims in that patent and the '484 Patent, use the term "virtual interconnections." "Virtual interconnections," according to the patent specifications, are established "via a pipelined, statically routed communication network." See '742 Patent 1:43-52; '484 Patent 1:42-51. Similarly, Claim 17 of the '484 Patent uses the term "statically communicating." In order to construe these claim terms, it is necessary to understand statically routed communication networks.

1  The specifications state that statically routed communication networks were previously in multiprocessor environments, systolic FPGA arrays and the VLSS system. Id. Some of these prior art references are cited in the specifications, such as an article describing the VLSS system. Other systems, such as the prior art systolic FPGA array system known as "Splash," were cited by the inventors in articles describing their invention, though not in the patents. Still other systems using statically routed communications that were known to the inventors and others of skill in the art include parallel processor systems such as "iWarp" and "NuMesh." The specifications contain no detail concerning any of these prior art systems, however.

Dr. Mangione would be able to explain the meaning of static communications and the use of statically routed networks in these prior art systems. He would competently testify that the prior art statically routed networks referred to in the '742 Patent and '484 Patent specifications used a communication technique in which data movements repeat in a pre-determined, predictable and periodic fashion. That understanding, which is confirmed by documentary evidence describing those systems, is consistent with the description of this technique in the patent specifications. See '742 Patent 1:43-46, 5:19-21, 5:22-27; '484 Patent 1:42-45, 5:45-47, 5:48-53. This type of evidence would be extremely helpful in construing claim terms including "virtual interconnections" and "statically communicating," and in ensuring that those constructions are consistent with the meanings that would be given to those terms by those of skill in the art. This is a proper area for the Court to hear expert testimony. AFG Industries, 239 F.3d at 1239.

Moreover, the inventors have described their invention in several articles and other publications. The descriptions in these publications, which were available to those of skill in the art, remove any ambiguity as to the meaning of the terms used in the claims, as Dr. Mangione-Smith can confirm. See Infigen, Inc. v. Advanced Cell Technology, Inc., 65 F. Supp. 2d 967, 974-75 (W.D. Wis. 1999) (any doubt over the proper interpretation of the term "oocyte" removed by reference to scientific papers

1 authored by one of the inventors and others).

2 For example, the term "virtual interconnections," which appears repeatedly
3 in the claims of the '742 Patent and the '484 Patent, was never used in the art prior to its
4 use by these inventors and their colleagues. In fact, this term, and its equivalent, "virtual
5 wires," were coined by the inventors.[1] In numerous papers describing the "virtual
6 interconnections" or "virtual wires" technique, the inventors describe the technique to
7 involve the static communication of synchronous logical signals between logic modules in
8 a multiplexed, pipelined fashion, wherein the transmission of each logical signal is
9 scheduled for a specific clock cycle. This description is consistent with the meaning
10 given to this term in the specifications. See '742 Patent 1:43-51, 4:52-59 & Fig. 3, 5:9-10,
11 5:19-21, 5:22-35, 5:36-40; '484 Patent 1:42-62, 5:7-14 & Fig. 3, 5:35-36, 5:45-47, 5:48-
12 61, 5:62-66.

13 The terms "multiplexed" and "pipelined," which are also used in Claim 17
14 of the '484 Patent, have specific meanings in the context of these patents. As stated in the
15 specifications: "Pipelining refers to signal streams in a particular phase and multiplexing
16 refers to signals across phases." See '742 Patent 4:50-52; '484 Patent 5:5-7. Dr.
17 Mangione-Smith will be able to explain what this statement means to one of skill in the
18 art, in part based on the consistent descriptions of these techniques in articles and theses
19 authored by the inventors and others. Those skilled in the art were aware of the inventors'
20 consistent use of this terms from 1993, when the inventors published their first paper
21 describing the virtual wires technique, as Dr. Mangione-Smith can confirm. This
22 evidence would remove any ambiguity as to the proper interpretation of the terms "virtual
23 interconnections," "multiplexed" and "pipelined." See Infigen, 65 F. Supp. 2d at 974-75.

---

[1] In the patent applications leading to the issuance of the '742 Patent and the '484 Patent, the inventors originally used the term "virtual wires," but that term was replaced with "virtual interconnections" solely to respect MIT's trademark in the term "VIRTUALWIRE." See 9/18/96 Amendment After Allowance ('742 Patent Prosecution History); 10/10/96 Preliminary Amendment ('484 Patent Prosecution History).

### 3. Construing Claim Terms To Avoid Making Claims Invalid.

Plaintiffs have advanced very broad interpretations of many of the terms in the patent claims. Many claims would be rendered invalid if these broad interpretations were adopted, given the state of the prior art at the time of the invention. Where possible, however, claim terms should be interpreted to avoiding making the claims invalid. Rhine v. Casio, 183 F.3d 1342, 1345 (Fed. Cir. 1999). Dr. Mangione-Smith's testimony would demonstrate the scope of the prior art, which would aid the Court in construing the terms in a manner that is consistent with the specification and does not invalidate the claims.

For example, Plaintiffs contend that the term "virtual interconnections," which is used in many claims in the '742 Patent and the '484 Patent, should be construed to mean "a logical electrical connection implemented by sharing an inter-module connection with other logical electrical connections." See Joint Claims Construction And Prehearing Statement. This broad construction, which goes well beyond the description in the specification, would make the "virtual interconnections" technique read on prior art systems such as "Splash." The Splash system, which shared intermodule communications among logical connections in an FPGA array, existed well before the inventors came up with their virtual interconnections or virtual wires technique, as Dr. Mangione-Smith can confirm. Plaintiffs' unduly broad construction of the term "virtual interconnections" would effectively invalidate the patent claims containing this term by making them read on prior art systems such as Splash. It is entirely proper for the Court to consider the testimony of Dr. Mangione-Smith and other evidence to avoid, as is possible here, such a result. See Rhine, 183 F.3d at 1345.

### B. Plaintiffs Face No Prejudice From The Granting Of This Motion.

No prejudice to plaintiffs would result from granting Axis's request to present expert testimony at the Claim Construction Hearing. Plaintiffs have had sufficient notice of Axis's desire to present such evidence and testimony, and an opportunity to review such evidence and depose Dr. Mangione-Smith.

1  Axis identified Dr. Mangione-Smith as an expert whose testimony would
2  support Axis's claim constructions in its Preliminary Claim Construction Statement And
3  Identification Of Extrinsic Evidence, in accordance with Patent Local Rule 4-2(b). Axis
4  also identified Dr. Mangione-Smith during the parties' negotiations over the claim
5  constructions, and Axis agreed to schedule a date for a deposition at that time. When the
6  Joint Claims Construction And Prehearing Statement was later filed, Axis again identified
7  Dr. Mangione-Smith as an expert that Axis proposed to call at the Claim Construction
8  Hearing, in accordance with Patent Local Rule 4-3.
9  Most recently, plaintiffs were given the opportunity to depose Dr.
10 Mangione-Smith. As agreed by the parties, the subject matter of that deposition
11 concerned the testimony that Axis proposes the Court hear at the Claim Construction
12 Hearing. That deposition took place on March 11, 2002.
13 In light of the above, there can be no prejudice to plaintiffs in granting this
14 motion.

## IV. CONCLUSION

16 For the foregoing reasons, Axis requests leave to present the testimony of
17 Dr. William H. Mangione-Smith at the May 3, 2002 Claim Construction Hearing in this
18 action.

20 Dated: March 18, 2002

GEORGE A. RILEY
DAVID R. EBERHART
LUANN L. SIMMONS
O'MELVENY & MYERS LLP


By  s/ George A. Riley
    George A. Riley
Attorneys for Defendant
Axis Systems, Inc.

SF1:461088.1