Edward V. Anderson (SBN 83148)
Edward C. Kwok (SBN 144302)
Georgia K. Van Zanten (SBN 116869)
Matthew J. Brigham (SBN 191428)
Julia S. Ferguson (SBN 216102)
SKJERVEN MORRILL MACPHERSON LLP
25 Metro Drive, Suite 700
San Jose, California 95110
Phone:  (408) 453-9200
Facsimile:  (408) 453-7979

David A.York (SBN 89942)
James L. Day Jr. (SBN 197158)
LAHAM & WATKINS
135 Commonwealth Drive
Menlo Park, CA  94025
Telephone:  (650) 329-4600
Facsimile:  (650) 463-2600

Attorneys for Plaintiffs
IKOS SYSTEMS, INC. and M.I.T.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IKOS SYSTEMS, INC., a Delaware Corporation, and MASSACHUSETTS INSTITUTE OF TECHNOLOGY, a Massachusetts Corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>AXIS SYSTEMS, INC., a Delaware Corporation,<br><br>Defendant. | Case No.: 01-21079 JW<br><br>**PLAINTIFFS IKOS SYSTEMS, INC. AND MASSACHUSETTS INSTITUTE OF TECHNOLOGY, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**<br><br>**Date:  May 3, 2002**<br>**Time:  8:00 a.m. – 12:00 p.m.**<br>**Place:  Courtroom No. 8** |

## <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION................................................................................................1

A.     Technology Background ...........................................................................2

B.     Patents-in-Suit ...........................................................................................5

       1.     U.S. PATENT NOS. 5,596,742 AND 5,761,484.........................5

       2.     U.S. PATENT NO. 5,649,176 ...................................................7

II.    ARGUMENT.....................................................................................................8

A.     Legal Principles Governing Claim Construction .....................................8

       1.     The Primary Source for Claim Construction is the Intrinsic Record ...........8

       2.     The Scope of the Claim is not Limited by the Specification........................9

       3.     Extrinsic Evidence Cannot Alter the Plain Meaning of the Claims ...........10

B.     Plaintiffs' Proposed Constructions .......................................................10

       1.     U.S. PATENT NOS. 5,596,742 AND 5,761,484.......................11

              a.     communicating, communicate, communication............................11

              b.     communication path .......................................................12

              c.     configurer .....................................................................12

              d.     intermodule/interpartition dependencies...........................13

              e.     multiplexed .................................................................13

              f.     multiplexer...................................................................14

              g.     phase ..........................................................................14

              h.     pipelined .....................................................................14

              i.     static virtual interconnection........................................15

              j.     statically communicating...............................................17

              k.     system clock period .....................................................17

              l.     time-multiplexed...........................................................17

              m.     virtual interconnection..................................................18

       2.     U.S. PATENT NO. 5,649,176.....................................................19

              a.     buses ...........................................................................19

              b.     configuring the logic system.........................................19

              c.     control signal ..............................................................20

              d.     controller/controller means..........................................20

              e.     environment, environmental.........................................21

              f.     environmental timing signal.........................................22

              g.     internal clock ..............................................................22

              h.     resynthesizing ..............................................................22

1

## TABLE OF CONTENTS (Cont)

2

**Page**

       i.      sampled/sampling ........................................................................23

       j.      synchronize/synchronizer ..............................................................23

III.      CONCLUSION ..................................................................................................24

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **TABLE OF AUTHORITIES**

2

### **FEDERAL CASES**

3   Bell Communications Research v. Vitalink Communications Corp.,
      55 F.3d 615 (Fed. Cir. 1995) ................................................................................ 8

4

   Bell & Howell Document Mgmnt. Prods. Co. v. Altek System,
5      132 F.3d 701 (Fed. Cir 1997) ............................................................................. 10

6   Digital Biometrics, Inc. v. Identix, Inc.,
      149 F.3d 1335 (Fed. Cir. 1998) ........................................................................... 8

7

   Dow Chemical Co. v. Sumitomo Chemical Co. Ltd.,
8      257 F.3d 1364 (Fed. Cir. 2001) ........................................................................... 9

9   Enercon GMBH v. Int'l. Trade Comm'n,
      151 F.3d 1376 (Fed. Cir. 1998) ......................................................................... 10

10

   Interactive Gift Express, Inc. v. Compuserve Inc.,
11      256 F.3d 1323 (Fed. Cir. 2001) ........................................................................... 9

12   Karlin Tech. v. Surgical Dynamics, Inc.,
      177 F.3d 968 (Fed. Cir. 1999) ..................................................................... 10, 21

13

   Key Pharm. v. Hercon Labs. Corp.,
14      161 F.3d 709 (Fed. Cir. 1999) ........................................................................... 10

15   Markman v. Westview Instruments,
      52 F.3d 967 (Fed. Cir.  1995), aff'd, 517 U.S. 370 (1996) ................................. 8

16

   SRI Int'l, Inc. v. Matushita Elec. Corp. of Am.,
17      775 F.2d 1107 (Fed. Cir. 1985) ......................................................................... 10

18   Sjolund v. Musland,
      847 F.2d 1573 (Fed. Cir. 1988) ......................................................................... 10

19

   Stevenson v. Int'l. Trade Comm'n,
20      612 F.2d 546 (CCPA 1979) ............................................................................... 21

21   Thermalloy, Inc. v. Aavid Eng'g, Inc.,
      121 F.3d 691 (Fed. Cir. 1997) ............................................................................. 8

22

   Vitronics Corp. v. Conceptronic, Inc.,
23      90 F.3d 1576 (Fed. Cir. 1996) ............................................................................. 8

24   Wiener v. NEC Elecs., Inc.,
      102 F.3d 534 (Fed. Cir. 1996) ............................................................................. 9

25

26

27

28

**FEDERAL STATUTES**

35 U.S.C. § 101 ........................................................................................................... 6

35 U.S.C. § 112, ¶ 2 .................................................................................................... 9

35 U.S.C. § 112, ¶ 1 .................................................................................................... 9

# I.  INTRODUCTION

In the early 1990s, in a laboratory at the Massachusetts Institute of Technology, two graduate students, Jonathan Babb and Russell Tessier, along with their supervisor, Professor Anant Agarwal, conceived of a significant advance in the field of Electronic Design Automation ("EDA") – a VirtualWires™ system.  Aspects of this system were immediately patented, disclosed to the public at conferences and in papers, and served as the foundation for a new company – Virtual Machine Works ("VMW").  Great efforts were taken to commercialize their VirtualWires™ system, which led to other innovations such as the patented "timing resynthesis" by VMW employees Charles Selvidge and Matthew Dahl.  However, after VMW and Plaintiff IKOS Systems (which acquired VMW in 1996) expended time and money to innovate and commercialize a product, the technological foundation those pioneers had built was misappropriated without recognition or compensation by a late entry into the market.

That newcomer, Defendant Axis Systems, filed its first patent application shortly after its corporate founding in 1997.  This 95-page application, which eventually issued as U.S. Patent No. 6,009,256 ("the '256 Patent"), is useful because it presumably was to serve as the foundation for the company's technology.  Notably, in this application the patented "SEmulation system" uses time-division multiplexing circuits to avoid pin limitations.  Brigham Decl.[1], Exh. E at 28:47-30:54, Figs. 9(A)-9(C).  As will be explained below, this is one of the core components of Plaintiffs' VirtualWires™ system and the subject of two of the patents-in-suit.  Even though the '256 Patent was filed four months after the first VirtualWires™ patent was issued, and over *four years* after the inventors of the VirtualWires™ system disclosed their ideas in a widely cited article, neither a reference to the individuals, their company, nor their numerous publications appear.  Axis similarly failed to acknowledge VMW's "timing resynthesis" patent, even though the '256 Patent claims and discusses concepts previously disclosed by those VMW inventors.

Axis has decided to treat these claim construction proceedings as its first attempt to explain away this disregard of its predecessors by advocating improper interpretations of the claim elements at issue.  Rather than construing the terms properly - in light of the claims themselves,

---

[1] Declaration of Matthew J. Brigham In Support Of Plaintiffs' Opening Claim Construction Brief.

1    the specifications, and the prosecution histories – Axis seeks to read unnecessary limitations into

2    unambiguous claim terms.  Axis impermissibly relies on preferred embodiments and seeks to

3    introduce numerous *other* sources of information such as subsequent articles and deposition

4    testimony which are irrelevant given the clarity of the intrinsic sources.  Axis focuses on the body

5    of work concerning the VirtualWires™ system as a whole, which was published or developed

6    after the filing of the patents-in-suit, rather than focusing on the specific patent claims.  As will be

7    shown below, construing the claims of the patents-in-suit in this manner is improper.  The claimed

8    inventions should be appreciated for the great advance they were at the time, not narrowed at the

9    request of an infringer.

10   **A.       Technology Background**

11        As will be explained in more detail at the Tutorial, the semiconductor industry is

12   characterized by intense competition and dramatic development in technology over time.  As a

13   result, chip designers are continually trying to introduce products to the market as soon as possible

14   that take advantage of recent advances.  IKOS is in the business of helping chip designers achieve

15   this goal by providing tools to test chips efficiently before they are manufactured.  This is

16   generally referred to as Electronic Design Automation (EDA).

17        EDA vendors sell computer hardware and software tools that are used by engineers

18   designing integrated circuits (ICs or "chips").  The process of designing chips is very much a "top

19   down" process.  The engineers start with relatively abstract parameters describing the functionality

20   of the chip.  They then move through a logical description of the chip, down into a schematic of

21   the electronic design which indicates the placement of the required transistors and the routing of

22   all the "wires" between the transistors.  The result is a description that can be transferred to the

23   chip manufacturer to produce the chip in silicon.

24        When designing chips, one of the earliest steps in the process involves writing down the

25   functional definitions ("logic") for the chip in a Hardware Description Language (HDL).

26   Examples of HDLs are VHDL (Very High Speed Integrated Circuit HDL) and Verilog.  Before

27   going on to the next step in the design process, the engineers need to be able to test or verify that

28   the logic in the HDL is correct.  As with any large software program, there are inevitable bugs.  It

1    is significantly cheaper to catch those bugs early in the design cycle.

2           The verification process is typically iterative.  An initial HDL description is written,

3    verification is performed, problems are identified, the description is edited, and verification is

4    done again.  This process is repeated until the circuit performs correctly.  Clearly, faster

5    verification will allow more iteration and can reveal more bugs in a shorter time period.

6           To verify the logical designs, there are a range of products available from companies like

7    IKOS to assist engineers: namely simulators, hardware accelerated simulators, and emulators.

8    Each of these products performs the same basic function of verifying the design, but the

9    verification is accomplished in slightly different ways.

10          For the most part, a simulator is software running on a microprocessor that runs the HDL

11   program to check for any bugs.  While this is generally the least expensive solution and works

12   well for small designs, simulators tend to be too slow for the more complex chips.  One way

13   around the speed deficiency of a simulator is to run some of the HDL on special-purpose hardware

14   in conjunction with the software.  This is called hardware-acceleration.  The portion of the HDL

15   that is running on the hardware will run much faster and thereby accelerate the simulation process.

16   Further along the spectrum are emulators, in which most or all of the HDL is run on the hardware.

17   In 1993, when two of the IKOS patents-in-suit were filed, logic emulators were capable of

18   emulating complex logic designs at clock speeds four to six orders of magnitude faster than even

19   an accelerated software simulator.

20          The core building blocks of the hardware for emulators and hardware-accelerators are

21   programmable logic chips, most commonly Field Programmable Gate Arrays (FPGAs) such as

22   those made by companies like Xilinx and Altera.  As a brief background, an FPGA is composed of

23   a number of configurable logic elements, which are interconnected together, and can communicate

24   signals to the outside world through physical pins.  An FPGA could be viewed as the electrical

25   equivalent of a chameleon; it can be programmed to mimic functioning of one type of electrical

26   circuit design at one point and then be reprogrammed to mimic another electrical circuit at another

27   time.

28          For purposes of this case, multiple FPGAs can be connected together to form a large

programmable system (or multi-FPGA system) which appears as a single, giant FPGA.  These

multi-FPGA systems can allow emulation of much larger designs than could be emulated on a

single FPGA.  Logic emulators are thus able to act as a surrogate for the chip before the chip's

fabrication is complete.  Some emulators actually have what is called "in circuit" capabilities.  For

example, if a user were designing a graphics chip, a cable could be run from the emulator system

(which contains the design of the graphics chip in multiple FPGAs) into the product that the chip

is ultimately destined for (such as a PC or video game system).  This enables the chip designer to

see how the chip design will function in the intended end-result product.

In order to verify the design of a chip using a multi-FPGA system, the large chip design is

partitioned into smaller pieces.  Each of these pieces are then implemented or "placed" in an

FPGA.  The routing of signals between the multiple FPGAs is then determined.  The result is

multiple FPGAs connected together through an interconnection network, each FPGA containing a

portion of the design.  As expected, this method is heavily dependent on the connections and

communication among the various FPGAs.  For example, since pins on the FPGA are used to

communicate signals between FPGAs, in traditional systems the size of the partition that can be

placed in a given FPGA is limited by the number of pins on the FPGA.  So, if an FPGA had six

pins, the size of the partition was limited to one that only needed to communicate six signals to

other FPGAs.  This "pin limitation" problem results in a great under-utilization of the logic

contained within the FPGAs because the pin limits would be reached before the logic capacity of

the FPGA was reached.  The patents-in-suit relate to removing these capacity constraints in

hardware-accelerated and emulation systems.

In short, individuals from M.I.T. and VMW (which was later acquired by IKOS)

developed and patented aspects of a new technology called VirtualWires™.  The VirtualWires™

technology is fundamental to current multi-FPGA systems because it enables the efficient

combining of multiple FPGAs for use as a single programmable system by overcoming physical

pin limitations that plague traditional multi-FPGA systems.  Simply put, the multiple "logical"

signals (signals from logic elements) are multiplexed such that they can share a common pin

without degrading the performance of the multi-FPGA system.  In addition, VMW developed and

1   patented a technology to allow an FPGA-implemented digital circuit to have a uniform timing

2   discipline using a circuit resynthesis procedure.  This uniform timing discipline helped alleviate

3   timing problems in the multi-FPGA system.  The details of each of the patents-in-suit is described

4   below.

5   **B.     Patents-in-Suit**

6       *1.     U.S. PATENT NOS. 5,596,742 AND 5,761,484*

7       U.S. Patent Nos. 5,596,742 ("the '742 Patent") and 5,761,484 ("the '484 Patent") are both

8   titled  "Virtual Interconnections for Reconfigurable Logic Systems."  Brigham Decl., Exhs. A and

9   B.  In general, these patents provide, in a reconfigurable logic system, a method to overcome

10  device pin limitations using "virtual interconnections."  Virtual interconnections overcome pin

11  limitations by multiplexing multiple logical signals such that they can be communicated through a

12  number of pins (which are less than the number of logical signals) by dividing the use of the pin(s)

13  based on time.

14      Figures 1 and 2 below help illustrate this principle:



15
16
17
18
19
20

21      **Figure 1:  Prior Art Interconnections          Figure 2:  Virtual Interconnections**

22  Figure 1 shows prior art interconnections which require six physical wires to communicate six

23  logical outputs from FPGA #1 to FPGA #2.  As seen in Figure 2, by using virtual

24  interconnections, these six logical signals can be sent through one physical wire by multiplexing

25  the signals ("Mux" is a shorthand way to refer to a "multiplexer").  Naturally, using $1/6^{th}$ the

26  number of pins to communicate the same number of logical outputs decreases the chance that the

27  pin limitations of the FPGAs will be reached.

28      A copy of the prosecution history of the '742 Patent is included as Exhibit H to the

1   Brigham Declaration.[2]   To summarize, the '742 patent was filed on April 2, 1993 by Anant

2   Agarwal, Jonathan Babb, and Russell Tessier and assigned to the Massachusetts Institute of

3   Technology.  Twenty-four claims were originally presented.  A Preliminary Amendment, filed in

4   May 1994, canceled claims 13, 17 and 23, amended claims 1-12, 14-16, 19, 21 and 22, and added

5   claims 25-52.  An Office Action, mailed in June 1996, allowed claims 1-9, 15-16, 19-22, 25-41,

6   and 43-52, and rejected claims 10-12, 14, 18, 24 and 42.  In response, in July 1996, Applicants

7   canceled the rejected claims.  Thus, claims 1-9, 15-16, 17-22, 25-41, and 43-52 were issued in the

8   '742 Patent as claims 1-42 on January 21, 1997.  Claims 1, 27, 32 and 34 are the independent

9   claims of the '742 Patent currently being asserted by Plaintiffs and claims 2-15, 20, 22, 25, 26, 29,

10  30, 33, and 35-42 are the asserted dependant claims.

11          On April 1, 1994, a PCT application was filed claiming priority to the '742 Patent

12  application.  After the normal PCT process, the application re-entered the United States Patent

13  Office, and eventually issued as the '484 Patent.  As a result, the specifications of the '484 and

14  '742 Patents are nearly identical and share many of the same claim terms.

15          A copy of the prosecution history for the '484 Patent is included as Exhibit I to the

16  Brigham Declaration.  To summarize, claims 1 through 20 were initially filed and rejected by the

17  examiner under 35 U.S.C. § 101 as claiming the same invention as that claimed in the '742 Patent.

18  This is referred to as a "statutory double patenting rejection".  Remaining claims 21 through 39

19  were rejected under the judicially created doctrine of "obviousness-type double patenting" as

20  being unpatentable over claims of the '742 Patent.  Pursuant to patent prosecution practice, the

21  applicants were able to overcome the rejection of claims 21 through 39 by filing a "terminal

22  disclaimer" (i.e. the '484 Patent expires on the same date as the '742 Patent).  The applicants,

23  however, had to overcome the statutory double patenting rejection of claims 1 through 20 by

24  explaining to the examiner why those claims were different from the claims of the '742 Patent.

25          In particular, the applicants successfully pointed out that the claims of the '742 patent did

26  not call for a configurer to determine a "static" virtual interconnection, and thus, the claims of the

27  _____

28  [2] The references cited during the prosecution of the '742 Patent and '484 Patent are included as
    Exhibit K to the Brigham Declaration.

'484 Patent recited different inventions.  Brigham Decl., Exh. I at IKOS0000487-493.  In issuing a notice of allowance, the examiner accepted these arguments.  As will be shown during the course of these claim construction proceedings, this is significant because Axis' attempt to define "virtual interconnection" in the same manner as "static virtual interconnection" flies in the face of this decision by the examiner.

The '484 Patent issued on June 2, 1998 with 39 claims.  Claims 1, 17, 21, 23, and 28 are the independent claims of the '484 Patent currently being asserted by Plaintiffs and claims 2-6, 8-12, 14, 16, 27, and 29-39 as the asserted dependant claims.

### 2. *U.S. PATENT NO. 5,649,176*

U.S. Patent No. 5,649,176 ("the '176 Patent"), titled "Transition Analysis and Circuit Resynthesis Method and Device for Digital Circuit Modeling," was filed on August 10, 1995 by Charles Selvidge and Matthew Dahl.  Brigham Decl., Exh. C.  In general, the '176 Patent provides a method to allow a digital circuit implemented on several FPGAs to have a uniform timing discipline.  This is accomplished by using a circuit resynthesis procedure.  In the resynthesis procedure, state elements (e.g., flip-flops) are replaced by load-enabled state elements, and a controller (e.g., a finite state machine) provides control signals to the load-enabled input terminals to ensure proper timing relationships between state elements.

A copy of the prosecution history for the '176 Patent is included as Exhibit J to the Brigham Declaration. [3]  To summarize, after a preliminary amendment not affecting the disputed claim terms, the claims of the '176 Patent were allowed on the first office action.  An amendment after allowance was also entered which did not effect the disputed claim terms.  On July 15, 1997, the '176 Patent issued with 50 claims.  Claims 1, 14, 27, 28, and 37 are the independent claims of the '176 Patent currently being asserted by Plaintiffs and claims 2-8, 10, 11, 13, 15-24, 29, 31-36, and 38-50 are the asserted dependant claims.

///

///

---

[3] The references cited during the prosecution of the '176 Patent are included as Exhibit L to the Brigham Declaration.

## II. ARGUMENT

**A.    Legal Principles Governing Claim Construction**

The purpose of claim construction is to determine "the meaning and scope of the patent claims asserted to be infringed." <u>Markman v. Westview Instruments</u>, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996).  Claim construction is a matter of law.  <u>Id.</u> at 979.  In this proceeding, the Court's responsibility is to interpret the claims in the patents-in-suit according to their plain and ordinary meaning as understood by one of ordinary skill in the art, without adding limitations not appearing in the actual wording of the claim.  The following is a discussion of the well-settle maxims governing this process.

### *1.    The Primary Source for Claim Construction is the Intrinsic Record*

The task of construction begins with intrinsic sources, that is, the sources available to the public in ascertaining the scope of the patent.  <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1582 (Fed. Cir. 1996)  (intrinsic evidence is "the most significant source of the legally operative meaning of disputed claim language").  There are three intrinsic sources:  the language of the claim, the specification, and the prosecution history (including prior art cited therein).  <u>See</u> <u>Vitronics</u>, 90 F.3d at 1583 ("[t]he claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely").  Limiting claim interpretation to use of intrinsic evidence serves an important public policy:  the public and competitors have a right to rely on definitive statements made during prosecution history thereby enabling them "to ascertain to a reasonable degree the scope of the patentee's right to exclude."  <u>Markman</u>, 52 F.3d at 978.  <u>See also</u> <u>Digital Biometrics, Inc. v. Identix, Inc.</u>, 149 F.3d 1335, 1347 (Fed. Cir. 1998) ("[t]he public has a right to rely on…definitive statements made during prosecution).

When interpreting claims, the language of a claim provides the starting point in a claim construction analysis.  <u>Bell Communications Research v. Vitalink Communications Corp.</u>, 55 F.3d 615, 619 (Fed. Cir. 1995) ("[f]irst, and most importantly, the language of the claim defines the scope of the protected invention"); <u>Digital Biometrics</u>, 149 F.3d at 1344 (the actual words of the claim are the controlling focus); <u>see also</u> <u>Thermalloy, Inc. v. Aavid Eng'g., Inc.</u>, 121 F.3d 691,

1    693 (Fed. Cir. 1997) ("[t]hroughout the interpretation process, the focus remains on the meaning

2    of claim language").  The claims define the limits of the invention and particularly point out and

3    distinctly claim what the applicant regards as the invention.  35 U.S.C. § 112, ¶ 2.  The court must

4    give the disputed claim terms "their ordinary and accustomed meaning as understood by one of

5    ordinary skill in the art" at the time of patent application.  Dow Chem. Co. v. Sumitomo Chem.

6    Co. Ltd., 257 F.3d 1364, 1372 (Fed. Cir. 2001); Wiener v. NEC Elecs., Inc., 102 F.3d 534, 539

7    (Fed. Cir. 1996) (courts must construe a term's meaning as it was understood on the patent

8    application date).

9          Second, the claims "must be read in view of the specification, of which they are a part."

10   Markman, 52 F.3d at 979.  The specification is defined by statute as the portion of the patent that

11   includes the description of the invention.  It "shall contain a written description of the invention,

12   and of the manner and process of making and using it, in such full, clear, concise, and exact terms

13   as to enable any person skilled in the art to which it pertains . . . to make and use the same." 35

14   U.S.C. § 112, ¶ 1.  When construing claims, the Court may consider the specification in so far as it

15   illuminates the intentions of the inventor:  "[a] patentee may choose to be his own lexicographer,

16   and use terms in a manner other than their ordinary meaning, as long as the special definition of

17   the term is clearly stated in the patent specification or file history."  Vitronics, 90 F.3d at 1582.

18         Third, the court may consider the prosecution history.  Vitronics, 90 F.3d at 1582 (finding

19   prosecution history to be "of critical significance in determining the meaning of the claims").  The

20   prosecution history includes the record of proceedings before the Patent and Trademark Office, the

21   patentee's representations during prosecution regarding the scope of the patent, and a review of

22   the prior art.

23         **2.      *The Scope of the Claim is not Limited by the Specification***

24         Although claims must be read in light of the patent specification, neither the language nor

25   the examples in the specification superimpose restrictions on the claims.  Markman, 52 F.3d at

26   979.  Accordingly, "in looking to the specification to construe claim terms, care must be taken to

27   avoid reading 'limitations appearing in the specification…into the claims.'"  Interactive Gift

28   Express, Inc. v. Compuserve Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001) (ellipsis in original)

1   (citations omitted); Sjolund v. Musland, 847 F.2d 1573, 1581 (Fed. Cir. 1988) (holding that

2   although claims are to be interpreted in light of the specification, it does not follow that limitations

3   from the specification may be read into the claims).

4          Likewise, claims may not be limited to the inventor's best mode, even when it is the only

5   embodiment disclosed.  Karlin Tech. v. Surgical Dynamics, Inc., 177 F.3d 968, 973 (Fed. Cir.

6   1999) ("[t]he general rule, of course, is that the claims of a patent are not limited to the preferred

7   embodiment, unless by their own language"); see also, Enercon GMBH v. Int'l. Trade Comm'n,

8   151 F.3d 1376, 1384 (Fed. Cir. 1998) (merely because "a specification describes only one

9   embodiment does not require that each claim be limited to that one embodiment) citing with

10  approval SRI Int'l., Inc. v. Matushita Elec. Corp. of Am., 775 F.2d 1107, 1121 n. 14 (Fed. Cir.

11  1985) (en banc).  Thus, it would be a reversible error to limit a claim to the best mode or to read

12  limitations from the specification into the claims.

13          **3.     *Extrinsic Evidence Cannot Alter the Plain Meaning of the Claims*

14          If, and only if, intrinsic evidence is not sufficient to construe the claims, the court may turn

15  to extrinsic evidence to help resolve the lack of clarity.  Key Pharm. v. Hercon Labs. Corp., 161

16  F.3d 709, 716 (Fed. Cir. 1999) ("[i]f the meaning of the disputed claim is clear from the intrinsic

17  record…that meaning and no other must prevail).  See also Bell & Howell Document Mgmnt.

18  Prods. Co. v. Altek Sys., 132 F.3d 701, 706 (Fed. Cir 1997) (relying on extrinsic evidence to

19  construe a claim is "proper only when the claim language remains genuinely ambiguous after

20  consideration of the intrinsic evidence").  Extrinsic evidence is "external to the patent and file

21  history" and includes, for example, expert testimony, inventor testimony, dictionaries, technical

22  treatises and articles.  Vitronics, 90 F.3d at 1584.  The need for considering external evidence

23  "will rarely, if ever, occur."  Id. at 1585.  Even if considered, extrinsic evidence may not be used

24  to construe a claim in a manner that is contrary to the intrinsic evidence.  Key Pharm., 161 F.3d at

25  716.

26  **B.     Plaintiffs' Proposed Constructions**

27          Through the claim construction process set forth in the Patent Local Rules, the parties have

28  narrowed the claim construction dispute to approximately 25 terms or phrases contained in the

asserted claims of the patents-in-suit.  As explained below, these disputed terms and phrases all have their plain meaning as understood by persons skilled in the art.  Therefore, in most cases the claim elements need no construction at all.  Plaintiffs have, however, proposed constructions where Axis felt there was an ambiguity or where the claim language could be explained to make it more readily understood by a jury.  Proposed Jury Instructions incorporating Plaintiffs' proposed constructions are attached as Exhibit D to the Brigham Declaration.

The disputes between Plaintiffs and Axis on the construction of these claims in most cases come down to a difference of a few words in the definitions.  For the most part, Axis chooses to impose extraneous restrictions on terms.  Plaintiffs, on the other hand, properly seek to have constructions that fairly reflect the import of the claims and specifications as understood by one skilled in the art, guided by generally accepted definitions of technical terms.

### 1.   U.S. PATENT NOS. 5,596,742 AND 5,761,484

#### a.   communicating, communicate, communication

**Plaintiffs' Proposed Construction:**  "Communication" is the transmission of information from one point to another.

**Support for Proposed Construction:**  As explained above, the language of a claim provides the starting point in a claim construction analysis.  The claims of the '742 and '484 Patents use the terms "communicating," "communicate," and "communication" in the context of "*communicating* signals between logic modules," "intermodule *communications*," "*communicating* through virtual interconnections," "*communications* between the partitions of the target circuit," and "*communicating* the received outputs."  See e.g., '742 Patent, claims 1, 2, 5, 34, 38; '484 Patent, claims 1, 3, 4, 17, 23, 28, 29, 37-39.  Therefore, in the context of the claims, "communication" is merely the transmission of information from one point to another.

To the extent the specifications of the '742 and '484 Patents need to be referenced, they similarly discuss the use of "communication" as the transmission of information (e.g. signals, outputs) from one point to another (e.g. from one logic module or partition to another).  See e.g.,'742 Patent at 2:25-27; '484 Patent at 2:38-39 ("pins for communicating signals between chips"); '742 Patent at 5:65-67, '484 Patent at 6:35-37 ("results are then communicated to other

1    FPGA partitions").

2            **b.      communication path**

3       **Plaintiffs' Proposed Construction:** A "communication path" is a route over which

4    signals are communicated.

5       **Support for Proposed Construction:** Plaintiffs believe that the term "communication

6    path" is self-explanatory and does not need construction.  In particular, the term "communication

7    path" is used in claim 1 of the '484 Patent in terms of "a static virtual interconnection which

8    includes a *communication path* extending through an intermediate reprogrammable logic module."

9    In this context, a "communication path" is just what it seems:  a physical route over which signals

10   are communicated.  The specification of the '484 Patent also calls this a "signal path" made up of

11   wires over which signals propagate.  '484 Patent at 6:16-23.

12           **c.      configurer**

13      **Plaintiffs' Proposed Construction:** A "configurer" is a system including software that

14   implements a compiler to realize logic circuit elements in a reprogrammable logic module.

15      **Support for Proposed Construction:**  First, the court must consider how the term

16   "configurer" is used in the claims of the '742 and '484 Patents.  In general, the "configurer"

17   configures a logic module to define a partition of a target circuit.  See '742 Patent, claims 1, 27,

18   34; '484 Patent, claims 1, 17, 28.  In other words, the "configurer" is a system, a part of which is a

19   compiler to realize logic circuit elements in the logic modules.  This includes the task of deciding

20   which circuit elements are included in a given partition.  The use of the term "configurer" in

21   dependant claims confirms this definition.  See '742 Patent, claim 2 and '484 Patent, claim 3

22   ("configuring the logic module to form a multiplexer"); '742 Patent, claim 20 and '484 Patent,

23   claims 14, 29 (comprising a "partitioner"); and '742 Patent, claim 6 and '484 Patent, claims 5, 32

24   ("optimizing logic module selection and phase division of the target circuit based on interpartition

25   dependencies").  The specifications of the '484 and '742 Patents also support this definition.  See

26   e.g., '742 Patent at 2:28-32, 2:64-3:15, 4:15-17, 6:11-22; '484 Patent at 2:40-44, 3:13-31, 4:36-38,

27   6:50-61.  Therefore, the context in which the term "configurer" is used in the claims, in

28   conjunction with the specifications, provides adequate support for Plaintiffs' proposed

1    construction.

2                    d.      intermodule/interpartition dependencies

3        **Plaintiffs' Proposed Construction:**  "Intermodule dependencies" and "interpartition

4    dependencies" is a relationship between two signals in different logic modules/partitions whereby

5    the value of one signal in one logic module/partition depends on the value of the other signal in

6    the other logic module/partition.

7        **Support for Proposed Construction:**  As recited in the claims of the '484 and '742

8    Patents, "the configurer optimizes logic module selection and phase division of the target circuit

9    based on *interpartition [inter-module] dependencies*".  '742 Patent, claim 6; '484 Patent, claims 5,

10   32.  In other words, since signals are being sent between logic modules or partitions of the target

11   circuit that are placed in those logic modules, a dependency analysis is performed to determine

12   whether the value of one signal in one logic module/partition depends on the value of the other

13   signal in the other logic module/partition.  See e.g., '484 Patent at 5:40-51; '742 Patent at 5:14-25.

14   As the specifications of the '742 and '484 Patents explain, "an output depends on an input if a

15   change in that input can change the output."  '484 Patent at 7:20-21; '742 Patent at 6:48-49.

16   Therefore, the proper definition of "interpartition/inter-module dependencies" is a relationship

17   between two signals in different logic modules/partitions whereby the value of one signal in one

18   logic module/partition depends on the value of the other signal in the other logic module/partition.

19                    e.      multiplexed

20       **Plaintiffs' Proposed Construction:**  In the context of a virtual interconnection,

21   "multiplexed" describes sharing a physical wire among multiple logical wires.

22       **Support for Proposed Construction:**  The term "multiplexed" is used in the claims as

23   follows: "memory data is *multiplexed* on virtual interconnections" ('742 Patent, claim 11) and

24   "communicating . . . outputs through a single pin in a *multiplexed* . . . fashion" ('484 Patent,

25   claims 17, 23).  The concept of signals being "multiplexed" in the '742 and '484 Patents is an

26   integral part of "virtual interconnections."  In general, multiplexing is the well-understood concept

27   of taking multiple inputs and controlling which of those inputs are outputted.  Thus, the output line

28   is "shared".  In the context of "virtual interconnections," "multiplexed" describes sharing a

physical wire among multiple logical wires or interconnections.  See e.g., '742 Patent at 2:9-12, 2:55-63, 3:2-6, 4:52-60, 5:32-35, 7:33-57, Figs. 3 and 6; '484 Patent at 2:21-24, 3:4-12, 3:18-22, 5:7-15, 5:58-61, 8:6-30, Figs. 3 and 6.

### f.   multiplexer

**Plaintiffs' Proposed Construction:**  In the context of a virtual interconnection, a "multiplexer" is a device for sharing a physical wire among multiple logical wires.

**Support for Proposed Construction:**  In order to have "multiplexed" signals, as that term is defined above, one needs a device to perform the "multiplexing."  Simply put, a "multiplexer" is such a device.  See e.g., '742 Patent at 2:9-12, 2:55-63, 3:2-6, 4:52-60, 5:32-35, 7:33-57, Figs. 3 and 6; '484 Patent at 2:21-24, 3:4-12, 3:18-22, 5:7-15, 5:58-61, 8:6-30, Figs. 3 and 6.

### g.   phase

**Plaintiffs' Proposed Construction:**  A "phase" is a period within a target clock period during which logic evaluation and communication between modules are performed.

**Support for Proposed Construction:**  The claims of the '742 and '484 Patents use the term "phase" as follows:  "logic modules are configured to operate in *phases* within a target clock period with inter-module communications being performed within each *phase*" ('742, claims 5, 38; '484 Patent, claims 4, 38), "*phase* division" ('742 Patent, claim 6; '484 Patent, claims 5, 32), and "dividing a first clock period . . . into *phases* during which program logic functions are performed and signals are transmitted between logic modules" ('742 Patent, claim 33).  Therefore, the claims themselves define what a "phase" is:  a period within a target clock period during which logic evaluation and communication between modules are performed.

The specifications of the '484 and '742 Patents similarly describe a "phase."  See e.g., '742 Patent at 2:44-47, 3:10-12, 5:57-60, 5:65-67, Fig. 4; '484 Patent at 2:61-64, 3:26-28, 6:27-30, 6:35-37, Fig. 4.

### h.   pipelined

**Plaintiffs' Proposed Construction:**  "Pipelined" is transmitting signals sequentially.

**Support for Proposed Construction:**  The term "pipelined" appears in claims 17 and 23 of the '484 Patent as follows:  "communicating the received outputs through a single pin in a

1   multiplexed, *pipelined* fashion."  In other words, signals are communicated in a *multiplexed*

2   fashion (signals from multiple logic wires are communicated over a shared physical wire) and a

3   *pipelined* fashion (the multiple signals are sent through the pin one after another or in a "stream").

4   See e.g., '484 Patent at 2:21-24.  This stream of signals comes as a result of the circuit's operation

5   being broken into several steps and performed by different logic elements.  Thus, pipelining

6   defines the timing aspect of the shared resource by defining the minimum tenure of each signal on

7   the shared wire.  Therefore, a proper definition of "pipelined" is transmitting signals sequentially.

8                              **i.      static virtual interconnection**

9         **Plaintiffs' Proposed Construction:**  A "static virtual interconnection" is a "virtual

10   interconnection" whose logical signals follow routes that are determined by the configurer and

11   which do not change between configurations.

12        **Support for Proposed Construction:**  The term "virtual interconnection" is defined

13   below by Plaintiffs as "a logical electrical connection implemented by sharing an inter-module

14   connection with other logical electrical connections."  Certain claims of the '484 Patent use this

15   term, with the qualifier that the virtual interconnection be "static."  While Plaintiffs assert that

16   "static" refers to the *location* of the virtual interconnection not changing, Axis asserts that static

17   somehow also refers to the *schedule* of signals travelling through that virtual interconnection not

18   changing.  Reading this limitation into the word "static" would be against the clear meaning of

19   that term as it is used in the claims of the '484 Patent.

20        As always, the court should look first to the claims themselves to assist in defining "static

21   virtual interconnection."  Claim 1 of the '484 Patent uses this term in the context of:  "the

22   configurer determining a *static virtual interconnection* which includes a communication path

23   extending through an intermediate reprogrammable logic module."  Since the claim points out a

24   *path* that must exist in the static virtual interconnection, it follows that the term *static* must refer to

25   physical *paths* or *routes* that do not change over time.  Again, looking at Figure 2 discussed in the

26   Introduction section above, for a given compilation the physical pathway that a given signal takes

27   between FPGA #1 and FPGA #2 is static and does not change.

28        Claim 21 of the '484 Patent recites:  "determining *static virtual interconnections* between

1  partitions corresponding to at least one common pin."  Again, the focus is on the *location* of the

2  virtual interconnection – "corresponding to at least one common pin."  Notably absent from the

3  way the term "static" is used in the claims of the '484 Patent is *any* temporal limitation or

4  correlation.

5        As far as the prosecution history is concerned, the U.S. prosecution history of the '484

6  Patent is of little assistance in defining "static virtual interconnection" other than clarifying that it

7  is different than a "virtual interconnection."  See discussion infra at Section I.B.1.  To the extent

8  Axis urges the court to look at the foreign prosecution of the '484 Patent, this evidence supports

9  Plaintiffs' construction by pointing out the difference between a claim which links a temporal

10  correlation to "static" and one that does not.  In particular, the phrase "fixed schedule of signals"

11  was a limitation added to the claims of the European patent application, but not to the claims of

12  the '484 Patent.  See Brigham Decl., Exh. F at IKOS0005429.  This shows that a fixed schedule of

13  signals is not an inherent property of a "static virtual interconnection," but rather, must be further

14  defined in the claims if the applicants want to include this requirement.  Therefore, since the '484

15  Patent claims do not mention a "fixed schedule," reading in this limitation would be improper.

16        In addition, the applicants specifically defined "static virtual interconnection" during the

17  PCT prosecution with respect to a predetermined *path*:

18  
19  
20  
21  
22
> Each signal is assigned a communication path by the configurer, which automatically configures the logic modules to provide *static virtual interconnections* for signals within the system.  As described at page 10, line 17 through page 11, line 32 of the Disclosure, the resulting system is a statically routed network.  In other words, every signal propagating through and between the logic modules *travels along a predetermined communication path*, as defined by the configurer.

23  Brigham Decl., Exh. G at IKOS0007432 (emphasis added).

24        Therefore, consistent with its use in the claims and the prosecution history, "static

25  virtual interconnection" should be defined as a "virtual interconnection" whose logical

26  signals follow routes that are determined by the configurer and which do not change

27  between configurations.

28   ///

**j.    statically communicating**

**Plaintiffs' Proposed Construction:**  "Statically communicating" is communicating according to a routing scheme which does not change between configurations.

**Support for Proposed Construction:**  Claim 17 of the '484 Patent uses this term in the context of:  "configured as a multiplexer . . . for *statically communicating* the received outputs through a single pin in a multiplexed, pipelined fashion."  As with "static virtual interconnection," "statically" is referring to *location* ("through a single pin"), not *scheduling*.  Therefore, "statically communicating" is communicating according to a routing scheme which does not change between configurations.  This coincides with the description of a "statically routed network" in the specification.  See e.g., '484 Patent at 1:42-45.

**k.    system clock period**

**Plaintiffs' Proposed Construction:**  A "system clock period" is the period of the clock signal providing a high frequency of operation in a logic module within the reconfigurable electronic system (also called pipeline clock period).

**Support for Proposed Construction:**  The term "system clock period" is used in the claims of the '742 and '484 patents as follows:  "each target clock period comprises a plurality of *system clock periods* which dictate the maximum rate at which signals in the electronic system change value" ('484 Patent, claim 6; '742 Patent, claim 7), "each *system clock period* is scheduled to either perform a computation or carry a communication signal during a particular target clock period" ('742 Patent, claim 8), and "each target system signal being carried during a *system clock period* " ('742 Patent, claim 9).  The specifications of the patents give examples of the "system clock period" in Fig. 4 (labeled "pipeline clock").  See also '742 Patent at 6:7-9; '484 Patent at 6:45-47.  Therefore, the term "system clock period" is best defined by the claims of which it is a part.  In particular, a "system clock period" is the period of the clock signal providing a high frequency of operation in a logic module within the reconfigurable electronic system (also called pipeline clock period).

**l.    time-multiplexed**

**Plaintiffs' Proposed Construction:**  In the context of a virtual interconnection, "time-

1  multiplexed" is a form of multiplexing in which time is used to control the sharing of the physical

2  wire among the logical wires.

3      **Support for Proposed Construction:**  The term "time-multiplexed" appears in several of

4  the asserted claims:  "communicate through virtual interconnections in a *time-multiplexed* fashion"

5  ('742 Patent, claims 1, 34; '484 Patent, claims 1, 39), "signals along the virtual interconnections

6  being *time-multiplexed* " ('742 Patent, claims 27, 32; '484 Patent, claim 21), "*time multiplexed*

7  interconnections" ('484 Patent, claim 9).  As explained above, in the context of a virtual

8  interconnection, "multiplexed" describes sharing a physical wire among multiple logical wires.

9  The qualifier "time" simply means that time controls this sharing.  <u>See</u> '742 Patent at 2:34-36, 3:2-

10  6, in light of 2:9-12, 4:44-59, 5:9-13; '484 Patent at 2:47-49, 3:18-22 in light of 2:21-24, 4:66-

11  5:14, 5:35-39.

12              **m.      virtual interconnection**

13      **Plaintiffs' Proposed Construction:**  A "virtual interconnection" is a logical electrical

14  connection implemented by sharing an inter-module connection with other logical electrical

15  connections.

16      **Support for Proposed Construction:**  The term "virtual interconnection," coined by the

17  inventors, appears in a number of the claims of the '484 and '742 Patents.  Since this term was not

18  known in the art at the time of filing, the specification provides a clear definition:

19      Virtual interconnections overcome pin limitations by intelligently multiplexing
        each physical wire among multiple logical wires and pipelining these connections
20      at the maximum clocking frequency of the FPGA.  *A virtual interconnection
        represents a connection from a logical output on one FPGA to a logical input on*
21      *another FPGA.*

22  '742 Patent at 2:9-14; '484 Patent at 2:21-27 (emphasis added).  Therefore, the term

23  "virtual interconnection" is simply a logical electrical connection (i.e. "connection from a

24  logical output on one FPGA to a logical input on another FPGA") implemented by sharing

25  an inter-module connection (i.e. a "physical wire") with other logical electrical

26  connections.

27      According to Axis, "virtual interconnections" is:

28      the name given to a technique for statically communicating synchronous
        logical signals between logic modules through a single pin in a multiplexed,

1   pipelined fashion wherein each logical signal is scheduled for a specific
2   cycle of the pipeline clock.

3   As with a number of the claim terms, Axis' proposed definition seeks to add unnecessary

4   limitations from the preferred embodiments into this claim term.  Most notably, Axis seeks

5   to add in the limitation that "each logical signal is scheduled for a specific cycle of the

6   pipeline clock."  While this may have been a method contemplated by the inventors,

7   nowhere is there a suggestion that this is the *only* way virtual interconnections can be

8   implemented.  Therefore, reading in those limitations would be improper.  See Enercon,

9   151 F.3d at 1384 (merely because "a specification describes only one embodiment does

10  not require that each claim be limited to that one embodiment").

11          Similarly, Axis seeks to improperly define "virtual interconnection" as having the

12  same meaning as the term "*static* virtual interconnection".  This argument directly

13  contradicts a finding by the Patent Office during the prosecution of the '484 Patent.  As

14  discussed above, the Patent Office found that claims that contained "*static* virtual

15  interconnections" were different than claims that contained "virtual interconnections".  See

16  Section I.B.1., infra.  Therefore, Axis' proposed definition is untenable.

17          **2.      *U.S. PATENT NO. 5,649,176***

18                  **a.      buses**

19  **Plaintiffs' Proposed Construction:**  "Buses" are an interface system to connect a number

20  of devices.

21          **Support for Proposed Construction:**  Claim 11 of the '176 patent calls for "the

22  interconnect includes *buses*".  The interconnect connects a plurality of configurable logic devices.

23  See '176, claim 8.  Thus, "buses" are simply a system to connect a number of devices.

24                  **b.      configuring the logic system**

25          **Plaintiffs' Proposed Construction:**  "Configuring the logic system" is compiling and

26  loading into a configurable logic system.  (Compilation may be defined as an algorithmic or

27  automated process for transforming a digital circuit description into configuration data received

28  into the configurable device to realize logic circuit elements in the configurable logic device.  '176

1   Patent at 20:5-8.)

2   **Support for Proposed Construction:**  The phrase "configuring the logic system" appears

3   in claims 1 and 4 of the '176 Patent.  In particular, the claims discuss configuring the logic system

4   "to perform logic operations," "to have a controller," and "to have combinational logic and

5   sequential logic."  In plain language, the logic system is programmed so that it performs certain

6   operations or has certain features.  In more technical terms, "configuring the logic system" is

7   compiling the digital description language and loading configuration data into the configurable

8   logic system.  <u>See e.g.</u>, '176 Patent at 1:31-33, 20:5-12.

9                   **c.       control signal**

10   **Plaintiffs' Proposed Construction:**  A "control signal" is a signal that coordinates the

11   application of logic operations.

12   **Support for Proposed Construction:**  The term "control signal" appears throughout the

13   claims of the '176 Patent.  <u>See</u> claims 3, 5, 6, 20, 23, 31, 33, 34, 42, 44, 46.  As the term suggests,

14   a "control signal" is a signal that controls something.  In the context of the claims and the

15   specification of the '176 Patent, a "control signal" is a signal that coordinates the application of

16   logic operations.  <u>See e.g.</u>, '176 Patent at 3:18-23 ("the logic operations are then coordinated by

17   application of these control signals"), 3:26-27, 8:53-57.

18                   **d.       controller/controller means**

19   **Plaintiffs' Proposed Construction:**  A "controller" is a circuit configured into the logic

20   system capable of coordinating the logical operations of the logic system.

21   **Support for Proposed Construction:**  The claims themselves define the term

22   "controller", and thus, no further construction is needed.  For example, claim 1 recites:

23   "configuring the logic system to have a *controller* for coordinating operation of the logic

24   operations."  <u>See also</u> claims 28, 40.  "Controller" is similarly defined in the specification.  <u>See</u>

25   <u>e.g.</u> '176 patent at 3:7-10.  Claim 27 similarly recites "*controller means* for coordinating operation

26   of the logic means."  An example of a "controller means" could be one or more finite state

27   machines for coordinating operation of the logic means.  <u>See</u> '176 patent at 4:2-5.  Therefore, a

28   "controller" or "controller means" should be defined as a circuit configured into the logic system

1   capable of coordinating the logical operations of the logic system.

2       Axis seeks to improperly read preferred embodiments into this claim term as well by

3   defining "controller" as:

4         a finite state machine configured within the configurable logic system that dictates
    the operation of the configurable logic in response to an internal clock signal and a
5         sampled environmental timing signal

6   Axis' limitation  of the "controller" to a "finite state machine" and the requirement that the

7   controller must act in response to a *sampled* environmental timing signal is without support.

8   While these embodiments are described in the specification, the term "controller" should not be

9   limited to those embodiments.  In addition, if "controller" is construed according to Axis'

10  definition, some of the dependant claims will be identical to the independent claims.  See e.g.

11  Claims 1-3.  Such a construction would be improper.  See Stevenson v. Int'l Trade Comm'n, 612

12  F.2d 546, 554 (CCPA 1979) ("we do not construe a broad claim to contain limitations expressed

13  in the more narrow claims"); Karlin Tech, Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 972

14  (Fed. Cir. 1999) (claim differentiation disfavors reading into independent claims limitations found

15  in dependent claims).

16         **e.**     **environment, environmental**

17      **Plaintiffs' Proposed Construction:**  An "environment" is a circuit or system external to

18  the configurable logic system with which the configurable logic system interacts (e.g., a host

19  workstation or a target system).

20      **Support for Proposed Construction:**  The term "environment" appears in claims 1, 14,

21  27, 28, and 37.  These claims discuss operating in an *environment*, including sending and

22  receiving signals to and from the *environment*.  Other than dependant claims 47 and 48, which

23  give examples of "environments," the claims themselves provide little guidance as to the proper

24  construction of the term "environment."

25      The specification, however, does provide guidance.  The specification describes an

26  environment as a "system in which it [the logic design] is intended to operate."  '176 Patent at

27  1:29.  Examples given are actual hardware target systems or workstations.  '176 Patent at 1:45-47

28  ("a simulation involves modeling the logic design on a workstation.  In this *environment* . . ."),

1    3:10-12 ("simulation devices, for example, operated in response to timing signals from the

2    *environment*"), 5:52-53 ("an *environment* such as a target system"), 6:12-13.  Therefore, the

3    proper interpretation of "environment" is a circuit or system external to the configurable logic

4    system with which the configurable logic system interacts (e.g., a host workstation or a target

5    system).

6                               **f.      environmental timing signal**

7            **Plaintiffs' Proposed Construction:**  An "environmental timing signal" is a timing signal

8    from the "environment" that represents a timing signal from the original (user's) circuit design.

9            **Support for Proposed Construction:**  As the term "environmental timing signal"

10   suggests, it is a timing signal from the "environment."  <u>See e.g.</u>, '176 Patent at 2:1-6, 3:6-7.  In the

11   original circuit design, the sequential logic elements operated in response to these timing signals.

12   <u>See</u> '176 at 3:29-32, 3:46-48, 3:55-56, 8:58-9:2.  Therefore, an "environmental timing signal" is a

13   timing signal from the "environment" that represents a timing signal from the original (user's)

14   circuit design.

15                              **g.      internal clock**

16           **Plaintiffs' Proposed Construction:**  The "internal clock" provides a time base for the

17   resynthesized circuit's operation.

18           **Support for Proposed Construction:**  As the '176 specification explains, "[t]he present

19   invention seeks to overcome the hold time problem by imposing a new timing discipline on a

20   given digital circuit design through a resynthesis process that yields a new but equivalent

21   circuit….By means of the resynthesis, the equivalent circuit relies on a new higher frequency

22   *internal clock* (or virtual clock) that is distributed with minimal skew."  '176 Patent at 2:43-54.

23   The specification goes on to state "[t]he internal clock provides a time base for the circuit's

24   operation."  '176 Patent at 2:64-65; <u>see also</u> 3:33-37.  Therefore the "internal clock" provides a

25   time base for the resynthesized circuit's operation.

26                              **h.      resynthesizing**

27           **Plaintiffs' Proposed Construction:**  "Resynthesizing" is transforming a given digital

28   circuit design into a new but equivalent circuit design according to a new constraint (e.g., a new

1   timing discipline).

2   **Support for Proposed Construction:**  Claims 14, 15, 18-23, and 39 of the '176 Patent use

3   the term "resynthesizing" in the context of resynthesizing sequential logic elements (e.g. latches

4   and flip-flops).  As the specification explains, "[t]he present invention seeks to overcome the hold

5   time problem by imposing a new timing discipline on a given digital circuit design through a

6   resynthesis process that yields a new but equivalent circuit."  '176 Patent at 2:44-46; <u>see also</u>

7   12:62-13:9.  Thus, a proper definition of "resynthesizing" is transforming a given digital circuit

8   design into a new but equivalent circuit design according to a new constraint (e.g., a new timing

9   discipline).

10                          **i.      sampled/sampling**

11  **Plaintiffs' Proposed Construction:**  "Sampling" is the process by which a component

12  (e.g., a state element) captures a signal value carried at a given point in time.

13  **Support for Proposed Construction:**  The claims of the '176 Patent use the term

14  "sampled" and "sampling" as follows:  claims 2, 29, 41 (synchronizer for *sampling* the

15  environmental timing signal), claims 3, 31, 42 (*sampled* environmental timing signal) and claim

16  13 (*sampling* times of the environmental data signals).  The specification of the '176 Patent states

17  in part that "sampling information reflects the fact that at some point in time, the value carried on

18  a wire may be sampled by a state element."  '176 Patent at 12:32-35.  Therefore, a definition of

19  "sampling" is the process by which a component (e.g., a state element) captures a signal value

20  carried at a given point in time.

21                          **j.      synchronize/synchronizer**

22  **Plaintiffs' Proposed Construction:**  To "synchronize" is to make a version of a signal

23  that is synchronous with a reference signal.  A "synchronizer" is a circuit for synchronizing.

24  **Support for Proposed Construction:**  The claims of the '176 patent discuss a

25  synchronizer in the context of environmental timing signals and internal clock signals.  One

26  example given in the specification is:  "The output of the synchronizer $V_{G0}$ is essentially the

27  version of the environmental clock signal that is synchronized to the internal clock signal.

28  *Specifically*, the new signal $V_{G0}$ has rising and falling edges that correspond to the rising edges of

1  the internal clock signal VClk." '176 Patent at 9:55-60 (emphasis added); <u>see also</u> 7:59-8:4, Fig.

2  4B.  Therefore, to "synchronize" is to make a version of a signal that is synchronous (i.e. has a

3  defined timing relationship) with a reference signal.  A "synchronizer" is a circuit for

4  synchronizing.

5                                    **III.  CONCLUSION**

6          For the reasons stated above, the Court should adopt Plaintiffs' proposed claim

7  constructions.

8  DATED:  March 29, 2002

                                              SKJERVEN MORRILL MACPHERSON LLP
9

10

                                              By  s/  Matthew J. Brigham
11                                                 Matthew J. Brigham

12                                            Attorneys for Plaintiffs
                                              IKOS SYSTEMS, INC. and MASSACHUSETTS
13                                            INSTITUTE OF TECHNOLOGY

14

15  858162  v1

16

17

18

19

20

21

22

23

24

25

26

27

28