1  GEORGE A. RILEY (S.B. #118304)
   DAVID R. EBERHART (S.B. #195474)
2  LUANN L. SIMMONS (S.B. #203526)
   O'MELVENY & MYERS LLP
3  Embarcadero Center West
   275 Battery Street
4  San Francisco, California  94111-3305
   Telephone: (415) 984-8700
5  Facsimile: (415) 984-8701

6  Attorneys for Defendant
   Axis Systems, Inc.
7

8                **UNITED STATES DISTRICT COURT**

9                **NORTHERN DISTRICT OF CALIFORNIA**

10                      **SAN JOSE DIVISION**

11  IKOS SYSTEMS, INC., and            Case No. C01-21079-JW
    MASSACHUSETTS INSTITUTE OF
12  TECHNOLOGY,                        **REPLY MEMORANDUM IN
                                       SUPPORT OF MOTION FOR LEAVE
13              Plaintiffs,            TO PRESENT EXPERT
                                       TESTIMONY ON CLAIM
14         v.                          CONSTRUCTION**

15  AXIS SYSTEMS, INC.,                Hearing Date:  April 22, 2002
                                       Time:          9:00 a.m.
16              Defendant.             Place:         Courtroom 8
                                       Judge:         Hon. James Ware
17

## I. INTRODUCTION.

Plaintiffs do not deny that the expert testimony of Dr. Mangione-Smith would aid the Court in understanding the highly technical patents at issue in this case. Nor do plaintiffs dispute that Dr. Mangione-Smith's testimony would ensure that the patent terms are construed consistently with the patent specifications and as those terms would be understood by one of skill in the art. Finally, plaintiffs do not argue that they would face any prejudice if the Court grants Axis's motion.

Instead, plaintiffs assert that "<u>generally</u> only intrinsic evidence should be used in interpreting claims." (Plaintiffs' Opposition at 2 (emphasis added).) Plaintiffs, however, do not dispute that the intrinsic evidence in this case is insufficient to interpret the disputed claims. Moreover, the available intrinsic evidence relevant to the disputed claims is complicated and technically challenging. Plaintiffs have asserted a total of 97 claims, all of which use highly technical terms that rely on sophisticated concepts from computer science and electrical engineering. Accordingly, the Court's use of expert testimony and other extrinsic evidence to assist in understanding the relevant technology and interpreting the disputed claims is entirely appropriate.

## II. EXPERT TESTIMONY IS NECESSARY FOR A PROPER UNDERSTANDING OF THE HIGHLY TECHNICAL INTRINSIC EVIDENCE.

As noted by plaintiffs, courts look first to intrinsic evidence in order to interpret disputed claims. See Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995). However, a court's consultation of expert testimony to assist in navigating its way through and understanding the intrinsic evidence is entirely appropriate. See, e.g., Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1308-1309 (Fed. Cir. 1999); EMI Group North America, Inc. v. Intel Corp., 157 F.3d 887, 892 (Fed. Cir. 1988); Charles E. Hill & Assocs. v. Compuserve, Inc., 65 F. Supp. 2d 924, 926 (S.D. Ind. 1999). The intrinsic evidence for the patents at issue in this case is highly complex and technical. Expert testimony is essential to its proper understanding.

Plaintiffs have asserted three patents – U.S. Patent No. 5,596,742 (the "'742

1  Patent"), U.S. Patent No. 5,761,484 (the "'484 Patent") and U.S. Patent No. 5,649,176
2  (the "'176 Patent") – concerning specialized hardware and software systems used to verify
3  the design of semiconductor integrated circuits or "chips." The specifications require a
4  thorough understanding of such concepts as:
5    • circuit design
6    • reconfigurable logic
7    • combinational logic
8    • sequential logic
9    • synchronous logic
10   • asynchronous logic
11   • high-level design languages, such as HDL and VHDL
12   • logic synthesis
13   • timing synthesis
14   • partitioning algorithms
15   • circuit simulation
16   • circuit emulation
17   • logical connections
18   • physical connections
19   • statically routed communications networks
20        For example, the term "virtual interconnections" appears throughout the
21  claims of the '742 and '484 Patents (both of which are titled "Virtual Interconnections For
22  Reconfigurable Logic Systems"). As demonstrated by its use in the specifications,
23  determining the proper meaning of "virtual interconnections" requires an understanding of
24  the complex concepts noted above:
25      Virtual interconnections overcome pin limitations by
        intelligently multiplexing each physical wire among multiple
26      logical wires and pipelining these connections at the
        maximum clocking frequency of the FPGA. ('742 Patent, col.
27      2, lines 9-12.)
28

1
2
3
4
> Established via a pipelined, statically routed communication network, these virtual interconnections increase available off-chip communication bandwidth by multiplexing the use of FPGA pin resources (physical wires) among multiple emulation signals (logical wires). ('742 Patent, col. 4, lines 54-59.)

5
6
> Statically routed networks can be used whenever communication can be predetermined. Static refers to the fact that all data movement can be determined and optimized at compile-time. ('742 Patent, col. 1, lines 43-46.)

7
8
9
> The use of virtual interconnections is limited to synchronous logic. Any asynchronous signals must still be 'hard-wired' to dedicated FPGA pins. This limitation is imposed by the inability to statically determine dependencies in asynchronous loops. ('742 Patent, col. 5, lines 36-40.)

10 Dr. Mangione-Smith's expert testimony would help explain these concepts.
11 He would describe how a statically routed network is one in which data communications
12 repeat in a pre-determined, predictable and periodic fashion. He would further explain
13 that "virtual interconnections" depend on the static nature of the communications to
14 schedule the transmission of logical signals between logic modules on specific clock
15 cycles. This type of evidence is essential for construing the claim including the terms
16 "virtual interconnections" and "statically communicating."

17 Similarly, the critical terms "environmental timing signal" and "internal
18 clock," which are used in most of the claims of the '176 Patent, can be understood only in
19 the context of such concepts as combinational and sequential logic, load enable signals
20 and clocking of logic elements in a circuit:

21
22
23
24
25
26
27
28
> In more detail, the logic system is configured to have both combinational logic, e.g. logic gates, and sequential logic, e.g. flip-flops, to perform the logic operations. The control signals function as load enable signals to the sequential logic. The internal clock signal is received at the clock terminals of that logic. Just like the original digital circuit design, each sequential logic element operates in response to the environmental timing signals. Now, however, these timing signals control the load enable of the elements, not the clocking. It is the internal clock signal that now clocks the elements. As a result, the resynthesized circuit operates synchronously with a single clock signal regardless of the clocking scheme of the original circuit design. ('176 Patent, col. 3, lines 24-36.)

1    Expert testimony could assist the Court in understanding the technical
2  concepts and terminology used describing these two signals.  Dr. Mangione-Smith could
3  explain that, consistent with the specification, both the "environmental timing signal" and
4  the "internal clock" are used to control the operation of the configurable logic system.  He
5  could further explain that the "environmental timing signal" comes from the environment
6  in which the modeled circuit will ultimately operate.  By contrast, the "internal clock,"
7  also referred to in the specification as the "virtual clock," exists only within the
8  configurable logic.  Dr. Mangione-Smith could then describe how the "internal clock" is
9  used to schedule or "clock" the operation of the configurable logic system.  The
10 "environmental timing signal," by contrast, is used to control the activation of certain
11 logic elements in the configurable logic system through a process involving signal
12 sampling.  By defining and explaining the technical concepts used in the intrinsic
13 evidence to describe the "environmental timing signal" and the "internal clock," Dr.
14 Mangione-Smith's testimony would ensure that these terms are construed consistently
15 with their use in the specifications and as these terms are understood by those skilled in
16 the art.  This is a proper use of expert testimony.  See Generation II Orthotics Inc. v.
17 Medical Technology Inc., 263 F.3d 1356, 1367 (Fed. Cir. 2001) (interpreting claim term
18 as it would be understood by one of skill in the art based on intrinsic evidence and expert
19 testimony of the understanding of the term in the art).

20 **III.   BECAUSE THE INTRINSIC EVIDENCE IS NOT SUFFICIENT IN THIS
21        CASE, EXPERT TESTIMONY IS NECESSARY TO ENSURE PROPER
         CLAIM CONSTRUCTIONS.**

22     While not denying the value of the extrinsic evidence that Axis seeks to
23 present, plaintiffs argue that such evidence should be considered only when intrinsic
24 evidence is "insufficient to enable the court to construe disputed claim terms."  (Plaintiffs'
25 Opposition at 2-3.)  Plaintiffs, however, do not maintain that the intrinsic evidence in this
26 case is sufficient to preclude the need for extrinsic evidence.  Plaintiffs do not dispute the
27 various examples presented in Axis's Motion of claim terms for which the intrinsic
28 evidence may prove insufficient.  Nor do plaintiffs dispute that expert testimony is

1  appropriate to resolve ambiguities in term meanings that may remain after an analysis of
2  the intrinsic evidence.

3        A number of the disputed claim terms are ill-defined or used inconsistently
4  in the patent specifications.  Expert testimony would provide the Court the needed
5  technological context to understand the proper meaning of these terms.

6        For example, in the original application for the '742 Patent, the inventors
7  claimed a technique of communicating through virtual interconnections "in a time-
8  multiplexed fashion through the pins." (Declaration of Luann L. Simmons ("Simmons
9  Decl." Ex. A, April 2, 1993 Application, pp. 23, 25-26.)  Because of concerns about prior
10 art, the claims were changed to require communicating through virtual interconnections
11 "in a time-multiplexed fashion through at least one pin, the inter-module communications
12 including interconnections which extend through <u>intermediate reconfigurable logic</u>
13 <u>modules</u>." (Simmons Decl. Ex. A, May 4, 1994 Amendment, pp. 2, 5-6.)  The term
14 "intermediate reconfigurable logic modules" is not defined in the specification.  Dr.
15 Mangione-Smith could explain the proper meaning of this term in light of the prior art
16 submitted to the Patent Office when the term was added to the claims.  Such testimony
17 could then further the Court's understanding of what it means to communicate in a "time-
18 multiplexed fashion," within the context of this patent.  The Court's reliance on expert
19 testimony for such a purpose is entirely proper.  <u>See</u> <u>AFG Industries, Inc. v. Cardinal IG</u>
20 <u>Co.</u>, 239 F.3d 1239 (Fed. Cir. 2001).

21       The term "virtual interconnections" did not exist in the art before it was
22 coined by the inventors of these patents and their colleagues.  In coming up with this term,
23 however, the inventors drew from concepts that did exist in the art.  As described by the
24 inventors in a paper included in the intrinsic evidence for both the '742 and '484 Patents,
25 "[v]irtual wires are similar to <u>virtual channels</u>, which de-couple resource allocation in
26 dynamically-routed networks, and to <u>virtual circuits</u> found in a connection-oriented
27 network." (Simmons Decl. Ex. B at p. 3 (emphasis added).)  As demonstrated above, the
28 specifications describe "virtual interconnections" by reference to "statically routed

communication networks," which also existed in the prior art. ('742 Patent, col. 4, lines 54-59.) Dr. Mangione-Smith would be able to describe the relevant prior art and explain the meanings of "virtual channels," "virtual circuits," and "statically routed communication networks." This testimony would assist in determining the proper meaning of "virtual interconnections," which is an appropriate use of extrinsic evidence for claim construction. AFG Industries, 239 F.3d at 1239.

Although the "environmental timing signal" and "internal clock" are key concepts within the meaning of the claimed invention, they are not clearly defined in the patent. The specification, however, does make an important distinction between the two – the "internal clock" is <u>invisible</u> to the environment from which the "environmental timing signal" originates. ('176 Patent, Abstract; '176 Patent, col. 3, lines 10-14.) Dr. Mangione-Smith could explain what it means to one with skill in the art for a signal to be "invisible" to the environment. Understanding this distinction between the two terms would assist the Court in understanding the proper constructions for each. This is also a proper use of expert testimony. AFG Industries, 239 F.3d at 1239.

**IV. THE CLAIM CONSTRUCTION HEARING, NOT THE TECHNOLOGY TUTORIAL, IS THE PROPER FORUM FOR EXPERT TESTIMONY FOCUSED ON THE PROPER MEANINGS OF THE PATENT TERMS.**

Plaintiffs claim that the Technology Tutorial scheduled by the Court, not the Claim Construction Hearing, is the proper forum for extrinsic evidence. Plaintiffs argue that the Tutorial provides the opportunity to use extrinsic evidence "to educate the court about the patent and the patent's relevant field of technology." (Plaintiffs' Opposition at 3.) The focus of the Technology Tutorial, however, is the latter of these subjects – "the patent's relevant field of technology." The Claim Construction Hearing, by contrast, is focused on the patents at issue and interpreting the specific claim terms that are in dispute. Because the extrinsic evidence Axis seeks to present by its Motion is directed at assisting the Court in construing the patent terms at issue, such evidence would properly be considered at the Claim Construction Hearing.

## V. THE VALUE OF EXPERT TESTIMONY CLEARLY OUTWEIGHS ANY POSSIBILITY THAT THE PROCEEDINGS WILL BE DELAYED AND PLAINTIFFS ADMIT THAT THEY WILL NOT BE PREJUDICED BY ITS CONSIDERATION.

While not disputing the value of expert testimony, plaintiffs argue that permitting such testimony would "unnecessarily" prolong the claim construction hearing. (Plaintiffs' Opposition at 4.) By explaining the complex intrinsic evidence and providing extrinsic evidence to resolve ambiguities regarding the meanings of the claim terms, focused expert testimony would streamline the construction of the claims in these highly technical patents. Any possibility that the proceedings would be delayed by allowing this testimony is clearly outweighed by its value to the Court. Thus, the expert testimony and other extrinsic evidence offered by Axis should be considered by the Court to ensure proper claim interpretation.

Plaintiffs make no effort to argue that they would be prejudiced by the Court's considering this expert testimony. Plaintiffs do not deny that they had sufficient notice of Axis's desire to present such evidence and testimony. Plaintiffs do not dispute that they had sufficient opportunity to review such evidence and depose Dr. Mangione-Smith. In fact, plaintiffs request that they be allowed to present their own expert testimony in the event the Court grants Axis's motion. Plaintiffs will face no prejudice by the Court's consideration of this valuable and necessary expert testimony.

## VI. CONCLUSION.

For the foregoing reasons, Axis requests that the Court grant its motion for leave to present the testimony of Dr. William H. Mangione-Smith at the May 3, 2002 Claim Construction Hearing in this action.

Dated: April 8, 2002

>                               GEORGE A. RILEY
>                               DAVID R. EBERHART
>                               LUANN L. SIMMONS
>                               O'MELVENY & MYERS LLP
>
>
>                               By   s/ George A. Riley
>                                       George A. Riley
>                               Attorneys for Defendant
>                               Axis Systems, Inc.

SF1:463559.1