1  GEORGE A. RILEY  (S.B. #118304)
   DAVID R. EBERHART  (S.B. #195474)
2  LUANN L. SIMMONS  (S.B. #203526)
   O'MELVENY & MYERS LLP
3  Embarcadero Center West
   275 Battery Street
4  San Francisco, California  94111-3305
   Telephone: (415) 984-8700
5  Facsimile: (415) 984-8701

6  Attorneys for Defendant
   Axis Systems, Inc.

7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10                  SAN JOSE DIVISION

11 | IKOS SYSTEMS, INC., and          | Case No. C01-21079-JW
   | MASSACHUSETTS INSTITUTE OF       |
12 | TECHNOLOGY,                      | **DEFENDANT AXIS SYSTEMS, INC.'S**
   |                                  | **RESPONSIVE BRIEF IN SUPPORT OF**
13 |               Plaintiffs,        | **ITS CLAIM CONSTRUCTION UNDER**
   |                                  | **PATENT LOCAL RULE 4-5(b)**
14 |          v.                      |
   |                                  | Hearing Date:  May 3, 2002
15 | AXIS SYSTEMS, INC.,              | Time:          8:00 a.m.
   |                                  | Place:         Courtroom 8
16 |               Defendant.         | Judge:         Hon. James Ware

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................. 1

II.   GENERAL BACKGROUND ............................................................................... 1

III.  CLAIM CONSTRUCTION:  U.S. PATENT NOS. 5,596,742 ('742 PATENT)
      AND 5,761,484 ('484 PATENT) ......................................................................... 1

      A.    Background ................................................................................................. 2

      B.    Claim Construction ..................................................................................... 4

            1.    The Proper Construction Of "virtual interconnections" ............................. 4

                  a.    Intrinsic Evidence Demonstrates That Virtual
                        Interconnections Require A Pipelined, Statically Routed
                        Communication Network. ................................................................ 4

                  b.    Plaintiffs' Interpretation Ignores The Definitions In The
                        Specification And Requires Nothing More Than
                        Multiplexing – The Prior Art. ........................................................ 6

                  c.    The Prosecution History Is Entirely Consistent With Axis's
                        Construction And Contradicts Plaintiffs' Construction. ................. 8

                  d.    The Inventors' Own Words Confirm That Virtual
                        Interconnections Require A Statically Routed
                        Communication Network In Which Each Statically
                        Communicated Signal Is Assigned To A Specific Cycle Of
                        The Pipeline Clock. ...................................................................... 11

            2.    The Proper Construction Of "static virtual interconnection" ................... 12

                  a.    The Intrinsic Evidence Demonstrates That "Static Virtual
                        Interconnection" Has The Same Meaning As "Virtual
                        Interconnection." .......................................................................... 13

                  b.    The Inventors Could Not Provide Any Additional Meaning
                        For The Added Word "Static." ...................................................... 15

            3.    The Proper Construction Of "statically communicating" ........................ 16

            4.    The Proper Construction Of "phase," "multiplexed," and
                  "pipelined" .............................................................................................. 17

            5.    The Proper Construction Of "multiplexer" ............................................. 19

            6.    The Proper Construction Of "time-multiplexed" .................................... 20

                  a.    The Prosecution History Defines The Term "Time-
                        Multiplexed" ................................................................................ 20

**TABLE OF CONTENTS**
(continued)

Page

b.     The Inventors Confirmed The Definition Provided By The
       Prosecution History ....................................................................... 21

7.   The Proper Construction Of "communicating," "communicate,"
     And "communication" ...................................................................... 21

8.   The Proper Construction Of "communication path" ................................ 21

9.   The Proper Construction Of "configurer" ................................................ 22

10.  The Proper Construction Of "inter-module dependencies" And
     "interpartition dependencies" ........................................................... 22

11.  The Proper Interpretation Of "system clock period" ............................... 23

IV.   CLAIM CONSTRUCTION: U.S. PATENT NO. 5,649,176 ("'176 PATENT") ............. 24

      A.   Background .............................................................................................. 24

      B.   Claim Construction ................................................................................. 26

           1.   The Proper Construction Of "environment" And "environmental" ......... 26

           2.   The Proper Construction Of "environmental timing signal" .................. 28

                a.     The Intrinsic Evidence Supports The Construction That An
                       Environmental Timing Signal Has A Fixed Frequency That
                       Is Slower Than The Internal (Virtual) Clock Signal. ................... 28

                b.     The Inventors' Words And Dictionary Definitions Support
                       Axis's Construction. ...................................................................... 30

           3.   The Proper Construction Of "internal clock" ........................................... 30

                a.     The Intrinsic Evidence Specifies A Fixed Frequency Signal
                       Existing Within The Configurable Logic System That Is
                       Invisible To The Environment. ...................................................... 31

                b.     The Extrinsic Evidence Requires That The Internal Clock
                       Signal Be Periodic And Have A Fixed Frequency. ....................... 31

           4.   The Proper Construction Of "resynthesizing" ......................................... 32

           5.   The Proper Construction Of "buses" ........................................................ 32

           6.   The Proper Construction Of "configuring the logic system" ................... 33

           7.   The Proper Construction Of "control signal" ............................................ 33

           8.   The Proper Construction Of "controller" And "controller means" ........... 34

1

**TABLE OF CONTENTS**
(continued)

2

**Page**

3        9.    The Proper Construction Of "sampled" And "sampling" ........................ 35

4        10.   The Proper Construction Of "synchronize" ............................................. 35

5        11.   The Proper Construction Of "synchronizer" ............................................ 36

6   V.   CONCLUSION ...................................................................................................... 36

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

<u>**CASES**</u>

4

Advanced Display Sys. v. Kent State Univ.,
  212 F.3d 1272 (Fed. Cir. 2000) ........................................................................ 1

Arthur A. Collins, Inc. v. Northern Telecom Ltd.,
  216 F.3d 1042 (Fed. Cir. 2000) ........................................................................ 1

SciMed Life Sys. v. Advanced Cardiovascular Sys.,
  242 F.3d 1337 (Fed. Cir. 2001) ........................................................................ 7

Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n,
  988 F.2d 1165 (Fed. Cir. 1993) ........................................................................ 7

Wang Labs., Inc. v. America Online, Inc.,
  197 F.3d 1377 (Fed. Cir. 1999) ...................................................................... 12

ZMI Corp. v. Cardiac Resuscitator Corp.,
  844 F.2d 1576 (Fed. Cir. 1988) ...................................................................... 17

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>Table of Abbreviations</u>

2

3        **"'742 Patent"** means United States Patent No.5,596,742.

4        "**'742 Application**" means the application that gave rise to the '742 Patent.

5        "**'484 Patent**" means United States Patent No. 5,761,484.

6        "**'484 Application**" means the application that gave rise to the '484 Patent.

7        "**'176 Patent**" means United States Patent No. 5,649,176.

8        "**'176 Application**" means the application that gave rise to the '176 Patent.

9        "**Patent Office**" means the United States Patent and Trademark Office.

10       "**Simmons Decl.**" means the Declaration Of Luann L. Simmons In Support Of Defendant

11  Axis Systems, Inc.'s Claim Construction Brief.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BRIEF IN SUPPORT OF AXIS'S PROPOSED
CLAIM CONSTRUCTION
C01-21079-JW

1    **I.        INTRODUCTION**

2             The patents in this lawsuit cover specific systems and methods for using arrays of

3    FPGAs to model complex circuit designs.  The products made by defendant Axis Systems, Inc.

4    ("Axis") use an approach that is fundamentally different than the methods and systems claimed in

5    the three patents at issue.  Nonetheless, in an attempt to ensnare Axis, plaintiffs have proposed

6    constructions that would read out the essential limitations of the patent claims and ignore

7    representations made during prosecution of the patents.  The Court should reject these proposed

8    improper constructions.

9    **II.       GENERAL BACKGROUND**

10            The three patents at issue relate to products that use FPGA arrays to simulate or

11   emulate the design of a semiconductor circuit.  A circuit designer first uses a software tool to

12   make an initial software model of the circuit design.  The software model is then compiled to

13   create the information used to configure the FPGA array to create a hardware model of the circuit.

14   The circuit model is then analyzed by the user to verify and debug the circuit design prior to

15   fabrication.  The circuit model may be operated in isolation or in the environment in which the

16   design is ultimately destined to function, such as a motherboard.

17            The three patents at issue must be construed together.  The '742 and '484 Patents

18   were filed by the same inventors, claim the same priority date, rely on identical drawings, and the

19   written descriptions are identical except for a few immaterial sentences.  Thus, these patents must

20   be construed consistently.  Arthur A. Collins, Inc. v. Northern Telecom Ltd., 216 F.3d 1042, 1044

21   (Fed. Cir. 2000).  The '176 Patent incorporates by reference the '742 Patent, making that patent

22   "effectively part of the host document as if it were explicitly contained therein."  Advanced

23   Display Sys. v. Kent State Univ., 212 F.3d 1272, 1282 (Fed. Cir. 2000).

24   **III.      CLAIM CONSTRUCTION:**
     **U.S. PATENT NOS. 5,596,742 ('742 PATENT) AND 5,761,484 ('484 PATENT)**
25

26            Plaintiffs' brief addresses the terms to be construed in alphabetical order.  Because

27   the terms are more easily understood if they are ordered based on their meanings, Axis addresses

28   the terms in a different order than plaintiffs.  For the convenience of the Court, charts containing

cross-references between the joint claim construction and pre-hearing statement, plaintiffs' brief and this brief are provided in Exhibit A.

### A.    Background

The heart of the '742 and '484 Patents is a technology called "virtual interconnections." Virtual interconnections are intended "to overcome pin limitations" in arrays of FPGAs or "logic modules" (the term used in the claims). An FPGA device has numerous logic elements that can be used to model portions of a circuit, but only a limited number of pins through which signals may be transmitted into or out of the device. As a result, an FPGA can process many more signals internally than it can transmit externally to neighboring FPGAs in the array. The constraint created by the limited number of pins may prevent the user from taking full advantage of the logic available in each FPGA.

To solve this problem, the inventors turned to what they termed "an old trick" – "multiplexing." Declaration of Luann Simmons ("Simmons Decl.") ¶¶ 50, 61. In the most general sense, "multiplexing" describes the sharing of a common communication resource. By sharing each pin among multiple logical signals, the inventors could make use of more logic elements within each FPGA. Of course, the inventors could not patent multiplexing, which had been known for decades. The prior art also taught multiplexing signals across common pins between FPGAs in products used to model circuit designs. Id. ¶¶ 83-85. Thus, the inventors devised a specific approach for which they coined the synonymous terms "virtual interconnections" or "virtual wires." Id. ¶¶ 9-15.

Virtual interconnections require the establishment of a "pipelined, statically routed communication network." In such a network, each signal is scheduled to cross the pins according to a particular time-slot of a "pipeline" clock – i.e., "statically communicated."

To understand the important relationship of the "pipeline clock" to a virtual interconnection, some background on clock signals is necessary. In a typical digital circuit, data communication is controlled by a periodic "clock" signal, which is essentially a uniform stream of pulses. On each cycle of the clock – the time period from one pulse to the next pulse – data signals are transmitted from their sources to their destinations throughout the entire circuit.

1    The patents at issue describe products in which the user configures an array of

2   FPGAs to model the logic operations of a circuit under design.  The clock for the circuit under

3   design is referred to as the "emulation clock" or the "target clock."  To accurately model the

4   operations of the circuit, a signal may have to travel through multiple FPGAs from its source to

5   its destination.  If signals must share a common pin, they will not reach their destination in one

6   cycle of the emulation clock because the emulation clock will only transmit one signal across the

7   pin on a single pulse.

8    To ensure that all data signals reach their destinations in one cycle of the

9   emulation clock, the patents teach a method to create a new, faster clock that can clock multiple

10   signals across the same pin within one cycle of the emulation clock.  This clock is called the

11   "pipeline clock" or "virtual clock."  The relationship between these clocks is depicted below:

12

13

14   

15

16

17

18   When using virtual interconnections, the faster pipeline (virtual) clock, not the target (emulation)

19   clock, controls the communications in the FPGA arrays.  In the example depicted above, the

20   pipeline clock will transmit up to eight signals across each FPGA pin within one cycle of the

21   target clock.  If the technique works properly, all signals will be transmitted by the pipeline clock

22   – or "pipelined" – to their destinations within a single cycle of the emulation clock.

23    In the systems and methods described in the patents, the circuit design is compiled

24   in a host workstation computer.  The host workstation schedules each signal communicated

25   across an FPGA pin for a specific pulse of the pipeline (virtual) clock.  The resulting system is

26   called a "statically routed communication network."  In this context, static means that the

27   communications are scheduled when the circuit is compiled.

28

1

**B.      Claim Construction**

2

**1.      The Proper Construction Of "virtual interconnections"**

3       Axis contends that "virtual interconnections" means "logical connections that

4    result from the application of the technique of statically communicating synchronous logical

5    signals between logic modules through a single pin in a multiplexed, pipelined fashion wherein

6    each logical signal is scheduled for a specific cycle of the pipeline clock."  Plaintiffs, on the other

7    hand, claim that a virtual interconnection is "a logical electrical connection implemented by

8    sharing an inter-module connection with other logical electrical connections" – in other words,

9    creating a connection by multiplexing (*i.e.*, "sharing") a pin (*i.e.*, "an intermodule connection").

10   Plaintiffs' unduly broad construction ignores express definitions in the specification and would

11   encompass any multiplexing of signals between logic modules, including the prior art.

12       Because the term "virtual interconnections" was coined by the inventors and has

13   no ordinary meaning to those of ordinary skill in the art, the proper interpretation of the term must

14   be based on the inventors' words in the specification and in the prosecution history.  Further, any

15   ambiguities must be resolved by the extrinsic evidence, including the inventors' writings and

16   testimony.  Voice Technologies Group, Inc. v. VMC Systems, Inc., 164 F.3d 605, 615-16 (Fed.

17   Cir. 1999).

18       The following analysis shows that virtual interconnections, by definition, are much

19   more than connections created by multiplexing a pin.  The definitions provided by the inventors

20   establish that: (1) virtual interconnections are "[e]stablished via a pipelined, statically routed

21   communication network; and (2) statically routed communication requires each signal to be

22   communicated (pass across a pin) during a predetermined time-slot of a pipeline clock; and

23   (3) the predetermination of time-slots occurs during the compilation process that precedes

24   configuring the FPGAs.

25

**a.      Intrinsic Evidence Demonstrates That Virtual Interconnections Require A Pipelined, Statically Routed Communication Network.**

26

27   **(1)      The Claims**.  The term "virtual interconnection" appears in every independent

28   claim in the '742 Patent and all but one independent claim of the '484 Patent.  A typical use of the

BRIEF IN SUPPORT OF AXIS'S PROPOSED
CLAIM CONSTRUCTIONS
C01-21079-JW

1   term is found in Claim 1 of the '742 Patent: "the logic module being configured to communicate

2   through virtual interconnections in a time-multiplexed fashion through at least one pin."

3       **(2)   The Specification**.  Virtual interconnections are "[e]stablished via a pipelined,

4   statically routed communication network."

5           A virtual interconnection represents a connection between a logical
            output 11a on one FPGA 10 and a logical input 19'a on another
6           FPGA 10'. **Established via a pipelined, statically routed
            communication network, these virtual interconnections** increase
7           available off-chip communication bandwidth by multiplexing 13
            the use of FPGA pin resources (physical wires) 15 among multiple
8           emulation signals (logical wires).

9   '742 Patent at 4:52-59; '484 Patent at 5:7-14 (emphasis added).

10          The term "statically routed communication network" means that the

11  communication pathways, including the transmission of signals across the pins, are established

12  based on an analysis of the signals in the circuit design before the FPGAs are configured.

13  "Statically routed networks can be used whenever communication can be predetermined.  Static

14  refers to the fact that all data movement can be determined and optimized at compile-time."  '742

15  Patent at 1:43-51; '484 Patent at 1:42-62.  The phrase "at compile-time" means when the circuit is

16  compiled to create the information necessary to configure the FPGAs.  '742 Patent at 6:15 - 7:17

17  & Fig. 5; '484 Patent at  6:54 - 7:57 & Fig. 5.

18          In the statically routed communication network required for virtual

19  interconnections, each signal has a fixed time slot that corresponds to a specific cycle of the

20  "pipeline clock."  The assignment of a signal to a time slot occurs during the "global routing"

21  step, which is part of the circuit compilation process required before configuring the FPGAs.

22  '742 Patent at 6:15 - 7:17 & Fig. 5; '484 Patent at 6:54 - 7:57 & Fig. 5.  "During global routing

23  (150), each logical wire is scheduled to a phase, and assigned a pipeline time slot (corresponding

24  to one cycle of the pipeline clock in that phase on a physical wire)."  '742 Patent 6:66-7:2; '484

25  Patent 7:38-41.  At the assigned time, the logical signal is communicated in a multiplexed,

26  pipelined fashion across the physical wire.  Thus, "[b]y pipelining and multiplexing physical

27  wires, virtual interconnections are created to increase usable bandwidth."  '742 Patent at 5:9-10;

28  '484 Patent at 5:35-36.

1        Because virtual interconnections are limited to static communications that are

2    scheduled in advance and bear a direct relationship to the pipeline (virtual) clock, virtual

3    interconnections cannot be used with asynchronous signals, which lack these characteristics.  The

4    patents clearly express this limitation on the use of virtual interconnections:

5              **The use of virtual interconnections is limited to synchronous
         logic.**  Any asynchronous signals must still be "hard-wired" to
6         dedicated FPGA pins.  This limitation is imposed by the inability to
         statically determine dependencies in asynchronous loops.
7

8    '742 Patent at 5:36-40; '484 Patent at 5:62-66 (emphasis added).  Because synchronous signals

9    are transmitted in a "statically routed communication network," the circuit communication is

10   "inherently static."  '742 Patent at 5:20; '484 Patent at 5:46.

11       The essential aspects of virtual interconnections are apparent from the claims and

12   specification cited above.  Virtual interconnections are established via a statically routed

13   communication network, which means that the signals must be statically communicated across

14   the pins.  The static communications are scheduled for specific cycles of the pipeline clock, which

15   is used to multiplex and pipeline synchronous signals across the pins.  Thus, virtual

16   interconnections require a statically routed communication network in which each statically

17   communicated signal is assigned to a specific cycle of the pipeline clock.

18              **b.    Plaintiffs' Interpretation Ignores The Definitions In The
                   Specification And Requires Nothing More Than Multiplexing –
19                   The Prior Art.**

20       Plaintiffs argue that "virtual interconnection" means nothing more than "a logical

21   electrical connection implemented by sharing an intermodule connection with other logical

22   electrical connections."  Plaintiffs' construction does not require a statically routed

23   communication network.  Nor does it require that signals be scheduled to the pipeline clock.

24   Rather, in plaintiffs' view any "sharing" (*i.e.*, multiplexing) of an "intermodule connection" (*i.e.*,

25   an FPGA pin) among signals would be a virtual interconnection.  This open-ended construction

26   cannot be squared with the specification or the claims.

27       For example, the specification states without qualification that "[t]he use of virtual

28   interconnections is limited to synchronous logic."  '742 Patent at 5:36-37; '484 Patent at 5:62-64.

1    This limitation does not fit plaintiffs' construction, because nothing would prevent asynchronous

2    signals from "sharing an inter-module connection." Under Axis's construction, the limitation

3    makes perfect sense. Signals can be determined and scheduled at compile-time only if they are

4    synchronous, and thus will have a fixed relationship to the pipeline clock.

5         Plaintiffs' construction of "virtual interconnections" as the electrical connections

6    that result from signals "sharing an intermodule connection" would effectively eliminate the

7    limitation of "virtual interconnections" – the fundamental idea of the patent – from the claims.

8    Such a construction must be rejected.  <u>Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n</u>, 988

9    F.2d 1165 (Fed. Cir. 1993).  Claim 1 of the '742 Patent, for example, calls for "the logic module

10   being configured to communicate through virtual interconnections in a time-multiplexed fashion."

11   Plaintiffs' broad construction of "virtual interconnections," however, would characterize all

12   "time-multiplexed" communications.

13        Plaintiffs' proposed construction would impermissibly broaden the meaning of

14   "virtual interconnections" well beyond its meaning in the patents.  "Virtual interconnections" is

15   consistently defined in the patents to require a statically routed communication network in which

16   each statically communicated signal is assigned to a specific cycle of the pipeline clock.  Thus,

17   the only explanation for how logic modules may be "configured to communicate through virtual

18   interconnections," is the assignment of the signals to specific cycles of the pipeline clock.  '742

19   Patent, Fig. 5.  Nothing in the patents suggests that the term was intended to have a broader

20   meaning than that stated in the specification.  Plaintiffs' broad construction must therefore be

21   rejected.  <u>SciMed Life Sys. v. Advanced Cardiovascular Sys.</u>, 242 F.3d 1337 (Fed. Cir. 2001).

22        Finally, plaintiffs' interpretation is not supported by the sole reference to the

23   specification on which they rely:

24         Virtual interconnections overcome pin limitations by intelligently
           multiplexing each physical wire among multiple logical wires and
25         pipelining these connections at the maximum clocking frequency of
           the FPGA.  *A virtual interconnection represents a connection from*
26         *a logical output on one FPGA to a logical input on another FPGA.*

27   Pl. Br. at 18 (quoting '742 Patent at 2:9-14) (emphasis added by plaintiffs).  The first sentence,

28   which describes the virtual interconnections technique, contradicts plaintiffs' construction.  If

BRIEF IN SUPPORT OF AXIS'S PROPOSED
CLAIM CONSTRUCTIONS
C01-21079-JW

1    plaintiffs' proposed construction were simply substituted into that sentence in place of "virtual

2    interconnections," the sentence would make no sense.  The sentence, moreover, specifies that

3    virtual interconnections overcome pin limitations **"by intelligently multiplexing each physical**

4    **wire among multiple logical wires and pipelining these connections at the maximum**

5    **frequency of the FPGA."**  Under plaintiffs' construction, virtual interconnections do not perform

6    "intelligent" multiplexing; in plaintiffs' view a virtual interconnection is simply a shared pathway

7    between logical modules.  By contrast, under Axis's interpretation the pins are "intelligently"

8    multiplexed because the communications across those pins are known and scheduled at compile-

9    time.

10          The second, italicized, sentence in the excerpt above on which plaintiffs rely, is

11   merely descriptive, not definitional; it states what a virtual interconnection "represents," but not

12   what the term means.  Notably, the identical sentence appears elsewhere in the patent in the

13   following context:  "A virtual interconnection represents a connection from a logical output on

14   one FPGA and a logical input on another FPGA.  **Established via a pipelined, statically routed**

15   **communication network, these virtual interconnections** increase available off-chip

16   communication bandwidth by multiplexing the use of FPGA pin resources (physical wires)

17   among multiple emulation signals (logical wires)."  '742 Patent 4:52-59 (emphasis added).  This

18   confirms the requirement that virtual interconnections be established in a statically routed

19   communication network.

20          ### c.    The Prosecution History Is Entirely Consistent With Axis's
           ### Construction And Contradicts Plaintiffs' Construction.

21

22          For the Court's convenience, a graphical depiction of the prosecution history for

23   the '742 and '484 Patents is provided in Exhibit B hereto.

24          When the inventors filed the '742 Application, they used the term "virtual wires"

25   to describe the alleged invention.  Simmons Decl. ¶ 19, Ex. 11.  The inventors submitted to the

26   Patent Office an April 1993 article containing their first published description of "virtual wires."

27   Id.  The article defined "virtual wires" as follows:

28

1

### 1.3     Virtual Wires

To overcome pin limitations in FPGA-based logic emulators, we propose the use of virtual wires.  A virtual wire represents a simple connection between a logical output on one FPGA and a logical input on another FPGA.  **Established via a pipelined, statically routed communication network, these virtual wires increase available off-chip communication bandwidth by multiplexing the use of FPGA pin resources (physical wires) among multiple emulation signals (logical wires).**

Id. ¶ 16 (footnote and endnote omitted) (emphasis added).  Later, the inventors amended their application to change the term "virtual wires" to "virtual interconnections."  Id. ¶¶ 9-10.  It is undisputed that these terms have the same meaning.  Id. ¶¶ 9-15.  Thus, this intrinsic evidence – the inventor's paper submitted to the Patent Office when they were prosecuting the '742 Application – confirms that virtual interconnections are established via a pipelined, statically routed communication network.

Through their proposed construction, plaintiffs are seeking to broaden the claims in a manner specifically rejected by the Patent Office.  The Patent Office rejected the inventors' attempt to claim a system for transmitting signals between logic modules over a shared pin that did not also require a statically routed communication network.  Id. ¶¶ 20-21.  In the '742 Application, the inventors included the following claim:

> 10. (Amended) A reconfigurable logic module comprising
>
> an array of gates configurable to define a logic circuit; and
> gates reconfigured as a multiplexer for receiving a plurality of outputs from the configured gate array and for communicating the received outputs through a single pin in a multiplexed, pipelined fashion.

Id. ¶ 20.  The Patent Office rejected this claim, and all claims depending from it, as anticipated by prior art.  Id. ¶ 21.  The inventors did not attempt to traverse the rejection; they simply canceled the rejected claims.  Id. ¶ 22.  Now plaintiffs are attempting to resurrect this rejected claim by defining "virtual interconnect" as meaning the simple "sharing" of a pin among multiple signals.  "[A] a claim cannot be construed to revive rejected or abandoned claims."  Arco Industries Corp. v. Chemcast Corp., 633 F.2d 435, 440 (6th Cir. 1980).  The plaintiffs' attempt should again be rejected.

1    In prosecuting the '484 Application, the inventors described their system and

2    method as requiring a "statically routed network" in which "every signal propagating through and

3    between the logic modules travels along a pre-determined communication path, as defined by the

4    configurer."  Simmons Decl. ¶ 26.  The inventors distinguished a prior art reference by William

5    Dally describing a system using "virtual channels."  Id. ¶¶ 25-27.  The inventors explained that

6    virtual channels use a dynamically routed system in which messages are "tagged" with routing

7    information to get them to their destination, "instead of having a predetermined static route."  Id.

8    ¶ 27.  The requirement that virtual connections be established via a "statically routed

9    communication network" in which each signal travels along a "predetermined static route" was

10   essential to the inventors' attempt to distinguish the prior art.[1]

11   The prosecution history also confirms the requirement that virtual interconnections

12   are pipelined and multiplexed.  In a letter explaining their position, the inventors represented:

13   "Virtual interconnections are created by pipelining and multiplexing physical wires among logic

14   wires."  Id. ¶ 32; see also id. ¶ 28.

15   Finally, the prosecution history demonstrates that the sentence from the

16   specification on which plaintiffs rely was not intended to be definitional.  In prosecuting the '484

17   Patent, the inventors declared:  "Each virtual interconnection **includes** a communication path

18   from a logical output on one FPGA to a logical input on another FPGA."  Id. ¶ 29 (emphasis

19   added).  This is almost identical to the sentence on which plaintiffs rely:  "A virtual

20   interconnection **represents** a connection from a logical output on one FPGA to a logical input on

21   another FPGA."  '742 Patent at 2:12-14 (emphasis added).  The words "includes" and

22   "represents" in these sentences make them descriptive, not definitional.  They do not purport to

23   state a complete definition of the term.

24

25

26

27
_____
[1]   Although the inventors at the same time added references to "static virtual interconnections"
28   in their claims, as explained below, that change was made to clarify the claims, not to limit them.

**d.    The Inventors' Own Words Confirm That Virtual Interconnections Require A Statically Routed Communication Network In Which Each Statically Communicated Signal Is Assigned To A Specific Cycle Of The Pipeline Clock.**

In a 1994 article, for example, the inventors stated:  "A virtual wire represents a connection from a logical output on one FPGA to a logical input on another FPGA established via a pipelined, statically routed communication network."  Simmons Decl. ¶ 33.  When asked whether this definition applies to the patent, one of the inventors, Dr. Tessier confirmed that this definition "is an accurate assessment of our thoughts in preparing the patent, yes."  Id. ¶ 36.  In numerous articles and papers by the inventors, the requirement of a statically routed communication network consistently appears.  Id. ¶ 40-49.

The evidence also confirms that signals communicated through virtual interconnections must be tied to the pipeline clock (which is often referred to by the synonymous term, "virtual clock").  An article by one of the inventors, Charles Selvidge, describes the scheduling of signals to transmissions across pins as "the fundamental aspect of VirtualWires."  Id. ¶ 50.  A paper written by Dr. Agarwal, another one of the inventors, describes "the fundamental step in VirtualWires technology" as the process that makes "all of the signals that emanate from the FPGAs have a **precise relationship to the virtual clock**."  Id. ¶ 51.  The '176 Patent similarly states:  "In a [sic] virtual wires systems signals are routed among multiple FPGAs **on specific internal clock VClk [virtual clock] cycles**."  '176 Patent 13:51-53 (emphasis added).

In depositions, the inventors confirmed that virtual interconnections require the scheduling of signals on specific cycles of the pipeline (or virtual) clock.  Dr. Babb testified that virtual wires communications are scheduled for specific cycles of the virtual clock.  Simmons Decl. ¶ 52.  He also confirmed that "intelligently multiplexing" as used in the specification refers to this specific compilation approach which results in the scheduling of the signals.  Id. ¶ 54.

The inventors have explained virtual interconnections as a technique rather than a physical pathway.  Dr. Agarwal testified that the expression "virtual interconnections" is used to "disassociate" the logical signals from the physical wire they are transferred over.  Id. ¶ 59.  He confirmed that a physical hard-wired connection therefore could not be a virtual interconnection.

BRIEF IN SUPPORT OF AXIS'S PROPOSED
CLAIM CONSTRUCTIONS
C01-21079-JW

1    Id. ¶ 58.  Similarly, Dr. Selvidge, an inventor on the related '176 Patent, described virtual

2    interconnections as a "technique," not an "entity."  Id. ¶ 60.

3                The patents do not teach how to implement virtual interconnections without static

4    communications, and the inventors confirmed that they never built such a system.  Id. ¶ 56

5    (confirming that in the virtual wires system built at MIT, "the logical signals are prescheduled to

6    each of the virtual clock time slots"); Id. ¶ 39 (confirming that virtual wires uses static

7    scheduling); Id. ¶ 38 (confirming that a virtual wire is established by a statically routed

8    communication network).  One of the inventors, Dr. Babb, admitted that a simple "naïve

9    multiplexing" of the signals absent the advance compilation steps required for virtual wires would

10   not work.  Id. ¶ 54.  Given that the patent disclosure does not enable any embodiment without

11   static communications, and the inventors have acknowledged that they were never able to build a

12   virtual interconnection system that was not statically communicated, a construction of the term

13   "virtual interconnections" that would extend the scope of term beyond static routing must be

14   rejected.  Wang Labs., Inc. v. America Online, Inc., 197 F.3d 1377 (Fed. Cir. 1999) (rejecting

15   claim construction that would encompass a non-enabled embodiment that the inventors were

16   unable to make).

17                In summary, the extrinsic evidence confirms the construction of virtual

18   interconnections supported by the intrinsic evidence:  "virtual interconnections" means "logical

19   connections that result from the application of the technique of statically communicating

20   synchronous logical signals between logic modules through a single pin in a multiplexed,

21   pipelined fashion wherein each logical signal is scheduled for a specific cycle of the pipeline

22   clock.

23            **2.    The Proper Construction Of "static virtual interconnection"**

24                Virtual interconnections are inherently static because, as specified in both the '742

25   and '484 Patents, virtual interconnections require establishing a pipelined, statically routed

26   communication network.  The term "*static* virtual interconnection" is used only in some claims of

27   the '484 Patent; it is not defined or even mentioned in the specification of the '742 or '484

28

BRIEF IN SUPPORT OF AXIS'S PROPOSED
CLAIM CONSTRUCTIONS
C01-21079-JW

1  Patents. The term "static" imposes no additional limitation on the term "virtual interconnection;"

2  it simply denotes the static nature of virtual interconnections.

3           As discussed below, during the prosecution of the foreign counterpart to the '742

4  Patent, the word "static" was added to "virtual interconnections" in some claims. The term

5  "static" was added only to emphasize the static nature of virtual interconnections and to overcome

6  rejections by the foreign examiners on grounds that "virtual interconnections" was unclear. After

7  the foreign prosecution was abandoned, the '484 application was examined in the United States

8  where it issued as the '484 Patent. None of the inventors or the attorneys who prosecuted the

9  patent could explain how the term "static" added any meaning to "virtual interconnection."

10  Accordingly, Axis's proposed construction is: "'static virtual interconnection'" has the same

11  meaning as "'virtual interconnection.'"

12           **a.       The Intrinsic Evidence Demonstrates That "Static Virtual Interconnection" Has The Same Meaning As "Virtual**
13  **Interconnection."**

14           A review of the interrelated history of the '742 and '484 Patents is necessary to

15  understand how "static" was added to the term "virtual interconnection" in some of the claims of

16  the '484 Patent.

17           The '742 Patent Application was filed on April 2, 1993. Simmons Decl. ¶¶ 19, 63.

18  Each claim in the application required a "virtual interconnection." Id.

19           On April 1, 1994, the inventors filed an application in an attempt to obtain a patent

20  on virtual interconnections under the Patent Cooperation Treaty ("PCT"). Id. ¶¶ 23, 63. When

21  filed, the PCT disclosure was identical to the '742 disclosure, except for a few immaterial

22  sentences. Id. at Ex. 11, 12, 15. Most of the claims in the PCT application were verbatim

23  identical to the claims in the pending '742 Application; the claims that were not identical differed

24  only in insubstantial respects. Id.

25           On December 23, 1994, 17 of the 22 claims in the PCT application were rejected

26  as unclear and unpatentable. Id. ¶¶ 25, 64. The rejected claims included the basic claims for

27  virtual interconnections. Id. at Ex. 13. To try to overcome the rejection, the inventors (through

28  their attorneys) argued that their approach required a statically routed communication network.

1   Id. ¶ 66.  To emphasize the point, they added the word "static" to "virtual interconnection" in the

2   claims.  Id. ¶ 65.  In their response to the rejections, the inventors described their "invention" as

3   follows:

> The configurer analyzes the logic signal dependencies and statically
> schedules and routes FPGA communications.  **Each signal is
> assigned a communication path by the configurer, which
> automatically configures the logic modules to provide static
> virtual interconnections for signals within the system.  As
> described at page 10, line 17 through page 11, line 32 of the
> Disclosure, the resulting system is a statically routed network.**
> In other words, every signal propagating through and between the
> logic modules travels along a predetermined communication path,
> as defined by the configurer.

10  Id. ¶ 66.

11          The description quoted above confirms that there is no distinction between "static

12  virtual interconnections" and "virtual interconnections."  The section of the "Disclosure" cited in

13  the above quote appears verbatim in the '742 Application and in the '742 Patent (except for one

14  inconsequential paragraph), and the definitions of the terms "static" and "statically routed

15  communication network" are word-for-word identical in the two disclosures.  Id. at Ex. 11, 12,

16  15.  The inventors stated and argued that when logic modules are configured "to provide static

17  virtual interconnections," then "the resulting system is a statically routed network."  Id. ¶¶ 65-66.

18  But "virtual interconnections" are "established via a pipelined, statically routed communication

19  network."  '742 Patent at 4:52-59; '484 Patent at 5:7-14.  Adding the word "static" before the

20  term "virtual interconnection" thus does nothing more than emphasize that virtual

21  interconnections require a statically routed communication network.

22          The attempt to clarify "virtual interconnections" by adding "static" did not

23  succeed.  On July 4, 1995, the claims in the PCT application were again rejected on the basis that

24  the term "static virtual interconnection" was "not clear."  Simmons Decl. ¶ 67.  For that reason,

25  the word "static," which appeared in the claims in front of the term "virtual interconnection," was

26  "ignored for the further considerations" by the examiners.  Id.  Ultimately, the inventors

27  abandoned attempts to secure foreign patents based on the PCT application.  Id. ¶ 69.

28

1    The PCT application, however, entered the national stage as a U.S. patent

2    application on September 28, 1995. Id. ¶ 70. On October 10, 1996, before the Patent Office had

3    acted on the application, the inventors added 17 new claims. Id. ¶¶ 11, 71. None of these newly

4    added claims used the term "static virtual interconnections." Id. ¶ 71, Ex. 9. Thus, following the

5    amendment, the '484 Application contained a mixed and inconsistent set of claims, some

6    referring to "static virtual interconnections" left over from the PCT prosecution, others referring

7    simply to "virtual interconnections."

8    On March 6, 1997, the Patent Office rejected the '484 Application on the grounds

9    of double patenting, in view of the similarly worded claims in the '742 Patent. Id. ¶ 72. The

10   inventors agreed to a terminal disclaimer to overcome this double patenting rejection. Id. ¶ 73.

11   The Patent Office then allowed the claims, and the '484 Patent issued on June 2, 1998. Id. ¶ 74.

12   The description of the invention presented during the PCT phase of the

13   prosecution of the '484 Application is part of the file history for the '484 Patent. Thus, that

14   description creates a prosecution history estoppel for the '484 Patent.

15
16
     **b.    The Inventors Could Not Provide Any Additional Meaning For
             The Added Word "Static."**

17   The inventors on the '484 Patent and their attorneys could not explain what

18   additional meaning, if any, was intended by adding the word "static" to "virtual interconnection."

19   When asked whether the term "static virtual interconnection" had any meaning to him,

20   Dr. Agarwal answered "[p]robably not." Simmons Decl. ¶ 75. Dr. Babb testified that the

21   adjective "static" was probably an "advertisement" intended as "an emphasis of the fact that we

22   were able to do the static scheduling." Id. ¶ 76. When the senior patent attorney who prosecuted

23   the '484 Patent was asked the meaning of static virtual interconnections, he responded: "I don't

24   know. Perhaps it's a superfluous term." Id. ¶ 77. The later deposed junior patent attorney could

25   not distinguish between "static virtual interconnections" and "virtual interconnections," even

26   though he had advance warning of the question from the senior patent attorney. Id. ¶¶ 78-79.

27   None of these witnesses adopted the construction proposed by plaintiffs. Simply put, there is no

28   evidence that the addition of the term "static interconnection" to the claims of the '484 Patent was

1   intended to do anything more than emphasize that signals transmitted through virtual

2   interconnections must be statically communicated.

3           **3.      The Proper Construction Of "statically communicating"**

4           Axis construes "statically communicating" to mean "communicating in a manner

5   in which all data movement is determined and optimized at the time the reconfigurable electronic

6   system is configured and the communications repeat in a predictable and periodic fashion."

7           The term "statically communicating" only appears in Claim 17 of the '484 Patent.

8   Claim 17 is the only independent claim in either the '484 or '742 Patents that does not recite

9   virtual interconnections.  Instead, the claim requires that:  "gates of the logic module of the

10  partition being configured as a multiplexer for receiving a plurality of outputs from the

11  configured array of gates and for **statically communicating** the received outputs through a single

12  pin in a multiplexed, pipelined fashion."  The same requirement exists for virtual

13  interconnections, which are inherently static because they are established via a pipelined,

14  statically routed communication network.  Claim 17 thus essentially incorporates the limitations

15  of virtual interconnections without using that term.

16          The patents define "static" to mean that "all data movement can be determined and

17  optimized at compile-time" – *i.e.*, before the modules are configured.  '742 Patent at 1:44-46;

18  '484 Patent at 1:43-45.  When signals are statically communicated, "communication patterns

19  repeat in a predictable fashion" – *i.e.*, they are periodic.  '742 Patent at 5:19-21; '484 Patent at

20  5:45-47.  Accordingly, "statically communicating" requires that the "data movements be

21  determined and optimized at the time the reconfigurable electronic system is configured and the

22  communications repeat in a predictable and periodic fashion."

23          In the '742 Patent, the Patent Office rejected a claim that contained an element that

24  was almost identical with Claim 17 of the '484 Patent, but with one crucial difference.  Simmons

25  Decl. ¶¶ 20-21.  The rejected claim called for "gates reconfigured as a multiplexer for receiving a

26  plurality of outputs from the configured gate array and for communicating the received outputs

27  through a single pin in a multiplexed, pipelined fashion."  Id.  Unlike the rejected claim, Claim 17

28

BRIEF IN SUPPORT OF AXIS'S PROPOSED
CLAIM CONSTRUCTIONS
C01-21079-JW

1   of the '484 Patent requires the "communicating" to be done "statically."  Without that limitation,

2   Claim 17 would have been rejected as well.

3       **4.       The Proper Construction Of "phase," "multiplexed," and "pipelined"**

4       The '742 and '484 Patents establish special definitions of the terms "pipelined"

5   and "multiplexed" that differ from the ordinary meanings of those terms.  Accordingly, the

6   special meanings expressed in the specification and the prosecution history must be used to

7   interpret "pipelined" and "multiplexed." <u>ZMI Corp. v. Cardiac Resuscitator Corp.</u>, 844 F.2d

8   1576, 1579 (Fed. Cir. 1988).

9       In order to statically communicate multiple signals across a single pin, the '742

10  and '484 Patents assign signals to particular pulses (or slots) of the pipeline (or virtual) clock.  To

11  organize the transmission of the signals across pins, the target clock period is divided into phases,

12  and each phase comprises several pulses of the pipeline clock.  The following diagram illustrates

13  this approach:



21      Signals that will be communicated across a pin are temporarily stored in a set of

22  registers.  During one phase of the target clock, signals are shifted serially onto the pin from the

23  registers and each signal is communicated across the pin on every pulse of the pipeline clock.

24  The patents refer to this communication as "pipelining."  During the next phase, signals from

25  another set of registers are shifted onto and "pipelined" across the pin.  The switch from one set

26  of registers in one phase to another set in the next phase is referred to as "multiplexing."  '742

27  Patent, 4:46-52; '484 Patent, 5:1-7.

28

1    This relationship of pipelining and multiplexing is shown in Figure 3 of the patents

2    (reproduced below):



12   Logical outputs 11a – 11d are pipelined across pin 15x under the control of the pipeline clock

13   during a first phase of the target clock.  Then, logical outputs 11e and 11f are pipelined across pin

14   15x under the control of the pipeline clock during a second phase of the target clock.  The switch

15   from transmitting logical outputs 11a – 11d in one phase to transmitting outputs 11e and 11f in

16   the next phase is multiplexing.

17            FIG. 3 shows an example of six logical wires 11a-f sharing a single
         physical wire 15x. The physical wire 15x is **multiplexed** 13
18       between two **pipelined** shift loops 20a, 20b, which are discussed in
         detail below. **Pipelining refers to signal streams in a particular**
19       **phase and multiplexing refers to signals across phases.**

20   '484 Patent at 5:1-7 (emphasis added); see also '742 Patent at 4:46-52.

21            In accordance with the definitions provided in the '742 and '484 Patents,  Axis

22   construes "pipelined" to mean "communicating different logical signals through a pin wherein

23   each logical signal is communicated in the same phase within a target clock period."  Axis

24   construes "multiplexed" to mean "communicating different logical signals through a pin wherein

25   each logical signal is communicated across a different phase within a target clock period."

26   Finally, Axis construes "phase" to mean "a period less than the target clock period during which

27   logical signals are pipelined, and across which logical signals are multiplexed."

28

1      With respect to "pipelining" and "multiplexing," the plaintiffs fail to use the

2   special meanings of these terms established in the specification and the prosecution history of the

3   '742 and '484 Patents. Simmons Decl. ¶¶ 80-82. With respect to "phase," the difference between

4   Axis's proposed interpretation and plaintiffs' proposed interpretation is as follows: Axis asserts

5   that a phase is "less than a target clock period," whereas plaintiffs assert that a phase is "within a

6   target clock period." This difference is not semantic. Plaintiffs proposed interpretation would

7   include a single phase that occupies the entire target clock period. That interpretation would

8   exclude the preferred embodiment which multiplexes across target clock phases during a single

9   target clock period. Such an interpretation is rarely correct.

10      Axis's proposed interpretation is supported by the claims and the specification.

11   Claim 5 of the '742 Patent refers to "phase**s** within a target clock period." Other claims use the

12   term "phase" to refer to a portion of the target clock or a division of the target circuit that uses

13   that clock. '742 Patent Claims 6, 21, 28; '484 Patent Claims 4, 5, 15, 22, 32, 38. Thus, the

14   period of a "phase" must be less than the target clock period.

15   **5.      The Proper Construction Of "multiplexer"**

16      Axis construes the term "multiplexer" to mean "a device that generates

17   'multiplexed' signals." A multiplexer generates signals that are multiplexed, as the term

18   "multiplexed" is defined above. Figure 3, reproduced above, shows the multiplexer as item 13.

19   The multiplexer causes "multiplexed" signals to be communicated over the pin. '484 Patent at

20   5:1-7; see also '742 Patent at 4:46-52.

21      Plaintiffs' contention that a multiplexer is simply "a device for sharing a physical

22   wire among multiple logical wires" sweeps too broadly. Plaintiffs' characterization would also

23   apply to "shift registers," which are shown in Figure 3 as elements 20a and 20b. These shift

24   registers control the pipelining of signals across the FPGA pin, and thus are devices for sharing a

25   physical wire. Yet "shift registers" are expressly distinguished from "multiplexers" in the claims

26   and in the specification. For example, Claim 18 of the '484 Patent requires "at least one shift

27   register coupled between the multiplexer and the configured gate array." This arrangement of

28   shift registers and a multiplexer is illustrated in Figure 3 of both the '742 and '484 Patents, which

1  is reproduced above.  In describing the invention, the specification states that the "FPGA chips

2  comprise an array of gates, shift registers, and multiplexers."  '742 Patent at 2:55-63; accord '742

3  Patent at 5:32-33 & Fig. 3; '484 Patent at 5:58-59 & Fig. 3.  Consistent with the claims and

4  specification, the terms "multiplexer" cannot encompass "shift register."  Plaintiffs' construction

5  must be rejected.

**6.      The Proper Construction Of "time-multiplexed"**

7          Axis construes the term "time-multiplexed" to mean "transmitted with other logic

8  signals over a common wire using a technique in which each logical signal is assigned a fixed

9  time slot that repeats through time in a predictable fashion."

**a.      The Prosecution History Defines The Term "Time-Multiplexed"**

12         The claims use the term "time-multiplexed" to describe the fashion in which

13  signals are communicated through virtual interconnections out of the logic modules.  See, e.g.,

14  '742 Patent Claim 1 ("the logic module being configured to communicate through virtual

15  interconnections in a time-multiplexed fashion through at least one pin").  However, neither the

16  claims nor the specification define the term "time-multiplexed."  The patents do use the

17  equivalent term "time-division multiplexing" to describe the very large simulation system

18  ("VLSS"), "a massively parallel simulation engine which uses time-division multiplexing to

19  stagger logic evaluation."  '742 Patent at 1:48-51; '484 Patent at 1:47-51.

20         In the articles the inventors submitted to the Patent Office, the term "time division

21  multiplexing" (or "TDM") consistently refers to the assignment of a particular signal to a

22  particular time slot on a particular pin.  An article describing the VLSS describes a time-division

23  multiplexing or "TDM" technique in which each input or output "is assigned a time-slot number

24  and a bus pin."  Simmons Decl. ¶ 85.  An article describing a system called "SuperSim" described

25  a time division multiplexing approach in which "[e]ach gate is assigned a pin number (1 to 8) and

26  a Time-Slot (TS) number."  Id. ¶ 83.  A patent on the same system states:  "The output of each

27  hardware gate is assigned a bus pin and a time slot."  Id. ¶ 84.  The inventors cited each of these

28  references to the Patent Office.  Id. ¶¶ 83-85.

1        This prosecution history thus shows that "time multiplexing" refers to

2  communication by assigning each signal to a time slot.  Because the time-slot is assigned, the

3  signal is always transmitted during the same slot.  The assignment of the signal to its time slot

4  thus repeats through time in a predictable fashion.

5

             **b.**     **The Inventors Confirmed The Definition Provided By The Prosecution History**

6

7        Dr. Babb confirmed that "time multiplexing" and "time division multiplexing"

8  have the same meaning in the context of these patents.  Id. ¶ 86; see also id. ¶ 87.  Dr. Babb also

9  agreed that "in time multiplexing, data is associated with a particular time slot."  Id. ¶ 88; see also

10  id. ¶ 90.  Similarly, Dr. Tessier confirmed that "time multiplexing implies some relationship to

11  clock phase."  Id. ¶ 89.

12        In subsequent patents, the inventors represented that the time multiplexing

13  approach of the '742 Patent is to "stack logic signals in time and then transmit the signals on

14  successive clock pulses to a destination FPGA."  Id. ¶¶ 92-93.  Dictionaries, glossaries and

15  articles provide consistent definitions.  Id. ¶ 94-98.  Those references also confirm that the signal

16  communications repeat in a predictable fashion.  Id.

17

             **7.**     **The Proper Construction Of "communicating," "communicate," And "communication"**

18

19        Axis defines the term "communication" to mean "the meaningful transmission of

20  information from one location to another."  Plaintiffs agree that communicating requires a

21  transmission of information, but omit the term "meaningful."

22        These terms are not defined in the patent.  However, the ordinary meaning of

23  "communicate" is "[t]o convey information about; make know; impart."  Id. ¶ 99.  Dr. Agarwal,

24  an inventor on these patents, testified that the "definition of communication" is "some knowledge

25  from here being transferred to some other location."  Id. ¶ 100.  Thus, communication requires

26  that a transfer of information that imparts some meaning to the recipient – i.e., that is meaningful.

27

             **8.**     **The Proper Construction Of "communication path"**

28        Axis agrees to accept plaintiffs' proposed construction of "communication path."

1

**9.      The Proper Construction Of "configurer"**

2          Axis defines the term "configurer" to mean "a system or element that configures

3  the logic system to perform a desired logic operation or calculation."

4          The patents do not define the term "configurer."  The specifications use the term

5  "configure," however, to refer to the configuration of the logic system.  '742 Patent at 1:14-21;

6  '484 Patent at 1:12-20 ("Once configured, an FPGA-based emulator is a heterogeneous network

7  of special purpose processors, each FPGA processor being specifically designed to cooperatively

8  execute a partition of the overall simulated circuit.")  A configurer therefore must be something

9  that configures the logic system.

10          The '176 Patent, though extrinsic to these patents, discloses the same logic

11  modules or devices disclosed in the '742 Patent and the '484 Patent.  The '176 Patent states:

12  "Configurable logic devices are a general class of electronic devices that can be easily configured

13  to perform a desired logic operation or calculation."  '176 Patent at 1:6-8.  It follows that a

14  "configurer" is a system or element that configures the logic modules "to perform a desired logic

15  operation or calculation."

16

**10.      The Proper Construction Of "inter-module dependencies" And
          "interpartition dependencies"**

17

18          Axis defines the term "inter-module (or interpartition) dependencies" to refer to

19  "the relationship between two signals in different reprogrammable modules **of a synchronous**

20  **logic design** whereby the value of one signal in one module (partition) depends on the value of

21  the other signal in the other module (partition)."  The principal difference between this

22  construction and plaintiffs' proposed construction is that plaintiffs omit the phrase "synchronous

23  logic design."  The issue for resolution by the Court is whether this construction should be limited

24  to synchronous logic designs on the basis that the claimed optimization is not possible with

25  asynchronous logic designs.

26          The claims that use these terms require that "the configurer optimizes logic

27  module selection and phase division of the target circuit based on [inter-module / interpartition]

28  dependencies."  '742 Patent Claim 6  (interpartition); '484 Patent Claims 5 (inter-module), 32

BRIEF IN SUPPORT OF AXIS'S PROPOSED
CLAIM CONSTRUCTIONS
C01-21079-JW

1   (interpartition).  In order to optimize the "phase division of the target circuit," the circuit

2   communications must have a known relationship to the phases of the target clock, which would

3   make them synchronous.  Otherwise, an optimization based on phases would be impossible.

4          The dependencies referred to in the claims are defined in the specification to result

5   from an "intelligent dependency analysis" of "a synchronous design with no combinatorial

6   loops."  '484 Patent at 5:40-45; '742 Patent at 5:14-19.  The specification further explains:

7                The use of virtual interconnections is limited to synchronous logic.
               **Any asynchronous signals must still be "hard-wired" to**
8              **dedicated FPGA pins.  This limitation is imposed by the**
               **inability to statically determine dependencies in asynchronous**
9              **loops.**

10  '742 Patent at 5:36-40; '484 Patent at 5:62-66 (emphasis added).  Thus, an intelligent dependency

11  analysis cannot be performed on asynchronous signals, which must be hard-wired.  Id.  The terms

12  "inter-module dependencies" and "interpartition dependencies" therefore are meaningless unless

13  applied a synchronous logic design.  The proper construction of this term requires a synchronous

14  logic design.

15         **11.      The Proper Interpretation Of "system clock period"**

16         Axis construes the term "system clock period" to mean "the period of a fixed

17  frequency clock signal that controls the pipelining of signals within a phase of the target clock

18  (*i.e.*, the period of the pipeline clock)."  The parties agree that the "system clock" is the same as

19  the "pipeline clock."  Pl. Br. at 17.  As explained above, the term "virtual clock" also identifies

20  this clock signal.

21         The claims refer to "system clock periods" as the clock periods that "dictate the

22  maximum rate at which signals in the electronic system change value."  '484 Patent Claim 6.

23  As described in the specification, this system or pipeline (virtual) clock is used to clock signals at

24  the "maximum frequency of the FPGA" – a fixed value.  '742 Patent at 6:7-9.  Thus, this clock

25  must have a fixed frequency.

26         The claims also provide that "each target clock period comprises a plurality of

27  system clock periods."  '742 Patent Claim 7; see also Claim 9 ("a physical intermodule pin carries

28  a plurality of target system signals during a target system clock period, each target system signal

1    being carried during a system clock period."). The specification requires that signals be pipelined

2    during an assigned "time slot" corresponding to a specific cycle of the pipeline clock within a

3    target clock phase. '742 Patent at 6:66-7:2 ("During global routing (150), each logical wire is

4    scheduled to a phase, and assigned a pipeline time slot (corresponding to one cycle of the pipeline

5    clock in that phase on a physical wire)."); '484 Patent at 7:38-41 (same). Thus, a pipeline clock

6    period or system clock period is the period of the fixed frequency signal that controls the

7    pipelining of signals within a phase of the target clock period.

8    **IV.    CLAIM CONSTRUCTION: U.S. PATENT NO. 5,649,176 ("'176 PATENT")**

9          **A.    Background**

10          The '176 Patent discloses a specific technique for performing a circuit simulation

11    or emulation when the modeled circuit design is operating within its intended environment –

12    often called the "target system." For example, if a user is designing a microprocessor, the FPGA

13    array used to model the microprocessor can be connected by cables to a motherboard in which the

14    microprocessor would ultimately operate. The user can then test the model using timing and data

15    signals from the "environment" of the motherboard. The '176 Patent addresses a particular

16    problem that results from using environmental timing signals to control the operation of the

17    FPGAs.

18          Each FPGA contains storage devices that control the data flow through the circuit.

19    A storage device typically has a data input, a clock input, and a data output, as shown in the

20    diagram of a simple "D flip-flop" in Figure 7B of the '176 Patent (reproduced below):

21

22

23

24

25

26

27

28

1

2

3

4

5

6



7   In this figure, the "D" input to the flip-flop receives the "IN" signal.  When a clock pulse arrives

8   on the "ECLK" (environmental clock) line, the D input is transferred to the "Q" output.  That

9   value is stored at the "Q" output until the next clock pulse arrives.

10          When the FPGAs receive a clock signal from the environment (termed an

11   "environmental clock" or "environmental timing signal" in the '176 Patent), "hold time

12   violations" can occur.  Hold time violations are caused when the input to the storage device

13   changes before the storage device receives the clock signal associated with that input.  This

14   causes the wrong value to be transferred to the output.

15          To avoid hold time violations, the '176 Patent describes a technique to control the

16   FPGAs by replacing the timing signals from the environment with signals from a high frequency

17   clock that is internal to the FPGA array, a clock the inventors call the "internal" or "virtual"

18   clock. (As previously noted, the "internal" or "virtual" clock has the same meaning as the

19   "pipeline clock.")  However, to ensure correct operation of the FPGAs with inputs from, and

20   outputs to, the environment, the FPGAs' operations must be coordinated with the environment's

21   timing signals.  The patent specifies a method and system to provide this coordination by

22   "resynthesizing" storage devices so that they are clocked by the internal clock but controlled by a

23   signal that is synchronized with the environmental timing signal.

24

25

26

27

28

This method and system is shown in Figure 7B of the '176 Patent (reproduced below):



The flip-flop shown above is clocked by the "VClk" (virtual clock) line, not the "EClk" (environmental clock) line.  The "EClk" is synchronized to the internal clock by the "Sync" (synchronizer) to generate the "$V_{go}$" signal.  In response to the "$V_{go}$" signal, the "FSM" (finite state machine) generates an "enable" signal on the "E" (enable) input of the flip-flop.  Unlike a simple "D flip-flop" that is controlled by a clock signal alone, the flip-flop in this figure is controlled by both a clock signal and an enable signal.  Both signals are required in order to practice the method disclosed in the patent.  Thus, a simple "D flip-flop" in the modeled design must be "resynthesized" into a new flip-flop having an additional control input for the control signal generated by the finite state machine, as shown in the above figure.

**B.      Claim Construction**

**1.      The Proper Construction Of "environment" And "environmental"**

Axis construes "environment" and "environmental" to mean "a system or circuit, external to the configurable logic system and the host workstation, in which the circuit design implemented in the configurable logic is intended to operate (*i.e.*, a target system)."  There are two principal differences between Axis's construction and plaintiffs' construction.  First, plaintiffs' construction applies to any circuit or system "with which the configurable logic system interacts," whereas Axis's construction applies to a circuit or system "in which the circuit design

1   implemented in the configurable logic is intended to operate."  Second, plaintiffs' construction

2   includes the host workstation in the definition, whereas Axis's construction does not.

3         As plaintiffs admit, the specification describes an environment as a "system in

4   which it [the logic system] is intended to operate."  Pl. Br. at 21:25-26 (citing '176 Patent at

5   1:29).  Other portions of the specification confirm this meaning.  See '176 Patent at 6:38-39 ("the

6   environment in which the logic system is intended to operate"); 10:65-66 ("the environment in

7   which the logic system is intended to ultimately function").  This aspect of Axis's construction is

8   thus supported both by the specification and plaintiffs' admission.

9         The "environment" within the meaning of the '176 Patent cannot include a host

10  workstation.  That is because the circuit modeled in the logic system is intended to operate in the

11  target system, not in the host workstation.  Figure 1 of the '176 Patent (reproduced below)

12  illustrates this distinction

13

14

15  

16

17

18  Figure 1 shows a host workstation, an emulation system, and a target system.  The description of

19  this figure in the specification equates the "target system" to the "environment."  Id. at 4:28-30.

20        The descriptions of the internal clock and environmental timing signal in the '176

21  Patent, discussed in more detail below, confirm that the environment does not include the host

22  workstation.  The specification requires the internal clock to be "invisible to the environment."

23  '176 Patent 3:12-13.  The internal clock, however, is part of the configurable logic system, which

24  is configured by the host workstation.  The internal clock cannot be "invisible" to the system used

25  to create it.  The host workstation, therefore, cannot be part of the environment.

26        Other patents by the inventors confirm Axis's construction.  The inventors

27  describe the use of FPGA emulation systems "to confirm the proper operation of the logic design

28

1    along with possibly its compatibility with an environment or user system **in which it is intended**

2    **to operate**."  Simmons Decl. ¶ 101.

3                    **2.      The Proper Construction Of "environmental timing signal"**

4                    Axis construes the term "environmental timing signal" to mean "a periodic signal

5    originating from the environment with a fixed frequency that is lower than the internal clock

6    frequency, and which is sampled by the internal clock to produce a data input to the controller."

7                            **a.      The Intrinsic Evidence Supports The Construction That An**
                                      **Environmental Timing Signal Has A Fixed Frequency That Is**
8                                     **Slower Than The Internal (Virtual) Clock Signal.**

9                    The claims mandate that the environmental timing signals come from the

10   environment.  For example, Claim 1 reads: "the logic system generating output signals to the

11   environment in response to at least one **environmental timing signal** and environmental data

12   signals **provided from the environment**." (emphasis added).  As explained above, the

13   "environment" does not include the host workstation.

14                   The inventors of the '176 Patent did not use the term "emulation clock," as the

15   inventors did in the '742 Patent, which was incorporated by reference into the '176 specification.

16   Instead, the inventors introduced a new term "environmental timing signal" which they defined

17   by reference to its source -- the "environment."

18                   Axis's construction includes three essential elements that are missing from

19   plaintiffs' construction.  First, the environmental timing signal must be periodic and have a fixed

20   frequency.  Second, its frequency must be lower than the internal clock frequency.  Third, it must

21   be sampled by the internal clock to produce a data input to the controller.

22                   The environmental timing signal must be periodic and have a fixed frequency.

23   The specification describes "a timing signal" used to "clock" a storage device.  '176 Patent at

24   2:10-13 ("Hold time problems commonly arise where a timing signal is intended to clock a

25   particular storage element to signal that a value at the element's input terminal should be held or

26   stored.").  The environmental timing signal ("Environmental Clock Signals #1 and #2) and the

27   internal (virtual) clock ("VClk") are shown in Fig. 4B as fixed frequency, periodic signals, with

28   the internal clock having a substantially higher frequency than the environmental timing signal.

1   Id., Fig. 4B; 4:41-44.  Nothing in the specification or claims discloses a clock or timing signal

2   that is aperiodic or has a variable frequency.

3   　　　　　　The environmental timing signal must have a period and a fixed frequency for the

4   additional reason that the patent requires the frequency of the environmental timing signal to be

5   lower than that of the internal clock.  The specification repeatedly describes the internal clock as

6   having a higher frequency than the environmental timing signal.  The summary of the invention

7   describes the replacement of the environmental timing signal by a "**higher frequency internal**

8   **clock**."  Id. at 2:53.  Similarly, the Abstract for the '176 Patent states:  "A method of configuring

9   a configurable logic system, including a single or multi-FPGA network, is disclosed in which an

10  **internal clock signal is defined that has a higher frequency than timing signals the system**

11  **receives from the environment in which it is operating**."

12  　　　　　　The requirement that the environmental timing signal have a fixed frequency can

13  be illustrated by comparing two hypothetical signal diagrams against these statements in the

14  specification.  The figure below shows a possible relationship between the environmental timing

15  signal and the internal clock that conforms to the specification:

16

17  **Environmental Timing Signal**

18

19  **Pipeline / Virtual Clock**

20

21  As shown in this figure, the virtual or internal clock has a higher frequency than the

22  environmental timing signal, as required by the specification.  If, by contrast, the environmental

23  timing signal lacked a fixed frequency, the following might result:

24

25

26

27

28

In this figure, the frequency and period of the environmental timing signal is not fixed. During some intervals of the environmental timing signal, its frequency appears higher than that of the internal clock, but on other intervals, it appears lower. In this example, it is impossible to say that the internal clock has a "higher frequency" than the environmental timing signal.

Finally, the environmental timing signal is sampled by the internal clock to produce an input to the controller. The specification states that the environmental timing signal is sampled by the internal clock. Id. at 3:18-23. The resulting sampled environmental timing signal is treated as a data signal. Id. at 3:17-18. This data signal is then fed to the controller that controls the sequential logic. Id. at 3:18.

### b. The Inventors' Words And Dictionary Definitions Support Axis's Construction.

The inventor Matthew Dahl agreed that the environmental timing signal must come from "the environment in which the logic system is intended to ultimately function." Simmons Decl. ¶ 106. The other inventor, Dr. Selvidge, testified that he "could not think of a way" to practice the patent without the internal clock running several times faster than the environmental timing signal. Id. ¶ 104.

Dr. Selvidge also confirmed that "'environmental timing signal' and 'environmental clock' mean the same thing." Id. ¶ 107. A "clock" is a "device that generates **periodic, accurately spaced** signals." Id. ¶ 103. For example, a CPU clock in a computer has a "**uniform** electrical frequency." Id. ¶ 102. The environmental timing signal must therefore be periodic and accurately spaced, and it must have a uniform, *i.e.*, fixed, frequency.

### 3. The Proper Construction Of "internal clock"

Axis construes "internal clock" to mean "a periodic signal of fixed frequency, existing within the configurable logic system and invisible to the environment, which provides

1  the time base for scheduling the operation of the configurable logic system (*i.e.*, the pipeline

2  clock)."  Plaintiffs construe "internal clock" simply as providing "a time base for the

3  resynthesized circuit's operation."  Plaintiffs' construction uses some of the words from the

4  specification, but ignores other provisions that define the function and purpose of the internal

5  clock.

6       **a.    The Intrinsic Evidence Specifies A Fixed Frequency Signal
             Existing Within The Configurable Logic System That Is
7            Invisible To The Environment.**

8       The specification confirms that the internal clock has a fixed frequency that is

9  higher than the environmental clock.  The specification describes the internal clock as "a new

10 **higher frequency internal clock (or virtual clock)** that is distributed with minimal skew."  '176

11 Patent at 2:53-54 (emphasis added).  The frequency of the internal clock is typically higher "by a

12 factor of at least four" than the frequency of the environmental timing signal.  Id. at 3:3-10.

13 According to the specification, the internal clock frequency is usually faster than the

14 environmental timing signal "by a factor of ten to twenty."  Id. at 8:9-12.

15      The above-quoted portion of the specification equates the internal clock to the

16 virtual clock.  The virtual clock, also called the pipeline clock, is what pipelines signals out of the

17 FPGAs in the '742 Patent.  In the '742 Patent, which is incorporated by reference into the '176

18 Patent, the pipeline (virtual) clock operates at the maximum frequency of the FPGA.  Id. at 6:7-9.

19 Thus, the internal clock must have a fixed frequency.

20      A schematic diagram "of the logic system of the present invention" in Figure 4A

21 shows "the internal or virtual clock" (VClk) within the configurable logic system.  Id. at 4:37-40

22 & Fig. 4A.  The specification requires the internal clock signal to be "**invisible** to the

23 environment."  Id. at 3:12-13 (emphasis added).  Therefore, the internal clock exists within the

24 configurable logic system and is invisible to the environment.

25      **b.    The Extrinsic Evidence Requires That The Internal Clock
             Signal Be Periodic And Have A Fixed Frequency.**
26

27      Standard definitions of the term "clock" require that the internal clock signal be

28 periodic and have a fixed frequency.  Simmons Decl. ¶¶ 102-103, 107-108.

The ordinary meaning of "internal" is also consistent with the Axis construction. The term "internal" is defined as: "Of, relating to, or located within the limits or surface; inner." Id. ¶ 109. Dr. Selvidge confirmed that the internal clock is a real clock with a real period that is invisible to the environment. Id. ¶ 110. Thus, an "internal" clock must exist within the logic system and must be invisible to the environment.

### 4.   The Proper Construction Of "resynthesizing"

Axis construes the term "resynthesizing" to mean "transforming a circuit design into a new design following an initial synthesis and analysis of the original circuit design." The chief difference between this construction and plaintiffs' construction is that plaintiffs' construction does not require an initial synthesis step. Plaintiffs give no meaning to the prefix "re-" in this term.

The term "resynthesis" is used in several claims to describe the transformation of a circuit design that has previously been synthesized into a new design to accommodate a different control signal. For example, Claim 14 reads: "resynthesizing sequential logic elements in the digital circuit design that are clocked by the environmental timing signal to sequential logic elements in the new circuit that are clocked by the internal clock signal." The specification explains that the circuit resynthesis follows a "transition analysis step, value analysis step, and sampling analysis step." '176 Patent at 11:66-13:25 & Fig. 6. These analysis steps are performed on the original design, which must first be synthesized.

The inventor Matthew Dahl agreed that the resynthesis technique requires "some preliminary synthesis." Simmons Decl. ¶ 113. This also follows from an ordinary understanding of the word. The prefix "re-" means "[a]gain; anew." Id. ¶ 112. Dr. Agarwal, when asked to differentiate resynthesis from synthesis, testified that resynthesis is "a resynthesis of what exists." Id. ¶ 114. Thus, a resynthesis must follow the original synthesis and analysis of the circuit.

### 5.   The Proper Construction Of "buses"

Axis construes the term "buses" to mean "common electrical pathways between circuit elements." There are two principal differences between this construction and plaintiffs'

1   construction.  First, plaintiffs' construction does not require the buses to be "electrical."  Second,

2   plaintiffs' construction requires "a number of devices" connected to the bus.

3          The bus connects "configurable logical devices."  '176 Patent Claim 8.

4   Configurable logic devices carry electrical signals.  The bus therefore must be a common

5   **electrical** pathway.

6          A "plurality of configurable logic devices" are connected by the bus.  Id.

7   A "plurality" means more than one, not "a number," as IKOS contends.  That is consistent with

8   the '484 Patent, which uses the term "bus" to refer to a connection from the output of one chip to

9   the input of another.  '484 Patent at 1:52-58.  Accordingly, "buses" are "common electrical

10  pathways between circuit elements."

11         **6.     The Proper Construction Of "configuring the logic system"**

12         Axis construes the term "configuring the logic system" to mean "implementing the

13  logic within the configurable logic system to perform a desired logic operation or calculation."

14         The term is used in Claim 1 of the '176 Patent to call for "configuring the logic

15  system to have a controller for coordinating operation of the logic operations in response to the

16  internal clock signal and the environmental timing signal."  According to the specification,

17  "[c]onfigurable logic devices are a general class of electronic devices that can be easily

18  configured to perform a desired logic operation or calculation."  '176 Patent at 1:6-8.  Thus,

19  "configuring the logic system" means configuring or implementing the logic within the

20  configurable logic system to perform a desired logic operation or calculation.

21         Plaintiffs define this term to require "compiling and loading a configurable logic

22  system."  This construction is neither meaningful nor supported by the claims or specification.

23         **7.     The Proper Construction Of "control signal"**

24         Axis construes the term "control signal" to mean "an output from a controller that

25  is used to dictate the operation of the sequential logic in the configurable logic system."  Plaintiffs

26  construe this term to mean "a signal that coordinates the application of logic operations."

27  Plaintiffs' definition ignores the claim language and definitions in the specification which require

28  that the control signal control the sequential logic in the configurable logic system.

The term is used in Claim 3 of the '176 Patent to call for a "finite state machine for generating control signals to control the logic operations in response to the sampled environmental timing signal." The specification teaches that the control signal is generated by the finite state machine, or controller. '176 Patent Abstract; 3:18-21; 8:53-56. The control signal controls, or dictates, the operation of the sequential logic components. Id. at Abstract; 3:21-23; 8:56-57. Thus, a "control signal" is an output from a controller used to control or dictate the operation of the sequential logic in the configurable logic system.

**8.      The Proper Construction Of "controller" And "controller means"**

Axis construes "controller" and "controller means" to mean "a finite state machine configured within the configurable logic system that dictates the operation of the configurable logic in response to an internal clock signal and a sampled environmental timing signal."

These terms are used in many claims. Claim 1, for example, recites a "controller for coordinating operation of the logic operations in response to the internal clock signal and the environmental timing signal." The specification defines the controller as a "specifically a finite state machine." '176 Patent at 3:66-4:5. In addition, the claims refer to the controller being configured to "dictate" the operation of the sequential logic. See Claim 12 ("configuring the controller to dictate set-up and hold times of signals to the environment"); Claim 13 ("configuring the controller to dictate sampling times of the environmental data signals").

Plaintiffs contend that the controller is "a circuit configured into the logic system capable of coordinating the logical operations of the logic system." If this construction were used in Claim 1, for example, the claim language "for coordinating operation of the logic operations" would effectively be transformed into "**capable** of coordinating the logic operations." The plaintiffs' construction would impermissibly broaden the claims, and must therefore be rejected.

The inventors confirmed the proper understanding of these terms. Dr. Selvidge testified that the patent "involves the use of a finite state machine as a controller." Simmons Decl. ¶¶ 115, 116. The other inventor, Matthew Dahl, confirmed that he was unaware of any implementation in which the controller would not be a finite state machine. Id. ¶ 118. Dr.

1  Selvidge also confirmed that the controller must reside entirely within the emulation system.  Id.

2  ¶ 117.

### 9.    The Proper Construction Of "sampled" And "sampling"

4          Axis construes the terms "sampled" and "sampling" to mean processed or

5  processing at fixed, periodic intervals.

6          The claims use "sampled" and "sampling" to refer to the processing of signals

7  coming from the environment.  See '176 Patent Claims 3, 31, 42 (referring to "the sampled

8  environmental timing signal"); Claims 2, 29, 41, ("sampling the environmental timing signal in

9  response to the internal clock signal"); Claim 13 ("sampling times of the environmental data

10  signals").  Because the sampling is done "in response to the internal clock signal," see Claims 2,

11  29, 41, it occurs at the internal clock rate, which has a fixed, periodic frequency, as demonstrated

12  above.

13          The specification explains that the process by which the synchronizer creates a

14  "synchronized version of the environmental timing signal" results in a "sampled environmental

15  clock."  '176 Patent at 3:15-21.  This conveys that sampling in this context requires some

16  "processing" of the signal, rather than simply capturing its value, as plaintiffs contend.

### 10.    The Proper Construction Of "synchronize"

18          Axis construes the term "synchronize" to mean "align a periodic signal to another

19  periodic reference signal in real time."

20          The term "synchronize" is used in Claim 37 to require "programming the

21  configurable logic device to synchronize the environmental timing signal to an internal clock

22  signal of the logic system."  The specification confirms that synchronization causes these signals

23  to be aligned in real time.  Figure 4B and the associated text describes the "$V_{go}$" signals as being a

24  version of the environmental clock that is "synchronized" to the internal or virtual clock so that

25  the signal transitions occur in unison.  '176 Patent at 8:17-21 & Fig. 4B.  This is consistent with

26  the dictionary definition of "synchronize," which is "[t]o cause to occur or operate at the same

27  time as something else."  Simmons Decl. ¶ 119.

28

1    Plaintiffs contend that to "synchronize" is "to make a version of a signal that is

2  synchronous with a reference signal."  Plaintiffs define "synchronous" as "circuit for

3  synchronizing."  These definitions are circular and give no meaning to the claims.

### 11.    The Proper Construction Of "synchronizer"

5    Axis construes the term "synchronizer" to mean "a circuit element that generates a

6  signal that is synchronized to a sampled environmental timing signal."[2]

7    The term is used in the claims to specify a "synchronizer for sampling the

8  environmental timing signal in response to the internal clock signal"  '176 Patent Claims 2, 29,

9  41.  As the specification provides, "a synchronizer is incorporated to essentially generate a

10 synchronized version of the environmental timing signal."  Id. at 3:15-17.  This synchronized

11 version, which is fed to the finite state machine that controls the sequential logic, is synchronized

12 to the internal clock.  Id. at 3:15-23, Fig. 4B, 7:59-8:5.  Accordingly, the synchronizer generates a

13 signal that is synchronized to the sampled environmental timing signal.

### V.    CONCLUSION

15    For the foregoing reasons, Axis requests that the Court adopt its proposed

16 constructions of the disputed claim terms.

17 Dated:  April 12, 2002

18                                   GEORGE A. RILEY
                                     DAVID R. EBERHART
19                                   LUANN L. SIMMONS
                                     O'MELVENY & MYERS LLP

20

21                                   By   s/ George A. Riley
                                     _____
22                                       George A. Riley
                                     Attorneys for Defendant Axis Systems, Inc.

23
SF1:464661.2
24

25

26

27
─────────────────────
[2]    In the Joint Claims Construction Statement, the words "internal clock" were erroneously
28 included before "signal" in Axis's construction of the term "synchronizer."