1  Edward V. Anderson (SBN 83148)
   Georgia K. Van Zanten (SBN 116869)
2  Matthew J. Brigham (SBN 191428)
   Julia S. Ferguson (SBN 216102)
3  SKJERVEN MORRILL LLP
   25 Metro Drive, Suite 700
4  San Jose, California 95110
   Phone:  (408) 453-9200
5  Facsimile:  (408) 453-7979

6  David A.York (SBN 89942)
   David Foster *(pro hac vice)*
7  James L. Day Jr. (SBN 197158)
   LATHAM & WATKINS
8  135 Commonwealth Drive
   Menlo Park, CA  94025
9  Telephone:  (650) 329-4600
   Facsimile:  (650) 463-2600
10
   Attorneys for Plaintiffs
11 IKOS SYSTEMS, INC. and M.I.T.

12                     UNITED STATES DISTRICT COURT

13                    NORTHERN DISTRICT OF CALIFORNIA

14                            SAN JOSE DIVISION

15  IKOS SYSTEMS, INC., a Delaware           Case No.: 01-21079 JW
    Corporation, and MASSACHUSETTS
16  INSTITUTE OF TECHNOLOGY, a              **PLAINTIFFS IKOS SYSTEMS, INC. AND
    Massachusetts Corporation,              MASSACHUSETTS INSTITUTE OF
17                                          TECHNOLOGY, INC.'S REPLY CLAIM
                  Plaintiffs,               CONSTRUCTION BRIEF**
18
    vs.
19                                          **Date:  May 3, 2002
    AXIS SYSTEMS, INC., a Delaware          Time:  8:00 a.m. – 12:00 p.m.
20  Corporation,                            Place:  Courtroom No. 8**

21                Defendant.

22

23

24

25

26

27

28

**PLAINTIFFS' REPLY CLAIM CONSTRUCTION BRIEF - Case No.: 01-21079 JW**

**TABLE OF CONTENTS**

I.   INTRODUCTION ..........................................................................................................1

II.  ARGUMENT ................................................................................................................1

    A.   The Primary Dispute With Respect to the '742 and '484 Patents Centers on the Definitions of "Virtual Interconnection," "Static Virtual Interconnection," and the Claim Terms Axis Attempts to Incorporate Therein ...............................................................................................................1

        1.   Axis's attempts to attribute a "fixed" nature to "virtual interconnections" and the transmission of logic signals is improper ............2

        2.   When the inventors intended to add a "static" limitation to a claim, they included that term ................................................................................7

        3.   The claim language itself, as well as the doctrine of claim differentiation, demonstrates other flaws in Axis's proposed definitions .................................................................................................9

    B.   Axis's Definition of "Environment" is Unnecessarily Limiting .............................11

    C.   Modifiers Added to Remaining Claim Terms Are Not Needed .............................12

III. CONCLUSION ...........................................................................................................13

## TABLE OF AUTHORITIES

### FEDERAL CASES

Bell & Howell v. Altek Systems,
    132 F.3d 701 (Fed. Cir. 1997) .......................................................................... 2, 5

Electro Med. Sys. S.A. v. Cooper Life Sciences,
    34 F.3d 1048 (Fed. Cir. 1994) ............................................................................. 5

Intervet Am., Inc. v. Kee-Vet Lab., Inc.,
    887 F.2d 1050 (Fed. Cir. 1989) ........................................................................... 2

Johnson Worldwide, Inc. v. Zebco Corp.,
    175 F.3d 985 (Fed. Cir. 1999) ................................................................... 1, 3, 12

Karlin Technology, Inc. v. Surgical Dynamics, Inc.,
    177 F.3d 968 (Fed. Cir. 1999) ........................................................................... 10

Laitram Corp. v. NEC Corp.,
    163 F.3d 1342 (Fed. Cir. 1998) ........................................................................... 2

Renishaw PLC v. Marposs Societa' per Azioni,
    158 F.3d 1243 (Fed. Cir. 1998) ........................................................................... 2

SciMed Life Sys. v. Advanced Cardiovascular Sys.,
    242 F.3d 1337 (Fed. Cir. 2001) ........................................................................... 7

Wiener v. NEC Elecs., Inc.,
    102 F.3d 534 (Fed. Cir. 1996) ............................................................................. 5

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Op. Brf. – | Plaintiffs' Opening Claim Construction Brief filed March 29, 2002. |
| Resp. Brf. – | Defendant Axis's Responsive Brief In Support of Its Claim Construction filed on April 12, 2002. |
| Simmons Decl. – | Declaration of Luann Simmons In Support Of Defendant Axis's Claim Construction Brief. |

## I. INTRODUCTION

Defendant Axis Systems is blunt about the rationale behind its claim construction positions. Axis's goal with each proposed definition is to support its theory that the accused products "use an approach that is fundamentally different than the methods and systems claimed in the three patents at issue." Resp. Brf. at 1. As a result, Axis inserts modifiers at every opportunity such as "fixed," "periodic," and "predictable" to unjustifiably limit the claim terms. This approach is contrary to established claim construction principles set forth by the Federal Circuit.

These claim construction proceedings are not an opportunity for Axis to redraft the claims of the patents-in-suit to fit its needs. Nor is it an opportunity to limit the claims to implementations preferred by the inventors or developed in later products. The purpose of claim construction is to determine the proper meaning and scope of any disputed claim terms. This can be done quickly and efficiently in this case because the Court need look no further than the claims themselves, the specifications, and the prosecution histories. Once those public sources of information are considered, the appropriateness of Plaintiffs' proposed claim constructions will be clear. At the same time, Axis's constructions will be exposed as the typical patent infringement defendant's attempt to impermissibly limit the scope of the claims.

## II. ARGUMENT

**A.   The Primary Dispute With Respect to the '742 and '484 Patents Centers on the Definitions of "Virtual Interconnection," "Static Virtual Interconnection," and the Claim Terms Axis Attempts to Incorporate Therein.**

Axis has adopted an overall claim construction strategy which weaves its way through the proposed definitions of **virtual interconnection**, **static virtual interconnection**, **statically communicating**, **multiplexed**, **time-multiplexed**, **pipelined**, **phase**, and **system clock period**.[1] This strategy is to load the definitions of these terms with as much extraneous verbiage as possible from the specification, inferences from the specification, post-filing articles, and testimony by the inventors. The Federal Circuit has cautioned against each of these practices. See Johnson Worldwide, Inc. v. Zebco Corp., 175 F.3d 985, 992 (Fed. Cir. 1999) ("mere inferences drawn from the description of an embodiment of the invention cannot serve to limit claim terms");

---

[1] For ease of reference, disputed claim terms are highlighted in **bold** throughout this brief.

1  Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1348 (Fed. Cir. 1998) (quoting Intervet Am., Inc. v.
2  Kee-Vet Lab., Inc., 887 F.2d 1050, 1053 (Fed. Cir. 1989)) ("interpreting what is meant by a word
3  in a claim 'is not to be confused with adding an extraneous limitation appearing in the
4  specification, which is improper.'"); Bell & Howell v. Altek Systems, 132 F.3d 701, 706 (Fed.
5  Cir. 1997) (testimony of an inventor concerning claim construction is entitled to little or no
6  consideration). Therefore, the Court must guard against accepting Axis's proposed definitions,
7  because to do so would be to limit the claimed invention in a manner never intended.

8         *1.    Axis's attempts to attribute a "fixed" nature to "virtual interconnections" and the transmission of logic signals is improper.*
9

10  Through the incorporation of unnecessary qualifiers in its proposed claim constructions,
11  Axis attempts to attach "fixed" and "predictable" as additional limitations to the claimed
12  inventions. These limitations, however, do not appear anywhere in the claims themselves.
13  Therefore, they should not now be imported. See Renishaw PLC v. Marposs Societa' per Azioni,
14  158 F.3d 1243, 1248 (Fed. Cir. 1998) ("the claim construction inquiry...begins and ends in all
15  cases with the actual words of the claim").
16  To demonstrate Axis's claim construction technique, the definitions of terms contained
17  within Axis's long proposed definition of **virtual interconnection** have been added below in
18  brackets:

19  > Axis contends that "**virtual interconnections**" means "logical connections that
20  > result from the application of the technique of **statically communicating**
21  > [communicating in a manner in which all data movement is *determined* and
22  > optimized at the time the reconfigurable electronic system is configured and the
23  > communications repeat in a *predictable* and *periodic* fashion] synchronous logical
24  > signals between logic modules through a single pin in a **multiplexed**
25  > [communicating different logical signals through a pin wherein each logical signal
26  > is communicated across a different **phase** within a target clock period], **pipelined**
27  > [communicating different logical signals through a pin wherein each logical signal
28  > is communicated in the same **phase** within a target clock period] fashion wherein
   > each logical signal is scheduled for a *specific* cycle of the pipeline clock [i.e.
   > **system clock** - a *fixed* frequency clock signal that controls the pipelining of signals
   > within a **phase** of the target clock]."

27  See Resp. Brf. at 4, 16, 18, 23 (definitions of **virtual interconnection**, **statically communicating**,
28  **multiplexed**, **pipelined**, and **system clock period**) (emphasis added). The term **phase** is further

**PLAINTIFFS' REPLY CLAIM CONSTRUCTION BRIEF - Case No.: 01-21079 JW**      **2**

1  defined by Axis as "a period less than the target clock period during which logical signals are
2  **pipelined**, and across which logical signals are **multiplexed**." Id. at 18.
3     As this exercise demonstrates, Axis's goal is to take a simple term, **virtual**
4  **interconnection** -- which is broadly defined in the specifications of the '484 and '742 Patents as a
5  connection from a logical output on one logic module to a logical input on another logic module --
6  and load it with extraneous and unnecessary limitations.  Axis characterizes the data movement as
7  predetermined, "predictable," "periodic," and occurring within "phases" on "specific cycles" of a
8  "fixed" frequency clock.  Some of these terms do not even appear in the specifications.  More
9  importantly, Axis's addition of these modifiers is against Federal Circuit authority.  Johnson
10 Worldwide, 175 F.3d at 989 ("General descriptive terms will ordinarily be given their full
11 meaning; modifiers will not be added to broad terms standing alone.").  Therefore, Axis's
12 modifiers should not be added to the broad term **virtual interconnection**.
13 ///
14 ///
15 ///
16 ///
17 ///
18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

1   The practical effect of each party's proposed definitions can be explained with reference to
2   the figure below.



11  The above figure shows Logic Module[2] #1 (LM1) that contains, among other things, Logic
12  Elements A and B (LEA and LEB), multiplexer MUX1 and pins I, II, and III.  Logic Module #2
13  (LM2) contains Logic Elements C and D (LEC and LED), de-multiplexer DMUX2, and pins IV,
14  V, and VI.  As an example, the output signal from LEA (a logical output) may need to get to the
15  input of LEC (a logical input) in a given design.  To do so, the signal travels from LEA to MUX1.
16  Through application of the appropriate control signal to MUX1, it is determined when the signal is
17  transmitted out of LM1 through pin I.  The signal then travels on a physical wire to DMUX2 of
18  LM2 through pin VI.  Finally, through application of the appropriate control signal to DMUX2, it
19  is determined when the signal is transmitted to LEC.

20  Similarly, an output signal from LEB may need to be transmitted to the input of LED.  To
21  do so, the signal travels from LEB to MUX1.  Through the application of the appropriate control
22  signal to MUX1, it is determined when the signal is transmitted out of LM1 through pin I.  The
23  signal then travels on the same physical wire as the signal from LEA (albeit at a different time) to
24  DMUX2 of LM2 through pin VI.  Finally, through application of the appropriate control signal to
25  DMUX2, it is determined when the signal is transmitted to LED.

26  Plaintiffs' definition of **virtual interconnection** is in accordance with the specification and
27  the claims.  Namely, a **virtual interconnection** is a logical electrical connection (e.g. the LEA-to-

---

[2] It is worth noting that while both parties have used FPGAs as examples of "logic modules," the '742 and '484 Patents do not limit the term "logic module" to an FPGA.

**PLAINTIFFS' REPLY CLAIM CONSTRUCTION BRIEF - Case No.: 01-21079 JW**          **4**

1  LEC connection) implemented by sharing an inter-module connection (e.g. pin I, pin VI, and the
2  physical wire) with other logical electrical connections (e.g. the LEB-to-LED connection).[3]
3  Axis's definition however, would also read into this term the requirement that it be predetermined
4  *when* MUX1 sends the signal from LEA to pin I and the signal from LEB to pin I, and that for a
5  given compilation, MUX1 *always* sends these signals, and *always* sends them in a specific order.

6        The "support" relied on by Axis for this definition shows nothing more than that the
7  inventors contemplated a similar embodiment in their implementation of the invention. The
8  articles and patents by the inventors are dated *after* the filing of the patents. See Simmons Decl.
9  Exhs. 19-25, 33-35, 41, and 42. Therefore, they do not offer proper guidance. See Wiener v. NEC
10 Elecs., Inc., 102 F.3d 534, 539 (Fed. Cir. 1996) (courts must construe a term's meaning as it was
11 understood on the patent application date). The deposition testimony relied on[4] was taken eight
12 years after the filing date, the time frame of the inventors' testimony was often not established (i.e.
13 whether they were answering based on what they know now or what they knew in 1993), and the
14 inventors understandably focused on how they implemented certain techniques in the "virtual
15 wires technology" or "virtual wires system", *not* on how to interpret specific claim elements,
16 which is a legal issue. See Bell & Howell, 132 F.3d at 706 (testimony of an inventor concerning
17 claim construction is entitled to little or no consideration). More importantly, none of this
18 overrides the fact that the *claims* do not require these limitations anywhere. See Electro Med. Sys.
19 S.A. v. Cooper Life Sciences, 34 F.3d 1048, 1054 (Fed. Cir. 1994) ("particular embodiments
20 appearing in a specification will not be read into the claims when the claim language is broader
21 than such embodiments.").

---

[3] Axis argues that this definition is an impermissible broadening of the claims because an originally filed claim, claim 10, was rejected by the Patent Office. Resp. Brf. at 9. The claim that was rejected, however, was broader than the issued claims because it lacked many of the elements contained in the issued claims such as "communicating signals between logic modules," a "configurer", and a "partition of a specified target circuit." Sending multiplexed signals over a common resource is just one aspect of the overall claimed invention. Therefore, the Court can adopt Plaintiffs' proposed definitions without reviving a rejected or abandoned claim.

[4] In some cases, Axis relies on testimony by individuals who were not inventors of the patents. See Resp. Brf. at 11:13-14 and 12:1-2 (Dr. Selvidge is not an inventor of the '484 and '742 Patents); 32:22-24 (Dr. Agarwal is not an inventor of the '176 Patent).

**PLAINTIFFS' REPLY CLAIM CONSTRUCTION BRIEF - Case No.: 01-21079 JW**      **5**

1    The only *claimed* limitation that appears with respect to how the multiplexer is controlled
2  is that many of the claims dictate that the signals must be **time-multiplexed**. In other words,
3  "time" is used to control the sharing of the physical wire, rather than something such as
4  "frequency" or "wavelength." If the signals were "frequency-multiplexed," each of the signals
5  would be assigned a different frequency and communicated over the same communication
6  channel. Television transmitters use this technique to transmit several television channels at the
7  same time. Signals could also be "wavelength-multiplexed" in which signals are assigned a
8  particular wavelength and transmitted on optical fibers. Therefore, the modifier "time" simply
9  conveys that the concept of "time" was being used to control the transmission rather than these
10 alternatives.

11    Not surprisingly, Axis seeks to define **time-multiplexed** using modifiers like "fixed" and
12 "predictable". An illustration of a common 2-to-1 multiplexer may be useful in showing why
13 Axis's definition is too limiting:



20   A multiplexer chooses, based on the "control," whether the signal on Input 1 or Input 2
21 will be outputted. So, at one interval of time signal A will be outputted, while at another interval
22 of time signal B will be outputted. B may be outputted again, then A, then A again, etc. The
23 possible sequences are endless. The bottom line, though, is that the signal on the control line
24 dictates which signal is sent and when it is sent.
25   Axis advocates a construction that would require that the order and exact time period in
26 which signals are transmitted through a multiplexer be predetermined and unchanging. In other
27 words, according to Axis's definition, the value(s) of the control signal, or how the multiplexer is
28 controlled, would be predetermined at compile time. It would be decided at the very beginning

1  that signal A would be transmitted at a specific time interval, followed by the transmission of
2  signal B at a specific time interval. The resulting output would always be ABABAB. Axis's
3  definition seeks to exclude the possibility that the output signals of the multiplexer may go from
4  ABABAB to ABBAAB to BAAABA during the emulation process. Neither the claims, the
5  specification, nor the prosecution history support the exclusion of this possibility. See SciMed
6  Life Sys. v. Advanced Cardiovascular Sys., 242 F.3d 1337, 1341 (Fed. Cir. 2001) (embodiment
7  excluded from the reach of the claims only "[w]here the specification *makes clear* that the
8  invention does not include a particular feature") (emphasis added).
9        In fact, the specifications of the '484 and '742 Patents specifically contemplate an
10 embodiment in which the logical signals are *not* assigned a fixed time slot and that do *not* repeat in
11 a predictable fashion. Namely, the patents discuss "event-driven emulation" in which the "pins
12 only communicate signals which have changed in value." See '742 Patent, claim 25; see also '742
13 Patent at 11:28; '484 Patent at 12:13 ("only send signals which change"). In other words, the
14 output of the multiplexer may initially be ABABAB, but if signal A does not change again until
15 the third cycle, then the output may be ABBABB. Therefore, not only does the specification not
16 limit the claims as Axis desires, but the inventors considered the possibility of an embodiment
17 which contradicts Axis's definition.

18       *2.    When the inventors intended to add a "static" limitation to a claim, they included that term.*
19

20       The inventors' own actions before the Patent Office exemplify why qualifiers such as
21 "static" and "fixed" should not be added into claims when they do not appear. Namely, the
22 applicants purposefully added the term "static" to describe **virtual interconnection** when they
23 intended to limit the invention to having a static or fixed nature. As discussed in Plaintiffs'
24 opening brief, the Patent Office specifically found claims that contained the limitation "static" to
25 be distinct from claims that did not contain that term.[5] Op. Brf. at 6-7. Ironically, in the context

26

27 [5] Axis states that the "double patenting" rejection was overcome by a terminal disclaimer. Resp. Brf. at 15. While this is partially true, it is incorrect with respect to the *statutory* double patenting
28 rejection. See Simmons Decl. Exh. 28 at p. 2-3 ("The filing of a terminal disclaimer cannot overcome a double patenting rejection based upon 35 U.S.C. 101."). Therefore, the inventors still had to establish that the claims that contained the term "static" were patentably different.

**PLAINTIFFS' REPLY CLAIM CONSTRUCTION BRIEF - Case No.: 01-21079 JW**       7

1  of **statically communicating**, Axis admits that "static" has a meaning. Resp. Brf. at 17:1-2

2  ("Without that limitation ["statically"], Claim 17 would have been rejected as well."). Axis

3  cannot be permitted to admit that "static" has a meaning in one place, but deny that it exists in

4  another. Therefore, the inventors have expressed a clear ability to include "static" in the claims

5  when it was so intended. This plain distinction should not be overridden by reading "fixed" and

6  "static" qualifiers into broad terms or accepting Axis's position that **virtual interconnection** and

7  **static virtual interconnection** are the same.

8      The dispute then shifts to the definition of "static". As the claims and prosecution history

9  demonstrate, when "static" is used in the claims, it refers to the *route* a logic signal takes or the

10 *location* of a virtual interconnection not changing. Looking at the figure below, for a given

11 compilation the physical pathway that a given signal takes from LEA to MUX1, from MUX1 to

12 pin I, from pin I to pin VI, from pin VI to DMUX2, and from DMUX2 to LEC is "static" and does

13 not change.



23     So, for example, the next time a signal is outputted from LEA and needs to reach LEC, it

24 will not go to MUX3, out of LM1 on pin II, into LM2 on pin V, and into LEC through DMUX1.

25 Rather, it will simply follow the same path it did before. Quotes from the foreign prosecution

26 relied on by Axis support this construction. See Simmons Decl., ¶ 26, 27 ("In other words, every

27 signal propagating through and between the logic modules travels along a predetermined

28 communication *path*, as defined by the configurer."; "Because dynamic routing is used [in the

1  Dally reference], a message can travel along a different *path* for each transmission of the message;
2  instead of having a predetermined *static route*.") (emphasis added).

3        Axis, however, seeks to add certain *temporal* limitations to the term "static." Axis argues
4  that static refers to *when* signals are communicated over the virtual interconnection (i.e. each
5  signal is scheduled for a specific cycle of the pipeline clock). Resp. Brf. at 4. Axis, however, fails
6  to point to any proper support for such a construction. The precise time w*hen* the signals travel
7  along the static pathway is not claimed, nor is it a part of the definition of "static" as used by the
8  inventors. As a result, it should not be read in by Axis or this Court.

        3.    *The claim language itself, as well as the doctrine of claim differentiation, demonstrates other flaws in Axis's proposed definitions.*

11        In addition to improperly reading limitations into the claims from the specification, Axis's
12  definition of **virtual interconnection** and the claim terms contained therein also improperly read
13  limitations from dependant claims into independent claims. Furthermore, some of Axis's
14  definitions completely contradict the express language of the claims.

15        Claim 28 of the '484 Patent and its dependant claims illustrate some of these problems.
16  Claim 28 includes the following relevant limitation: "the logic module being configured to
17  communicate through virtual interconnections through *at least one pin*." Therefore, this claim
18  specifically contemplates that the **virtual interconnection** can communicate through *at least one*
19  pin, not "through a *single* pin" as Axis tries to incorporate into the definition of **virtual**
20  **interconnection**.[6]

21        More importantly, not until dependant claim 38 is there a requirement that communications
22  be performed within a **phase**. See also dependant claim 4 of the '484 Patent and dependant claim
23  5 of the '742 Patent. This demonstrates the numerous problems with Axis's incorporation of the
24  requirement of **phases** into the definitions of **multiplexed** ("across a different phase"), **pipelined**

---

[6] Similar contradictions exist with respect to Axis's definitions of **configurer** and **control signal**. Axis's definition of **configurer** does not account for the situation where it can further include a partitioner, which is specifically set forth in claim 20 of the '742 Patent ("wherein the configurer comprises a partitioner . . ."). With respect to **control signal**, Axis seeks to add "sequential logic" to the definition even though claim 31 of the '176 Patent discusses the use of **control signals** with *combinational* logic. Therefore, the adoption of any of these definitions proposed by Axis would be improper.

1  ("communicated in the same phase"), and **pipeline clock** ("within a phase"), which are in turn
2  used in Axis's definition of **virtual interconnections**. If the Court adopts these definitions, at a
3  minimum it would be reading limitations of a dependant claim into an independent claim. In such
4  an instance, the Federal Circuit has turned to the doctrine of claim differentiation to discourage
5  such a construction.[7] See Karlin Tech, Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 972 (Fed.
6  Cir. 1999) (claim differentiation disfavors reading into independent claims limitations found in
7  dependent claims).

8        The other problem with Axis's incorporation of **phases** into the definitions of **multiplexed**
9  and **pipelined** is that these proposed definitions would only describe a preferred embodiment of
10 the hardware needed to implement **virtual interconnections**. The requirement of communicating
11 in **phases** is a by-product of the preferred shift loop architecture set forth in Figure 6 of the
12 patents. The claims, though, were not intended to be limited in this manner. Rather, the
13 specification states that "[t]here are many possible ways to implement the hardware support for
14 virtual interconnections." '484 Patent at 7:67-8:2; '742 Patent at 7:27-28. In fact, one of the
15 advantages of using logic modules such as FPGAs rather than fixed hardware structures is that
16 they can be programmed to implement almost any type of logic, some of which would invariably
17 not require the communication of signals in phases. Therefore, once the phase requirement is
18 properly removed from the support on which Axis relies ("pipelining refers to signal streams in a
19 particular phase"), the definition of **pipelined** is clear. **Pipelined** refers to "signal streams" or
20 transmitting signals sequentially.

21 ///
22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28

---

[7] As pointed out in Plaintiffs' Opening Brief, Axis's proposed definition of **controller** has similar claim differentiation problems. Op. Brf. at 21.

**PLAINTIFFS' REPLY CLAIM CONSTRUCTION BRIEF - Case No.: 01-21079 JW**      **10**

1 **B. Axis's Definition of "Environment" is Unnecessarily Limiting.**

2 The primary dispute between the parties with respect to the '176 Patent is the definition of
3 **environment**. Axis seeks to define **environment** as limited to an external target system, and thus,
4 limit the applicability of the '176 Patent to "in-circuit emulation." An example of in-circuit
5 emulation is shown in Figure 1 of the '176 Patent:



13 In "in-circuit emulation," a cable runs from the emulation system and is plugged into a target
14 system. For example, if the logic design being emulated is a microprocessor and the target system
15 is a personal computer, the cable will plug directly into a board in the personal computer where the
16 microprocessor would ultimately be placed once manufactured.

17 When properly construed, however, the term **environment** also includes a host
18 workstation that is modeling the target system in software. Such a construction would properly
19 cover verification systems such as "accelerators" and "target-less emulation" shown below:



27 In such a system, software is running on the host workstation to configure the FPGAs in the
28 emulation system (the "configuration portion"), while at the same time, software is running that

**PLAINTIFFS' REPLY CLAIM CONSTRUCTION BRIEF - Case No.: 01-21079 JW**     **11**

1  models the **environment** in which the design is intended to operate (the "environment portion"). [8]

2  In our example above, the environment portion of the workstation would be modeling the

3  operation of the personal computer.

4        Support for this construction is found directly in the specification. The specification of the

5  '176 Patent explains that simulation devices, which involve modeling the logic design in software

6  on a workstation, operate "in response to timing signals from the **environment**." '176 Patent at

7  1:45-47, 3:10-12. Simulation devices do not use external target systems, but rather, the entire

8  operation is run in software. Thus, by linking simulation devices to timing signals from the

9  **environment**, the inventors contemplated and disclosed the existence of **environmental timing**

10  **signals** generated in a completely software-implemented system. Therefore, Axis's attempt to

11  limit the definition of **environment** (and thus, **environmental timing signal**) to a hardware

12  external target system should fail.

13  **C.    Modifiers Added to Remaining Claim Terms Are Not Needed.**

14        With respect to the remaining claim terms, Plaintiffs stand by the proposed definitions set

15  forth in the opening brief. It is only worth noting that for a number of the remaining terms in each

16  of the patents, Axis again improperly adds unnecessary modifiers. See <u>Johnson Worldwide</u>, 175

17  F.3d at 989 ("modifiers will not be added to broad terms standing alone"). For example, Axis

18  adds terms like "meaningful" in the definition of **communicate**, which begs the question, what is

19  "meaningful"? It similarly adds "synchronous logic design" to **inter-module/partition**

20  **dependencies** and terms such as "periodic signal" and "fixed" to claim terms **environmental**

21  **timing signal**, **internal clock**, and **sampled**. It is difficult to tell how Axis would try to use these

22  extraneous descriptive words in an attempt to bolster its noninfringement or invalidity theories.

23  The bottom line, however, is that the principles of claim construction do not allow a defendant or a

24  Court to simply redraft the claims to add unnecessary terms.

25

26  ──────────────────

27  [8] Axis's argument that the **internal clock** must be "invisible" to the **environment** does not conflict with Plaintiffs' definition of **environment**. The part of the workstation that configures the

28  system (and thus, is aware of the **internal clock**) is separate from, and generally does not communicate with, the simulator portion running on the workstation. Therefore, the **internal clock** would still be invisible to the portion that is the **environment**.

### III. CONCLUSION

For the reasons stated above, the Court should adopt Plaintiffs' proposed claim constructions.

DATED: April 19, 2002

SKJERVEN MORRILL LLP

By s/ Matthew J. Brigham
Matthew J. Brigham

Attorneys for Plaintiffs
IKOS SYSTEMS, INC. and MASSACHUSETTS
INSTITUTE OF TECHNOLOGY

862229 v4

**PLAINTIFFS' REPLY CLAIM CONSTRUCTION BRIEF - Case No.: 01-21079 JW**          **13**