1

2

3

4

5

6                                    NOT FOR CITATION

7

8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11                                   SAN JOSE DIVISION

12   IKOS   SYSTEMS,   INC.   AND   MASSACHUSETTS     NO. C 01-21079 JW
     INSTITUTE OF TECHNOLOGY,
13                                                    **ORDER RE CLAIM**
                   Plaintiffs,                        **CONSTRUCTION**
14
15      v.

16   AXIS SYSTEMS, INC.,

17                 Defendant.
     _____/       [Docket No. 32]
18

19          Plaintiffs Ikos Systems, Inc. ("Ikos") and Massachusetts Institute of Technology ("MIT")

20   initiated this patent infringement suit against Defendant Axis Systems, Inc. ("Axis").  Plaintiff filed a

21   complaint on February 7, 2001, asserting infringement of three United States Patents:  U.S. Patent No.

22   5,596,742 (the "'742 Patent") and U.S. Patent No. 5,761,484 (the "'484 Patent"), both entitled

23   "Virtual Interconnections for Reconfigurable Logic Systems"; and U.S. Patent No. 5,649,176 (the

24   "'176 Patent"), entitled "Transition Analysis and Circuit Resynthesis Method and Device for Digital

25   Circuit Modeling."  The technology at issue relates to the field of electronic design automation.  The

26   parties participated in a Markman hearing before this Court on May 3, 2002.

27          Claim construction is purely a matter of law, to be decided exclusively by the Court.  Markman

28   v. Westview Instruments, Inc., 517 U.S. 370, 387 (1996).  Claims are construed from the perspective

United States District Court
For the Northern District of California

1   of a person of ordinary skill in the art at the time of the invention.  Markman v. Westview Instruments,

2   Inc., 52 F.3d 967, 986 (Fed. Cir. 1995).  To determine the meaning of the claim terms, the Court

3   initially must look to intrinsic evidence, that is, the claims, the specification, and, if in evidence, the

4   prosecution history.  Autogiro v. United States, 384 F.2d 391 (Ct. Cl. 1967).  The Court must look first

5   to the words of the claims themselves.  See Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582

6   (Fed. Cir. 1996).  These words are to be given their ordinary and customary meaning unless it is clear

7   from the specification and prosecution history that the inventor used the term with a different meaning.

8   Id.  The claims should be interpreted consistently with the specification.  See Renishaw PLC v.

9   Marposs Societa' Per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998).  Arguments and amendments

10  made during prosecution of a patent application limit claim terms so as to exclude any interpretation

11  that was disclaimed during prosecution.  Southwall Tech., Inc. v. Cardinal IG Co., 54 F.3d 1570,

12  1576 (Fed. Cir. 1995).

13          Where intrinsic evidence alone resolves any ambiguity in a disputed claim term, it is improper

14  to rely on extrinsic evidence.  Vitronics, 90 F.3d at 1583, 1585.  However, extrinsic evidence may be

15  considered in the rare instances where the intrinsic evidence is insufficient to enable the court to

16  construe disputed claim terms.  Id. at 1585.

17  A.      The '742 and '484 Patents

18  1.      "Virtual Interconnections", "Static", "Statically Routed Communication Network",

19          "Pipelined", "Multiplexed", "Time-Multiplexed", "Phase"

20          A major point of contention with respect to the '742 and the '484 Patents centers on the

21  definition of "virtual interconnection(s)," a term found in each of the independent claims of the '742

22  Patent (Claims 1, 27, 32, and 34) and most of the independent claims of the '484 Patent (Claims 1, 21,

23  23, and 28) currently being asserted by Plaintiffs.  Plaintiffs and Defendant agree that this term was

24  coined by the inventors and has no clear meaning to those of ordinary skill in the art.  The parties

25  hence look to the specifications and prosecution history of the patents for their definitions.

26          Plaintiffs Ikos and MIT construe a "virtual interconnection" as "a logical electrical connection

27  implemented by sharing an inter-module connection with other logical electrical connections."

28                                                      2

1   Defendant Axis argues that Plaintiffs' definition is unduly broad and would encompass any

2   multiplexing of signals between logic modules, including the prior art.  Defendant looks to the

3   preferred embodiments of the '742 Patent and construes "virtual interconnections" to mean "logical

4   connections that result from the application of the technique of statically communicating synchronous

5   logical signals between logic modules through a single pin in a multiplexed, pipelined fashion wherein

6   each logical signal is scheduled for a specific cycle of the pipeline clock."  While the Court believes

7   that Plaintiffs' definition is unduly broad, Defendant's construction appears largely in keeping with the

8   language of the patents.  The specification of the '742 Patent relied upon by Plaintiffs for their

9   construction indicates that "virtual interconnections overcome pin limitations by intelligently

10  multiplexing each physical wire among multiple logical wires and pipelining these connections at the

11  maximum clocking frequency of the FPGA."  ('742 Patent at 2:9-14.)  Substituting Plaintiff's

12  definition in place of "virtual interconnections" would cause this and similar phrases throughout the

13  patents to lose their meaning.  The Court finds that the intrinsic evidence supports Defendant's

14  proposition that virtual interconnections are established "via a pipelined, statically routed

15  communication network."  ('742 Patent at 4:52-59; '484 Patent at 5:7-14.)  Moreover, the

16  specifications state unequivocally that "the use of virtual interconnections is limited to synchronous

17  logic."  ('742 Patent at 5:36-37; '484 Patent at 5:62-63.)  The Court construes a "**virtual**

18  **interconnection**" as "a logical connection resulting from the application of a technique that creates

19  multiple logical connections between logic modules through a single pin by sending time-multiplexed,

20  pipelined, synchronous logical signals over a statically routed communication network."[1]

21        The Court defines "**static**" to mean "that all data movement is determined and optimized at

22  compile-time."  ('742 Patent at 1:45-47; '484 Patent at 1:44-46.)  The Court construes "**statically**

23  **routed communication network**" consistent with the definition of "static" to mean that

24  "communication pathways, including the transmission of signals across the pins, are established at

25  compile-time based on an analysis of the signals in the circuit design before the FPGAs are

26  _____

27        [1]The Court understands "logical signals" to be signals that originate from the performance of a logic function, such
       as an "AND gate" or "OR gate".

28                                          3

1   configured."

2       The Court construes "**pipelining**" to mean "transmitting different logical signals sequentially in

3   a signal stream wherein each logical signal is transmitted in the same phase."  The Court's

4   construction of "pipelined" is consistent with the intrinsic evidence and combines elements of both the

5   Plaintiffs' and Defendant's definitions.  ('742 Patent at 4:50-52; '484 Patent at 5:5-7.)  "**Pipelined**"

6   means "transmitted through the technique of pipelining."

7       The Court construes "**multiplexing**" consistent with its well-understood usage to mean "the

8   sharing of a physical wire or pin among multiple logical wires."  In the context of virtual

9   interconnections, the term "multiplexing" is generally used to refer to the concept of time-multiplexing.

10  ('742 Patent at 2:9-12, 4:50-52, 5:31-33; '484 Patent at 2:21-24, 5:5-7, 5:58-61.)  Although the term

11  "time-multiplexed" is not specifically defined in the '742 and the '484 Patents and is mentioned only

12  in the claims, the specifications provide an effective construction of the term in their discussion of

13  multiplexing and virtual interconnections.  ('742 Patent at 2:9-12, 4:50-52, 5:31-33; '484 Patent at

14  2:21-24, 5:5-7, 5:58-61.)  The Court construes "**time-multiplexing**" to signify "a form of multiplexing

15  in which time is used to control the transmission of different logical signals through a pin wherein

16  each logical signal is communicated across a different phase."  The term "**multiplexed**" means

17  "transmitted through the technique of multiplexing."  The Court adopts Defendant's definition of a

18  "**multiplexer**" as a "device that generates multiplexed signals."

19      The Court adopts Plaintiffs' definition of "**phase**" as "a period within a target clock period

20  during which logic evaluation and communication between modules are performed."

21  2.   "Static Virtual Interconnections"

22      Plaintiffs argue that the existence of the term "static virtual interconnections" in some claims of

23  the '484 Patent negates Defendant's argument that virtual interconnections are inherently static.  ('742

24  Patent at 5:20; '484 Patent at 5:46.)  Plaintiffs argue that the inventors "purposefully added the term

25  'static' to describe virtual interconnection when they intended to limit the invention to having a static

26  or fixed nature."  (Pl. Reply Brief, at 7.)  The Court finds several problems, however, with Plaintiffs'

27  reasoning. First, Plaintiffs acknowledge that they are not construing the term "static" in the same

28                                                    4

United States District Court

For the Northern District of California

manner as Defendant, namely to refer to the determination of data movement at the time of compilation. Instead, Plaintiffs argue that "static" refers to "the *route* a logic signal takes or the *location* of a virtual interconnection not changing." (Pl. Reply Brief, at 8.) In this context, a signal propagated through a "static virtual interconnection" will always travel via the same predetermined path. While Plaintiffs' construction may differentiate "static virtual interconnections" from "virtual interconnections," Plaintiffs' definition of "static" is distinct from the definition proffered by the Defendant and therefore does not necessarily nullify Defendant's definition of "virtual interconnection". Second, the Court construes "static" to refer "to the fact that all data movement can be determined and optimized at compile-time," consistent with the definition given in the specifications. ('742 Patent at 1:45-47; '484 Patent at 1:44-46.) In order to avoid the unsupported assignment of two separate definitions to the same term within the same patents, the Court must reject Plaintiffs' construction. Finally, the prosecution history of the patents in question lead the Court to conclude that the existence of the term "static virtual interconnections" in some claims of the '484 Patent does not negate, but rather reaffirms and emphasizes, the inherently static nature of "virtual interconnections". (Def. Brief, at 14.) The term "**static virtual interconnections**" is construed to have the same meaning as "virtual interconnections" by the Court.

3. "Communication", "Communication Path"

Plaintiffs construe "**communication**" as "the transmission of information from one point to another." The Court adopts Plaintiffs' definition and rejects Defendant's suggestion that the modifier "meaningful" be added before the word "transmission".

The parties agree on, and the Court adopts, the definition of "**communication path**" as "a route over which signals are communicated."

4. "Statically Communicating"

The term "statically communicating" only appears in Claim 17 of the '484 Patent, the only independent claim in either the '484 Patent or the '742 Patent that does not recite "virtual interconnections." The Court construes "**statically communicating**" to mean "communicating in a manner in which all data movement is determined and optimized at compile-time and the

communication patterns repeat in a predictable fashion." This construction is based on the specifications in the patents that address the term "static" and its meaning in the context of communications. ('742 Patent at 1:44-46, 5:19-21; '484 Patent at 1:43-45, 5:45-47.)

5.    "Configurer"

Plaintiffs construe "configurer" to mean "a system including software that implements a compiler to realize logic circuit elements in a reprogrammable logic module." Defendant defines the term as "a system or element that configures the logic system to perform a desired logic operation or calculation." The Court adopts a modified form of the Defendant's construction of "**configurer**" to mean "a system that configures the logic system to perform a desired logic operation or calculation."

6.    "Intermodule Dependencies", "Interpartition Dependencies"

Plaintiffs construe "**intermodule dependencies**" and "**interpartition dependencies**" to refer to "a relationship between two signals in different logic modules/partitions whereby the value of one signal in one logic module/partition depends on the value of the other signal in the other logic module/partition." Defendants essentially argue that the phrase "of a synchronous logic design" should be added to qualify the term "modules/partitions" to limit the above definition. The Court adopts Plaintiffs' definition without the qualifying language proposed by Defendant.

7.    "System Clock Period" (also called "Pipeline Clock Period")

Plaintiffs construe "system clock period" as "the period of the clock signal providing a high frequency of operation in a logic module within the reconfigurable electronic system." Defendant construes the term to mean "the period of a fixed frequency clock signal that controls the pipelining of signals within a phase of the target clock (i.e., the period of the pipeline clock)." The Court adopts a modified form of Defendant's definition of "**system clock period**" to mean "the period of a clock signal that dictates the maximum rate at which signals in the electronic system change value and controls the pipelining of signals within a phase of the target clock (i.e., the period of the pipeline clock)." ('742 Patent, Claims 7-9, at 6:7-9; '484 Patent, Claim 6.)

6

1    B.      Claims of the '176 Patent

2    1.      "Environment", "Environmental"

3    Plaintiffs construe "environment" to mean "a circuit or system external to the configurable

4    logic system with which the configurable logic system interacts (e.g., a host workstation or a target

5    system)."  Defendant contests the inclusion of the "host workstation" in the definition of environment

6    and argues that the claims and specifications of the '176 Patent restrict the definition of environment to

7    a circuit or system "in which the circuit design implemented in the configurable logic is intended to

8    operate (i.e., a target system)."  The Court agrees with Plaintiffs that the term environment is used in

9    the specifications to refer both to a target system, i.e., "the intended environment" or "the environment

10   in which the logic system is intended to ultimately function," and a host workstation, depending upon

11   the context.  ('176 Patent at 1:41-50, 10:65-66.)  For example, in discussing verification systems such

12   as "hardware accelerators," the specifications refer to a host workstation that is modeling the target

13   system in software as the "environment."  ('176 Patent at 1:41-50.)  In such target-less emulation, the

14   host workstation assumes the role of the "intended environment" referred to in the specifications.  Id.

15   Defendant highlights a potential problem with the inclusion of "host workstation" in

16   "environment" even under limited circumstances.  The specifications require the internal clock, which

17   forms a part of the configurable logic system, to be "invisible to the environment."  ('176 Patent at

18   3:12-13.)  This condition would preclude the host workstation, which is necessarily aware of the

19   internal clock as it configures the configurable logic system, from being a part of the environment.  The

20   Court agrees with Plaintiffs, however, that in the context of hardware accelerators and target-less

21   emulation, the part of the host workstation simulating the target can still be construed as the

22   "environment" and considered separate from the part configuring the configurable logic system.

23   The Court construes "**environment**" to mean "a system or circuit external to the configurable

24   logic system, and external to the host workstation where a separate target system is present, in which

25   the circuit design implemented in the configurable logic is intended to operate."

26

27   2.      "Environmental Timing Signal"

28                                                    7

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    Plaintiffs would like the Court to construe an "environmental timing signal" as "a timing signal

2    from the 'environment' that represents a timing signal from the original (user's) circuit design."

3    Defendant argues that the term "environmental timing signal" must (i) be periodic and have a fixed

4    frequency, (ii) have a frequency that is lower than the internal clock frequency, and (iii) be sampled by

5    the internal clock to produce a data input to the controller.  The Court construes  "**environmental**

6    **timing signal**" as "a timing signal originating from the environment with a frequency that is lower than

7    the internal clock frequency."  ('176 Patent at 2:53.)

8    3.    "Internal Clock", "Resynthesis"

9    Plaintiffs propose that "internal clock" simply "provides a time base for the resynthesized

10   circuit's operation."  Defendant construes "internal clock" to mean "a periodic signal of fixed

11   frequency, existing within the configurable logic system and invisible to the environment, which

12   provides the time base for scheduling the operation of the configurable logic system (i.e., the pipeline

13   clock)."  The Court incorporates elements from both constructions to construe the "**internal clock**," or

14   "virtual clock", as "a signal existing within the configurable logic system and invisible to the

15   environment that provides a time base for scheduling the operation of the resynthesized circuit." ('176

16   Patent at 2:53-54, 3:12-13, 4:37-40, Fig. 4A.)

17   The Court adopts Defendant's definition of "**resynthesis**" as "transforming a circuit design

18   into a new design following an initial synthesis and analysis of the original circuit design."

19   4.    "Buses"

20   Plaintiffs define "buses" as "an interface system to connect a number of devices."  The Court

21   adopts Defendant's construction of "**buses**" as "common electrical pathways between circuit

22   elements" based on the language in the claims.  ('176 Patent, Claims 8, 11.)

23   5.    "Configuring the Logic System"

24   Defendant defines "configuring the logic system" to mean "implementing the logic within the

25   configurable logic system to perform a desired logic operation or calculation."  The Court adopts

26   Plaintiffs' construction of "**configuring the logic system**" as "compiling and loading into a

27   configurable logic system" based on the language in the claims and the specifications.  ('176 Patent

28

8

Claims 1 and 4, 1:31-33.)

6.    "Control Signal", "Controller", "Controller Means"

Plaintiffs define "control signal" as "a signal that coordinates the application of logic operations." Defendant construes "control signal" to mean "an output from a controller that is used to dictate the operation of the sequential logic in the configurable logic system." The Court adopts a modified version of the Defendant's definition of "**control signal**" to mean "an output from a controller that is used to coordinate the operation of the sequential logic in the configurable logic system." ('176 Patent, 3:18-23, 3:26-27, 8:53-57.)

The Court construes "**controller**" or "**controller means**" to mean "a circuit configured into the logic system that coordinates the logic operations of the logic system in response to the internal clock signal and the environmental timing signal." Plaintiffs argue that a "controller" or "controller means" is "a circuit configured into the logic system capable of coordinating the logical operations of the logic system." Defendant argues that the definition must refer to "a finite state machine" that "dictates" operations "in response to an internal clock signal and a sampled environmental timing signal." The Court incorporates elements of both definitions into its construction, but rejects the specification of the "finite state machine", a preferred embodiment, into the definition based on the language of the claims and the specifications. ('176 Patent Claims 1-3, 12, 13, 27, 28, 40, at 3:7-10, 3:66-4:5.) The Court also finds persuasive Plaintiffs' argument that inclusion of the "finite state machine" language in the definition would render dependent Claim 3 redundant of independent Claim 1. ('176 Patent Claims 1-3.)

7.    "Sampled", "Sampling"

Defendant construes "sampled" and "sampling" to mean "processed or processing at fixed, periodic intervals." The Court adopts Plaintiffs' construction of "**sampled**" and "**sampling**" as "the process by which a component (e.g., a state element) captures a signal value carried at a given point in time." ('176 Patent at 12:32-35.)

8.    "Synchronize", "Synchronizer"

Defendant construes "synchronize" to mean "align a periodic signal to another periodic reference signal in real time."  The Court construes "**synchronize**" as "to make a version of a signal that is synchronous (i.e., has a defined timing relationship) with a reference signal."  The Court further adopts Plaintiffs' construction of "**synchronizer**" as "a circuit for synchronizing."  ('176 Patent at 9:55-60.)

Dated: June 18, 2002                                             /s/ James Ware
                                                        JAMES WARE
                                                        United States District Judge

02046263jwlc3civ

**United States District Court**

For the Northern District of California

10

**United States District Court**
For the Northern District of California

1    **THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

2

3    Edward V. Anderson
Skjerven Morrill LLP
4    25 Metro Drive, Suite 700
San Jose, CA 95110
5    Tel: (408) 453-9200
Fax: (408) 453-7979
6

7    David A. York
David Foster
8    James L. Day Jr.
Latham & Watkins
9    135 Commonwealth Drive
Menlo Park, CA 94025
10    Tel: (650) 329-4600
Fax: (650) 463-2600
11

12    George A. Riley
David R. Eberhard
13    Luann L. Simmons
O'Melveny & Myers LLP
14    Embarcadero Center West
275 Battery Street
15    San Francisco, CA 94111-3305
Tel: (415) 984-8700
16    Fax: (414) 984-8701

17

18

19

20    **Dated:**                         **Richard W. Wieking, Clerk**

21

22                                       **By:**_____
                                         **Ronald L. Davis**
23                                          **Courtroom Deputy**

24

25

26

27

28